## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| SCHNEIDER LIMITED PARTNERSHIP, <br><br> Claimant, <br><br> v. <br><br> MERIDIAN SURGICAL PARTNERS – MONTANA, LLC, and MERIDIAN SURGICAL PARTNERS, LLC, <br><br> Respondents. | Case No. 65-20-1400-0026 <br><br><br><br> **FINDINGS OF FACT, CONCLUSIONS OF LAW AND INTERIM AWARD** |

THE UNDERSIGNED ARBITRATOR, David A. Ranheim, was designated in accordance with the written arbitration agreement in the applicable March 4, 2011, Operating Agreement of Orthopedic Neuro Institute Surgical Center, LLC (Joint Ex. 3).

Following extensive pre-hearing discovery, motion practice and briefs, the matter came on for hearing before the Arbitrator on June 15, 2016, and continued through June 24, 2016. David M. Clark and Gregory Constanza appeared on behalf of Claimant Schneider Limited Partnership ("SLP"). E. Steele Clayton IV, J. Taylor Chenery and Doug James appeared on behalf of Respondents Meridian Surgical Partners-Montana, LLC ("MSP-Montana") and Meridian Surgical Partners, LLC ("Meridian").

Evidence submitted at the hearing included live and video testimony from fact and expert witnesses and a substantial number of exhibits, some of which were designated portions of transcripts of depositions and other relevant proceedings. Following the hearing, counsel submitted their respective detailed proposed findings of fact and conclusions of law, along with post-hearing briefs, all of which the Arbitrator has carefully reviewed and considered. Following

**EXHIBIT**

**3**

tabbies®

receipt of the post-hearing submissions, the hearing was declared closed on September 15, 2016, and pursuant to agreement of counsel the time for issuing the Arbitrator's award was set at October 31, 2016.

Based upon all of the foregoing, the Arbitrator makes the following Findings of Fact, Conclusions of Law and Interim Award:

## INTRODUCTION

This arbitration involves claims arising out of the failure to open an ambulatory surgery center ("ASC") in Billings, Montana, as envisioned by Dr. John H. Schneider, a neurosurgeon and, through a revocable trust, one of the original partners in SLP. Meridian is in the business of investing in and managing ASCs throughout the country and was enlisted to help Dr. Schneider realize his vision.

Using a variety of legal rubrics and theories, described in more detail below, SLP claims that Meridian and MSP-Montana are responsible for the failure of the surgery center to open and are liable for damages allegedly suffered by SLP as a result. Respondents counter that it is Dr. Schneider's own misconduct that is responsible for the failure of the surgery center to open and that SLP, as Dr. Schneider's alter ego, is liable for damages allegedly suffered by Respondents as a result.

## FINDINGS OF FACT

### A.  Meridian, MSP-Montana and ONI LLC

1.  Kenny Hancock, Catherine Kowalski, and Jim Uden developed the business plan for Meridian in 2005 and began trying to identify potential funding sources to capitalize the company. Meridian became operational in March 2006 as a Delaware LLC. Hancock Tr. 753:24 – 756:24; Joint Ex. 1.

2

2.      Since 2006, Mr. Hancock has been Meridian's Chief Development Officer, and Ms. Kowalski has been Meridian's Chief Operating Officer. Hancock Tr. 757:4-15; Kowalski Tr. 1311:14 – 1312:5.

3.      Prior to co-founding Meridian, Mr. Hancock was a founder and Chief Development Officer of OrthoLink Physicians Corporation, which consolidated orthopedic surgeon practices and developed business opportunities outside of the surgeons' professional fees such as ASCs, imaging and real estate. OrthoLink had 225 orthopedic surgeon partners. From 1996 – 2000, OrthoLink developed eight de novo ambulatory surgery centers ("ASCs"). Hancock Tr. 743:15 – 745:5.

4.      In 1997, Ms. Kowalski became a part of the OrthoLink team when the company she was working for, Ortho Excel, was acquired by OrthoLink. Kowalski Tr. 1309:18-22.

5.      At OrthoLink, Mr. Hancock had experience with eight de novo ASCs that obtained transfer agreements and became operational and three ASCs that were in the development phase at the time OrthoLink was sold in 2000. Hancock Tr. 745:6 – 746:2.

6.      The ASCs that OrthoLink developed sometimes encountered resistance from hospitals when asked to enter into a transfer agreement from a hospital, but all eight ASCs received transfer agreements. Hancock Tr. 746:3-14.

7.      One of OrthoLink's ASCs obtained a transfer agreement with a hospital located directly across the street that had previously rejected OrthoLink's request to build the surgery center on the hospital's campus. Hancock Tr. 745:20 – 748:4.

8.      After OrthoLink was sold, Mr. Hancock and Ms. Kowalski founded Surgical Alliance Corporation, which provided all services related to surgical procedures except for

3

inpatient care.  Surgical Alliance focused on orthopedic surgeons and neurosurgeons.  Hancock Tr. 748:5 – 749:13.

9.    Surgical Alliance recruited 34 orthopedic surgeons to join together and develop a de novo surgical hospital in Columbus, Ohio.  Hancock Tr. 750:2-751:2.

10.    Surgical Alliance developed a de novo ASC in Nashville, Tennessee with fifteen orthopedic surgeons.  Hancock Tr. 751:3-16.

11.    Ms. Kowalski was in charge of the regulatory issues associated with getting Surgical Alliance's de novo projects operational.  Hancock Tr. 751:17-22.

12.    Buddy Bacon and John Wilson also joined Meridian in 2006.  Wilson Tr. 1400:15-23.

13.    Mr. Bacon served as the Chief Executive Officer of Meridian from 2006 to 2013.  Joint Ex. 412, Bacon Dep. 11:13-24.

14.    Mr. Wilson served as the Chief Financial Officer of Meridian from 2006 to 2013 and has been the Chief Executive Officer from 2013 to present.  Wilson Tr. 1400:23 – 1401:12, 1402:16-20.

15.    Mr. Bacon worked in public accounting from 1986 to 1996.  From 1996 to 2005, Mr. Bacon worked for healthcare companies serving as CFO, COO, and CEO.  Joint Ex. 412, Bacon Dep. 8:8 – 9:11.

16.    Mr. Wilson has a Masters of Accountancy and received his certified public accountant certification.  He worked in public accounting from 1994 to 2000. Wilson Tr. 1395:4 – 1397:2.

17.    From 2001 to 2006, Mr. Wilson worked for healthcare companies serving as CFO and COO.  Wilson Tr. 1396:7 – 1400:22.

4

18.      When Meridian was founded, it received a $75 million capital investment from Arcapita Investment Management.  Arcapita is headquartered in Bahrain and has offices in Atlanta, London, and Singapore.   Meridian primarily dealt with Arcapita's Atlanta office. Arcapita has invested in various companies including Caribou Coffee, PODS Moving and Storage, Cirrus Aircraft, J. Jill Apparel, and Church's Chicken, among others.  Hancock Tr. 757:22 – 759:19; Wilson Tr. 1407:21 – 1408:16.

19.      Because some of Arcapita's investors adhere to Sharia law, its portfolio companies, such as Meridian, must use capital lease financing structures that do not require the portfolio company to pay or receive interest.  Wilson Tr. 1407:17 – 1408:16; Hancock Tr. 760:3 – 14.

20.      Other than the prohibition on paying interest, Meridian is not required to follow any other aspects of Sharia law, its employees are not required to adhere to Sharia law and none of its investors, including those that invested in Orthopaedic Neuro Institute Surgical Center, LLC ("ONI" or "ONI LLC"), a Delaware LLC formed for the purpose of opening and operating ONI, are required to adhere to Sharia law.  Wilson Tr. 1410:9-24; Joint Exs. 3 and 4.

21.      ONI Realty Investors, LLC, ("ONI Realty") is a Delaware LLC formed on May 21, 2010 for the purpose of owning and managing the real estate that was to house the ONI ASC. Hancock Tr. 782:11-18. ONI would lease an 8,000 square foot surgical suite in a large medical complex that was constructed by ONI Realty. Hancock Tr. 782:25-783:18.

22.      In its first year in 2006, Meridian acquired ownership interests in three ASCs. Hancock Tr. 757:14 – 21.

5

23.     By 2009, Meridian had acquired approximately six ASCs.  At that time, Meridian held ownership in two de novo ASCs that were complete or substantially complete and two other de novo ASCs that were in the early stages of development.  Hancock Tr. 761:3-12.

24.     MSP-Montana is a LLC duly formed under Delaware law for the purpose of holding an ownership interest in ONI LLC and providing management services to ONI LLC and has always been in good standing.  The sole member of MSP-Montana is Meridian.  MSP-Montana is governed by an operating agreement.  Wilson Tr. 1474:5 – 1475:14; Joint Exs. 50 and 5.

25.     MSP-Montana has officers and a board of directors. The Board of Directors met to approve the investment in ONI and subsequently had meetings to discuss ONI as needed. Wilson Tr. 1474:9-16, 1477:6-20.

26.     MSP-Montana is a disregarded entity for tax purposes which means that MSP-Montana does not file a tax return and income or loss is instead included on Meridian's tax return since it is the sole member of MSP-Montana.  Wilson Tr. 147:10 – 1476:2, 1509:22 – 1510:7.

27.     MSP-Montana did not receive any management fees because the fees were a percentage of ONI's collections and ONI did not operate.  Wilson Tr. 1476:5-24.

28.     MSP-Montana did not set up a separate bank account because ONI never became operational and there were no management fees being collected by MSP-Montana.  Wilson Tr. 1476:25 – 1477:5.

29.     MSP-Montana is consolidated with Meridian for financial accounting purposes and therefore a separate set of financial records was not maintained because any entries on MSP-Montana's books would be eliminated in the consolidation process.  Wilson Tr. 1510:8-18.

30.     MSP-Montana had assets consisting of its investment in ONI and the Management Services Agreement. Wilson Tr. 1476:3-13.

**B.      SLP and Dr. Schneider's Concept of an ASC in Billings, Montana**

31.     SLP is a Wyoming limited partnership organized in 2007 and subject to the provisions of W.S. §17-14-101, et. seq. Joint Ex. 137. SLP was created as part of the Schneiders' business and estate planning objectives. Joint Ex. 392, Schneider Dec. Dep. 140:8-20; Joint Ex. 392, Schneider May Dep. 36:19-21. SLP was and continues to be the owner of an interest in ONI and ONI Realty. In addition to the interests associated with the ONI project, SLP has held other related assets from time to time but its primary continuing asset is its interests in the ONI project. Joint Ex. 392, Schneider Dec. Dep. 149:1-150:6.

32.     At the times leading up to the present dispute, the ownership and management structure of SLP was as follows:

        a.   The John Schneider Revocable Trust (John's Trust) was a limited partner holding a 49.5% interest in the partnership. Joint Ex. 392, Schneider Dec. Dep. 147:17-24; Joint Ex. 393, Schneider 341 Tr. (March 23, 2015) 48:32-49:10. However, pursuant to the provisions of the partnership agreement governing SLP, the interest held by Dr. Schneider's revocable trust was forfeited when Dr. Schneider filed a Chapter 7 bankruptcy petition. Joint Ex. 392, Schneider May Dep. 34:5- 35:18. As part of a far reaching settlement with the United States Bankruptcy Trustee, all interest in Schneider Management and all limited partnership interests in SLP became property of Michelle Schneider, Dr. Schneider's wife, or her designee. Schneider Tr. 434:25-435:10.

7

b.  The Michelle Schneider Revocable Trust (Michelle's Trust) was a limited
    partner holding a 49.5% interest in the partnership. Joint Ex. 392,
    Schneider Dec. Dep. 147:17-24; Joint Ex. 393, Schneider 341 Tr. (March
    23, 2015) 48:32-49:10. As noted above, the filing of Dr. Schneider's
    bankruptcy resulted in Michelle's Trust holding all limited partnership
    ownership interests in SLP, as well as all ownership interests in Schneider
    Management.

c.  Schneider Management, LLC, ("Schneider Management") is a Wyoming
    LLC organized in 2007 and subject to the provisions of W.S. §17-29-101,
    et. seq. Joint Ex. 138. Schneider Management was the general partner of
    SLP and held a 1% interest in the partnership. Joint Ex. 392, Schneider
    May Dep. 40:13-17; Joint Ex. 393, Schneider 341 Tr. (March 23, 2015)
    48:32-49:10; Schneider Tr. 418:22-25. John's Trust and Michelle's Trust,
    in turn, held the ownership interests in Schneider Management. Joint Ex.
    392, Schneider Dec. Dep. 147:25-148:5; Joint Ex. 393, Schneider 341 Tr.
    (March 23, 2015) 74:32-43.

d.  As the events unfolded leading to an investment in the ONI Center and
    through the year 2011, Dr. Schneider acted as the manager of Schneider
    Management, which as noted above, was in turn the general partner of
    SLP. Joint Ex. 392, Schneider Dec. Dep. 148:6-15; Joint Ex. 392,
    Schneider May Dep. 103:8-15; Schneider Tr. 418:2-12. In 2012, Kathleen
    Burrows, Dr. Schneider's sister, became the manager of Schneider
    Management. Joint Ex. 392, Schneider Dec. Dep. 148:16-19; Schneider

8

Tr. 429:8-20; Joint Ex. 393, Schneider 341 Tr. (March 23, 2015) 51:19-20. Then, in February of 2015, Michelle Schneider became the manager of Schneider Management. Joint Ex. 392, Schneider Dec. Dep. 148:20-21. Dr. Schneider currently does not hold an ownership or management position with SLP or Schneider Management, either individually or through his revocable trust. Joint Ex. 392, Schneider May Dep. 102:22-24.

33.    Dr. Schneider is a board-certified, fellowship-trained neurosurgeon who was first licensed to practice in Montana in 1996. At various times thereafter he lived and successfully practiced in Billings, Montana and Cody, Wyoming.

34.    As early as 2007 or 2008, Dr. Schneider began contemplating and laying the groundwork for opening an ASC in Billings, Montana as an extension of his Wyoming practice. Schneider Tr. 134:13-19. Dr. Schneider began looking into the regulatory requirements for an ASC and contacted Mr. Roy Kemp, the State of Montana regulator for ASCs, to inquire if he needed a Certificate of Need to open and operate an ASC. Schneider Tr. 140:12 – 141:5, 258:11-16; Joint Ex. 411, Trier Dep. 25:11-26:5.

35.    The first contact or conversation that anyone at Meridian had about a potential ASC project in Billings, Montana was when Teresa Trier, on behalf of Dr. Schneider, approached Chris Suscha at the Becker's ASC conference in Chicago in June 2009. Suscha Tr. 815:3 – 8:15:18; Joint Ex. 411, Trier Dep. 26:16-24; Hancock Tr. 763:14 – 765:5.

36.    At the time, Ms. Trier was the medical practice administrator for Northern Rockies Neuro-Spine ("Northern Rockies"), a business owned by Dr. Schneider located in Billings, Montana. Ms. Trier worked in that capacity from approximately 2005 to 2012. While Ms. Trier would play an important administrative role in the implementation of the Billings ASC,

9

Ms. Trier had neither the time nor the expertise to spearhead this project and an outside development partner such as Meridian was required. Schneider Tr. 139:19-140:6, 141:8-18; Joint Ex. 411, Trier Dep. 12:10-16, 13:17–15:3, 32:20-23, 33:20-34:2.

37.     In 2009, Chris Suscha was Meridian's Vice President of De Novo Development. Mr. Suscha worked in healthcare valuation and investment prior to joining Meridian and was responsible for identifying markets in which there was interest in developing a de novo ASC and determining whether an ASC was economically viable in that market. Suscha Tr. 813:11 – 814:23.

38.     After meeting Ms. Trier at the 2009 Becker's ASC conference, Ms. Trier informed Mr. Suscha that she worked for Dr. Schneider and that Dr. Schneider was interested in building an ASC in Billings, Montana. Suscha Tr. 815:19 – 816:7.

39.     Dr. Schneider and Teresa Trier's initial contact with Meridian in 2009 was unsolicited. Meridian had not previously considered opening an ASC in Montana and had not previously identified Montana as a target market for developing an ASC. Hancock Tr. 765:6 – 16.

40.     Mr. Suscha did not meet Dr. Schneider at the 2009 Becker's ASC conference in Chicago. For some period of time following the initial contact with Ms. Trier at the 2009 Becker's ASC conference, Mr. Suscha had contact strictly through Ms. Trier before he ever spoke to Dr. Schneider directly. Suscha Tr. 816:8-11, 819:21 – 820:6.

41.     Kenny Hancock's first contact with Dr. Schneider occurred on a conference call in late 2009 or early 2010, months after the Becker's conference in Chicago. On that call, Dr. Schneider explained his vision for a prospective ASC that he felt needed to be in Billings,

Montana because Billings was the epicenter for trade and healthcare in that region of the country. Hancock Tr. 766:14 – 767:24.

42.     Dr. Schneider represented to Meridian on the initial conference call that he had previously practiced in Billings, had a home in Billings, and was seeing patients in Billings. Dr. Schneider explained to Meridian that people in that region of the country commonly drove up to five hours to come to the Billings market for goods and services, including healthcare. Dr. Schneider represented to Meridian that he knew surgeons in Billings and in Cody, Wyoming with whom he had practiced who would be interested in practicing at an ASC in Billings. Hancock Tr. 768:2 – 24.

43.     In 2005, Dr. Schneider drew patients from a large area and a lot of patients living in Wyoming came to Billings, Montana to see him at Northern Rockies. As a result, Dr. Schneider performed surgeries in Cody, Wyoming, Powell, Wyoming, and Sheridan, Wyoming. From 2005 to 2012, Dr. Schneider exclusively performed surgeries in Wyoming. Joint Ex. 411, Trier Dep. 15:4-18, 16:16 – 17:20.

44.     Mr. Suscha testified that he has never been to Northern Rockies and that neither Dr. Schneider nor Teresa Trier ever asked him to visit Northern Rockies or speak with anyone there. Suscha Tr. 844:25 – 846:12.

45.     After the initial conversation with Dr. Schneider, Meridian conducted due diligence related to a potential ASC project with Dr. Schneider in Billings. Mr. Hancock and Mr. Suscha were responsible for conducting due diligence for the ONI Center. Hancock Tr. 768:25 – 771:19; Joint Ex. 412, Bacon Dep. 31:14-16.

46.     When considering a new de novo ASC project, Meridian considers who the potential surgeon partners are and whether Meridian wants to do business with those people.

11

Meridian also considers the surgeons' case volumes and the scope of the proposed project. Hancock Tr. 762:13 – 763:13.

47.     As part of its due diligence, Meridian obtained Dr. Schneider's historical case volumes from Ms. Trier. Meridian would not pursue an ASC project without examining case volume data for the surgeons involved. Meridian reviewed the case volume and case mix data from Dr. Schneider's practice and conducted due diligence into Dr. Schneider's background. Based on that diligence, Meridian concluded that Dr. Schneider had a strong practice as a neurosurgeon, and no issues were identified in Dr. Schneider's past that would be cause for concern. Hancock Tr. 768:25 – 771:19; Suscha Tr. 820:7 – 822:3.

48.     In July 2009, Dr. Schneider began reaching out to potential physician investors, including Drs. Stephen Emery and Frank Schmidt, about his vision for an ASC in Billings. Schneider Tr. 261:19 – 262:18, 263:11 – 264:7; Joint Ex. 114; Joint Ex. 116.

49.     On February 26, 2010, Dr. Schneider wrote to the Advanced Care Hospital of Montana stating that he would be submitting his application for privileges at the hospital so that if he needed to transfer a patient from ONI, he could transfer the patient to the Advanced Care Hospital. Joint Ex. 118; Schneider Tr. 407:3 – 409:12.

50.     On March 29, 2010, Dr. Schneider wrote a letter to Andrew Baker, CRNA, stating:

> As we have discussed this last year, several local providers expressed interest in the Orthopedic Neurological Institute concept. This will be a multidisciplinary collective of independent practitioners who utilize common resources to provide a comprehensive musculoskeletal care through Southern Montana and Northern Wyoming.

Dr. Schneider also stated:

> Meridian Surgical Partners is utilizing my information to project a bare bones Pro-Forma on a single suite surgical center located within the orthopedic

12

> neurological institute building, located on the west end of Billings, Montana.
> Location and operations construction plans are currently progressing. . . The
> Advanced Care Hospital located proximate to the ONI facility will provide
> transfer care services.

Dr. Schneider sent identical letters to Drs. Schmidt, Emery, Jay Winzenried, and others. Joint

Exs. 120, 380; Schneider Tr. 264:8 – 265:7, 410:14 – 411:7.

51.     After performing due diligence on the Billings market and receiving and

reviewing case-specific data from Dr. Schneider, Meridian obtained case volume data related to

other potential physician investors in ONI LLC. Based on the information that it had received

from the surgeons, Meridian created some financial modeling of a potential ASC project in

Billings under multiple different scenarios. Suscha Tr. 822:4 – 823:16.

52.     Following Meridian's due diligence period, Dr. Schneider and Meridian agreed to

an initial in-person meeting in Cody, Wyoming in April 2010 to discuss further a potential ASC

project in Billings. Meridian understood that it was involved in a competitive process with other

potential management companies with respect to the potential ASC project in Billings. Hancock

Tr. 771:20 – 772:23.

53.     In April 2010, Chris Suscha and Kenny Hancock traveled to Cody, Wyoming to

meet with Dr. Schneider and other potential investors in the Billings ASC project. At that point,

Meridian had not yet agreed to invest money in Dr. Schneider's proposed project. Dr. Schneider,

Teresa Trier, Dr. Schmidt, Dr. Emery, Dr. Winzenried, Andy Baker, and a handful of other

surgeons attended the April 2010 meeting. Dr. Schneider arranged for the other surgeons to

attend the meeting and Meridian was introduced to those surgeons for the first time at that

meeting. Hancock Tr. 770:14 – 24, 772:24 – 773:21;  Suscha Tr. 823:17 – 824:16; Schneider Tr.

266:17 – 267:4.

13

54.    At the April 2010 meeting, Dr. Schneider discussed his vision for a comprehensive regional spine and orthopedic focused ASC in Billings.  Hancock Tr. 773:22 – 774:13.

55.    At the April 2010 meeting, Meridian provided a handout to the potential physician investors that included financial modeling based on case volume data that Dr. Schneider had provided to Meridian.   Hancock Tr. 774:14 – 776:16; Suscha Tr. 825:16 – 826:15, 831:4 – 831:16; Joint Ex. 414, Winzenried Dep. (Sept. 23, 2015) 21:7 – 22:21; Joint Ex. 17.

56.    In advance of the April 2010 meeting with potential investors, Dr. Schneider and Teresa Trier reviewed and approved the presentation that Meridian provided to the potential investors, including the financial modeling and scenarios that were based on case volume data that Dr. Schneider and Teresa Trier had provided to Meridian.  Suscha Tr. 824:23 – 828:12, 831:4 – 831:16; Joint Ex. 122.

57.    According to the financial scenarios presented at the April 2010 meeting, spine cases performed by Dr. Schneider would account for 28% of the case volume but more than 80% of the ASC's total revenue.  Suscha Tr. 828:23 – 830:23; Hancock Tr. 776:17 – 778:1; Joint Ex. 17 at MSPM 001295 - 001297.

58.    The parties at the April 2010 meeting discussed that the project would entail two separate and distinct partnerships – one related to the ASC and one related to the real estate on which the ASC would be located.  Meridian was only involved in the ASC side of the project. Hancock Tr. 778:2 – 25.

59.    A representative of Prime Healthcare, Mark Samples, attended the April 2010 meeting to discuss the physician investors' potential investment in the real estate.  Neither

14

Meridian, MSP-Montana nor Arcapita holds any ownership interest in Prime Healthcare. Hancock Tr. 780:6 – 781:2.

60.     ONI Realty LLC was established for the purpose of investing in the real estate aspect of the Billings ASC project. ONI Realty is a separate and distinct entity from ONI LLC. Respondents have never held an interest in ONI Realty. Hancock Tr. 781:3 – 782:15.

61.     ONI Realty owned the comprehensive medical office building in Billings that included the surgery center, clinic space for Dr. Schneider and Drs. Emery, Schmidt and Winzenried, an imaging center, and vacant space that was intended for physical therapy and rehabilitation services. ONI LLC leased the surgery center suite from ONI Realty. Hancock Tr. 782:11 – 783:18.

62.     The parties at the April 2010 meeting discussed that all investors in the project would have to guarantee the ASC's debt obligations in accordance with each investor's pro rata ownership interest in the ASC. Hancock Tr. 779:1 – 780:5.

63.     The only reservation raised at the April 2010 meeting was by Dr. Schmidt who did not want to take call at a Billings hospital. Hancock Tr. 784:15 – 785:1.

64.     Kenny Hancock testified that he does not recall any discussion about a transfer agreement at the initial April 2010 meeting and that he would find any discussion about a transfer agreement at an initial meeting to be very unusual. Hancock Tr. 785:2 – 10.

65.     Ms. Trier testified that she and Dr. Schneider were concerned about obtaining a transfer agreement, and she expressed that concern to someone from Meridian at the April 2010 meeting and was told that Meridian had never been unable to obtain a transfer agreement from a hospital and that Meridian had dealt with hospitals that did not want a surgery center to come to

15

fruition but they had always received a transfer agreement.  Joint Ex. 411, Trier Dep. 31:24 – 32:18, 36:6-20, 92:24 – 93:25, 130:2-14.

66.     Ms. Trier did not testify that Meridian made any statements regarding an antitrust lawsuit or legally compelling the Billings hospitals to grant a transfer agreement at the April 2010 meeting. Joint Ex. 411, Trier Dep.

67.     During the April 2010 meeting, no one from Meridian represented that Meridian could legally compel a hospital to grant a transfer agreement to the Billings ASC or discussed a potential antitrust lawsuit or potential antitrust violations relating to the Billings ASC.  During the syndication phase of the ONI project Mr. Suscha never discussed with any of the ONI investors legally compelling a local Billings hospital to grant a transfer agreement against its will.  Mr. Suscha has never discussed compelling a hospital to grant a transfer agreement to an ASC in the syndication phase of any project, and he testified that such a discussion would not make any sense and is not logical.  Suscha Tr. 832:1 – 834:3.

68.     Kenny Hancock testified that there was absolutely no discussion at the initial April 2010 meeting about antitrust laws or using any kind of legal force or legal claims to obtain state licensure for the ASC project.  If he believed such actions were necessary, it would have been a non-starter for Meridian.  Hancock Tr. 785:11 – 786:1.

69.     Mr. Hancock testified that Meridian had not had any discussions with Dr. Schneider about antitrust laws leading up to the April 2010 meeting and that Meridian would never have attended the meeting if such issues had been raised at that point in the development of the project.  Hancock Tr. 786:6 – 787:3.

16

70.     OrthoLink, Surgical Alliance, and Meridian had never filed a lawsuit to obtain a transfer agreement, and Mr. Hancock has never had discussions with any physician investors about filing such a lawsuit. Hancock Tr. 787:4 – 23.

71.     None of the non-Schneider physicians testified that Meridian represented at the April 2010 meeting that it could legally compel an unwilling hospital to enter into a transfer agreement. Joint Ex. 409, Schmidt Dep.; Joint Ex.410, Emery Dep.; Joint Ex. 414, Winzenried Dep.

72.     Neither Dr. Schneider nor Ms. Trier represented to Mr. Suscha that Dr. Schneider would be unwilling to become active staff at a Billings hospital as part of the ONI project. Suscha Tr. 834:4 – 834:10.

73.     Neither Dr. Schneider nor Teresa Trier ever asked Mr. Suscha to go to Billings Clinic or St. Vincent's Healthcare to speak with surgeons there.  Suscha Tr. 846:13 – 846:16.

74.     The ONI LLC Private Offering Memorandum ("POM") was not distributed at the initial April 2010 meeting.  Prior to the ONI POM being distributed in the summer of 2010, Mr. Hancock had not had any discussions with Dr. Schneider about a transfer agreement for the ONI project.  Mr. Hancock does not recall discussing obtaining a transfer agreement for the ONI Center until sometime in 2011 when MSP-Montana began the process of attempting to obtain one. Hancock Tr. 790:9-20, 976:2-22.

C.      **Initial Investment in ONI LLC**

75.     In May 2010, Chris Suscha provided the final investment documents for the ONI Center to Dr. Schneider and Ms. Trier for them to review on behalf of SLP.  The final investment documents included the ONI Operating Agreement, the Management Services Agreement

17

("MSA"), the ONI POM, and investment instructions, which included a Subscription Agreement. Joint Ex. 18; Suscha Tr. 834:11 – 835:17.

76.     The ONI POM disclosed the risks associated with investing in ONI LLC, including, but not limited to, the following:

> "THE PURCHASE OF UNITS OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK. SEE 'RISK FACTORS.'" Joint Ex. 1, p. i.

> "PHYSICIAN INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME." Joint Ex. 1, p. i.

> "YOU MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD. . . ." Joint Ex. 1, p. ii.

> **"Risk Factors**
> The general economic, financial and regulatory risks of owning and operating a surgical center are considered to be substantial and such risks could adversely affect the Company and the Center.  Many of the factors which may affect the Company are subject to change or are not within the control of the Company.  See 'RISK FACTORS.'" Joint Ex. 1, p. 2.

> **"RISK FACTORS**
> *The purchase of Units involves a substantial degree of financial risk. In evaluating an investment in the Company, a prospective Physician Investor should carefully consider the risk factors described below, among other risk factors.*" Joint Ex. 1, p. 4.

77.     The ONI POM advised potential investors of the importance and need to perform their own independent analysis of the investment opportunity:

> "IN MAKING AN INVESTMENT DECISION PHYSICIAN INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED." Joint Ex. 1, p. ii.

> "THE PROSPECTIVE INVESTOR IS URGED TO REQUEST ANY ADDITIONAL INFORMATION CONSIDERED NECESSARY TO MAKE AN INFORMED INVESTMENT DECISION." Joint Ex. 1, p. ii.

18

*"Physician Investors should read the entire Memorandum carefully before making an investment decision, including the Risk Factors beginning on page 4."* Joint Ex. 1, p. 1.

"We encourage you to consult with your own investment, tax, legal or other advisors to determine whether an investment in the Units is appropriate for you." Joint Ex. 1, p. 4.

"Physician Investors should consult with their own independent counsel and financial and tax advisors concerning the Company and their investment in Units." Joint Ex. 1, p. 11.

78.    The ONI POM warned of the risks specifically related to licensing issues associated with the surgery center:

**"Government Regulatory Risks**
Ownership and operation of health care facilities, such as the Center, are subject to regulation by federal, state and local governments. Various levels of regulatory activity affect the Company's operations and activities by requiring licensure or certification of its facilities, regulating the use of its properties and controlling the reimbursement to the Company for services provided. Such regulations are likely to change frequently. In addition, the investment of physicians in health care facilities such as the Center and certain other financial relationships between physicians and facilities such as the Center are subject to uncertain interpretations of laws and regulatory requirements. . . . PHYSICIAN INVESTORS SHOULD CAREFULLY REVIEW THE SECTION OF THIS MEMORANDUM ENTITLED 'GOVERNMENT REGULATIONS.'" Joint Ex. 1, p. 7.

\* \* \*

**"Licensure and Certification Regulations**
The Company intends to apply for a license to operate the Center and for certification to participate in the Medicare program. An adverse review or determination by a licensure or certification regulator could result in the loss or restriction of licensure or certification, which could have a material adverse effect on the Company, including, among other possibilities, potentially requiring the Center to temporarily or permanently cease operations." Joint Ex. 1, pp. 25-26.

79.    The Private Offering Memorandum explicitly advised that there were no assurances that the project would be profitable:

**"No Assurance of Distributions**
There can be no assurance that the Company will be able to operate profitably or have sufficient cash to make distributions to its Members." Joint Ex. 1, p. 8.

19

**"No Operating History of the Company**
The Company's lack of operating history makes it difficult to evaluate its business and prospects, and there may exist additional and unforeseen risks that may not or cannot be identified at this time. No assurance can be given as to the future success of the Company's operations or the amount of any future income or loss that the Company will realize as a result of the Company's operations." Joint Ex. 1, p. 4.

**"Summary Financial Forecasts**
The financial forecasts are based on various assumptions and actual results can vary, materially and adversely, from those forecasted." Joint Ex. 1, p. 3.

**"Financial Forecasts**
The financial information presented is based upon certain assumptions regarding future events over which the Company and the Management Company will have little or no control.   Actual results for any period can vary, materially and adversely, from those forecasted." Joint Ex. 1, p. 5.

80.     Expert Richard Bays has worked in healthcare operations for over twenty years and has personal experience with the development of approximately twenty independent de novo ASCs.  Bays Tr. 1676:14 – 1676:18, 1678:3 – 1678:5; Joint Ex. 109 (Bay's Expert Report). Claimant's expert Chuck Owen has no experience with a de novo ASC project that did not involve hospital ownership in the ASC.  Owen Tr.576:23 – 577:1.

81.     Mr. Bays is primarily responsible for obtaining state licensure for the ASC when he is engaged to work on a de novo ASC project.  Bays Tr. 1676:19 – 1677:9, 1678:3 – 1678:18. Claimant's expert Chuck Owen testified that for his opinions he relied on the expertise of three individuals who have a deeper knowledge of ASC licensure than he does and who are not employees of his company.  Owen Tr. 575:1 – 576:2.

82.     Mr. Bays has worked as the administrator for three or four ASCs, ensuring that those ASCs remained in compliance with regulatory requirements and overseeing daily operations. Bays Tr. 1678:19 – 1679:11.

83.     For ten years, Mr. Bays has been working extensively with the Texas Ambulatory Surgical Center Society, which is one of the largest ASC-related trade associations in America. Bays Tr. 1679:12 – 1680:9.

84.     Mr. Bays has reviewed approximately twelve private offering memorandums related to investment in an ASC. In some of those instances, Mr. Bays reviewed the offering memorandum on behalf of a potential physician-investor to assess the physician-investor's risk exposure. Bays Tr. 1700:9 – 1701:10.

85.     Mr. Bays testified that the ONI POM is very well done and includes detailed statements about a number of risks associated with investment in ONI LLC. Bays Tr. 1701:11 – 1701:25.

86.     Mr. Bays testified that the ONI POM contained adequate disclosures about financial risks, potential financial returns, evaluation and analysis of the investment, risks related to licensing and regulatory issues related to the surgery center, and risks related to dependence on physician relationships. Bays Tr. 1702:1 – 1704:25; Joint Ex. 109, p. 4, 8-13.

87.     The risk disclosures in the ONI POM were more extensive than risk disclosures in other private offering memorandums that Mr. Bays has reviewed for other ASC projects. Joint Ex. 109, p. 13.

88.     Mr. Bays testified that private offering memorandums related to investment in ASCs typically do not disclose risks associated with obtaining a transfer agreement. Mr. Bays has never seen a private offering memorandum for an ASC that specifically discusses a transfer agreement and would not expect to see such language because a transfer agreement is only one possible component of the licensure process. Bays Tr. 1704:4 – 1704:14; Joint Ex. 109, p. 9.

21

89.     The ONI POM was distributed to the ONI investors, and Dr. Schneider read it. Schneider Tr. 268:1-5; Hancock Tr. 794:21 – 795:3.

90.     Dr. Schneider never raised any questions or concerns with Mr. Suscha about the risks disclosed in the Private Offering Memorandum. Suscha Tr. 839:11-15.

91.     Mr. Suscha collected signed ONI LLC investment documents from Dr. Schneider on July 22, 2010, including a Subscription Agreement signed by Schneider Limited Partnership, which incorporated the terms of the ONI POM. Suscha Tr. 840:18 – 844:19; Hancock Tr. 794:21 – 795:13; Joint Ex. 3; Joint Ex. 6.

92.     By signing the Subscription Agreement, Schneider Limited Partnership represented and warranted that:  1) Schneider Limited Partnership or its representative had such knowledge and experience in financial and business matters that it was capable of evaluating the merits and risks of the investment; 2) Schneider Limited Partnership was able to bear the financial risk of losing its entire investment; 3) Schneider Limited Partnership understood that there were significant risks associated with the investment, including but not limited to those risks set forth in the Private Offering Memorandum; and 4) Schneider Limited Partnership (or together with its representatives) possessed sufficient expertise to utilize the information furnished, evaluate the risks of investment in ONI LLC, and make an informed investment decision. Joint Ex. 6, p. 3.

93.     By signing the Subscription Agreement, Schneider Limited Partnership also "agree[d] to be bound by all the terms and conditions contained in the Operating Agreement as amended from time to time." Joint Ex. 6, p. 3.

94.     Dr. Schneider also signed the ONI Operating Agreement individually, as an Affiliated Physician, agreeing: "The undersigned hereby executes this counterpart member

22

signature page to the operating agreement of Orthopedic Neurological Institute Surgical Center, LLC with the intent of being bound by all of the provisions and terms therein applicable to the undersigned". Joint Ex. 3 at MSPM 000821 - 000823; Schneider Tr. 269:3-18.

95.     The ONI Operating Agreement provides that "[e]ach Physician Member and Affiliated Physician shall maintain at all times medical malpractice insurance complying with the bylaws and policies of the Center relating to medical staff and their clinical activities." Joint Ex. 3 § 8.3.

96.     Section 8.15(a) of the ONI Operating Agreement provides, in relevant part:

> (a)     Each of the following events shall be deemed a "*Triggering Event*" for purposes of this Section 8.15 with respect to any Physician Member or Affiliated Physician ("*Terminating Physician*")
>
> . . .
>
> (iii)    the cessation of the practice of medicine by such Terminating Physician on a full-time basis;
>
> . . .
>
> (vi)     A Terminating Physician (A) makes an assignment for the benefit of creditors or admits in writing his inability to pay debts generally as they become due, (B) applies to any tribunal for the appointment of a trustee or receiver of any substantial part of his assets, (C) commences any voluntary readjustment of debt, dissolution or other liquidation laws of any jurisdiction, (D) becomes the subject of any involuntary proceedings and such Terminating Physician indicates his approval, consent or acquiescence, or (E) becomes the subject of an order appointing a trustee or receiver, adjudicating him bankrupt or insolvent, or approving a petition in any involuntary proceeding, and such order remains in effect for ninety (90) days;
>
> (viii)   the exclusion of such Terminating Physician by the Centers for Medicare & Medicaid Services or the state Medicaid agency from participation in the Medicare or Medicaid program for any reason;
>
> (ix)    such Terminating Physician being charged, indicted, or convicted of a felony in violation of any state or federal law related to healthcare matters;
>
> (x)     such Terminating Physician fails to maintain medical staff privileges at the Center;

23

. . .

(xi)　　the withdrawal by the Terminating Physician from the LLC or from any other another [sic] entity through which the Terminating Physician has a direct or indirect ownership interest in the LLC; and

. . .

(xiii)　　the determination by Members holding the Requisite Majority that a Physician Member's Membership Interest shall be repurchased by the LLC.

Joint Ex. 3 § 8.15(a).

97.　Section 8.15(b) of the ONI Operating Agreement further states:

(a)　In the event of a Triggering Event, the LLC, at the direction of the Board, shall have the right, but not the obligation (except with respect to Section 8.15(a)(xii) above in which the LLC has the obligation), to purchase the Membership Interest of the applicable Physician Member. . .

Joint Ex. 3 § 8.15(b).

98.　Article I of the ONI Operating Agreement defines "Requisite Majority" as "Members holding 70% of the Membership Interests, to include Meridian." Joint Ex. 3, p. 4. "Meridian" is defined as "Meridian Surgical Partners – Montana" in the introductory paragraph of the ONI Operating Agreement. Joint Ex. 3, p. 1.

99.　The Operating Agreement also states that that "Agreement and the rights of the Members shall be governed by and construed and enforced in accordance with the laws of the State of Delaware and, specifically, the [Delaware Limited Liability Company] Act." Joint Ex. 3 § 13.3.

100.　ONI LLC and MSP-Montana also executed a Management Services Agreement under which MSP-Montana would oversee certain management and administrative operations of the ASC. Joint Ex. 5. ONI LLC and MSP-Montana are the only parties to the Management Services Agreement. Joint Ex. 5, p. 11.

24

101.    The Management Services Agreement stated that, among other things, MSP-Montana would have the responsibility to supervise, consult, and oversee the business operations of the ONI Center and would be responsible for coordinating all business and administrative activities, including to "Coordinate all reasonable and necessary actions to maintain all licenses, permits, and certificates required for operation of the Center and to ensure that all appropriate certification and accreditation available to the Center's operations are obtained." Joint Ex. 5, § 3.3.

102.    The Management Services Agreement also states that that "Agreement shall be construed and enforced according to the laws of the State of Delaware, without regard to its conflict of law rules." Joint Ex. 5, § 13.3.

**D.      Post-Syndication Activities and Dr. Schneider's Misconduct**

103.    Around September or October 2010, construction on the ONI Center began.  ONI Realty owned the real estate related to the project and oversaw the construction of the ONI Center.  Schneider Tr. 269:19-22; Hancock Tr. 795:14 – 796:10.  The ONI Center was scheduled to open in January 2012.  Joint Ex. 411, Trier Dep. 145:9-11, 146:4-14.

104.    Soon thereafter, Laurence Stinson, Dr. Schneider's former attorney, informed Dr. Schneider that Dr. Jimmie Biles, a doctor with whom Dr. Schneider had an acrimonious and contentious relationship, had been calling Billings hospitals in order to prevent the ONI Center from opening.  Schneider Tr. 269:23 – 270:22.

105.    On October 25, 2010, Dr. Schneider purchased 14,240 mailing labels, which were made available to Lisa Shaurette Fallon.  Joint Ex. 31; Schneider Tr. 342:1-16; Joint Ex. 392, Schneider Dep. (Dec. 11, 2015) 181:17 – 182:15.

106.  In November 2010, Dr. Schneider caused Ms. Fallon to mail 14,239 defamatory fliers about Dr. Biles.  Ms. Fallon asked Dr. Schneider to pay for the mailing because she couldn't afford to pay for it herself.  The flyer stated:

> Alert – my name is Rita and I was in Cody and broke my ankle this summer and this doctor 'fixes it' (sic) He did a terrible job and I needed two more surgeries at home and I am suing him.  I looked up this doctor and found this recent arrest.  If this is your doctor beware and let the hospital in Cody and your state medical board know about him.  He has already been investigated for drunkenness when on call at the hospital and has a dozen lawsuits that he lost!  The Wyoming board of medicine told me he has several complaints from other doctors and Physician Assistants that he was drunk at work and in the operating room.  Beware!  How can they let someone like this practice?  You can find this line at Park County Sheriff's department website.

First Req. Judicial Notice, Ex. I, p. 2; Joint Ex. 49 ¶¶ 42, 45; Joint Ex. 392, Schneider Dep. (Dec. 11, 2015) 179:3-18.

107.  In January 2011, Jovanna Grissom, on behalf of MSP-Montana, contacted Billings Clinic and St. Vincent's Healthcare, the two hospitals located in Billings, Montana, about executing a transfer agreement with the ONI Center.  Grissom Tr. 1144:14 – 1145:4; Kowalski Tr. 1316:4 – 1316:8.

108.  Ms. Grissom was hired by Meridian in 2010 as a Regional Vice President of Operations.  Ms. Grissom was responsible for overseeing the day-to-day management and operations of two of Meridian's ASCs that were already open.  Ms. Grissom was also responsible for developing the ONI Center, including satisfying the licensing and regulatory requirements necessary to open the surgery center.  Grissom Tr. 1137:2 – 1141:2.

109.  Before joining Meridian, Ms. Grissom developed and managed four de novo ASCs from 2000 to 2010.  Ms. Grissom was responsible for satisfying the applicable licensing and regulatory requirements for those ASCs and had successfully secured four transfer agreements.  Grissom Tr. 1129:14 – 1136:6.

26

110.   Ms. Grissom reported to Catherine Kowalski, who was also responsible for licensure and regulatory requirements of the ONI Center. Kowalski Tr. 1315:9-22; Joint Ex. 412, Bacon Dep. 37:18-22.

111.   Throughout the development process, Ms. Grissom updated Ms. Kowalski weekly, and sometimes several times a week, about the ONI Center and attempts to obtain a transfer agreement. Kowalski Tr. 1315:9-22, 1316:21 – 1317:3; 1341:23 – 1342:15.

112.   Meridian did everything it could do to obtain a state license for the ONI Center. Kowalski Tr. 134:23 – 1343:1.

113.   In January 2011, neither hospital in Billings was willing to execute a transfer agreement with the ONI Center at that point in time.  In other Meridian projects, hospitals had initially refused to execute transfer agreements with the ASC.  Grissom Tr. 1144:14 – 1145:10; Kowalski Tr. 1316:9 – 1317:18; Joint Ex. 25.

114.   Meridian's general practice is to attempt to obtain a transfer agreement with a local hospital for its ASCs even if a transfer agreement is not required to obtain a state license. Grissom Tr. 1146:13 – 1146:23.

115.   From January 2011 to May 2012, MSP-Montana regularly updated the ONI physician-investors about the status of obtaining a transfer agreement for the ONI Center. Grissom Tr. 1144:14 – 1151:1.

116.   In May 2011, a meeting of ONI LLC's Board of Directors was held.  Drs. Emery, Schmidt, and Schneider were present at that meeting and were informed by Ms. Grissom that "[c]urrently neither hospital system in the community is willing to enter into a[] [transfer] agreement with us." Joint Ex. 25.

27

117.    Following the May 3, 2011 board meeting, Ms. Grissom followed up with St. Vincent's to inquire about a transfer agreement again.  On May 10, 2011, Ms. Grissom had a telephone conversation with Randall McDaniel and Sarah McNamara, members of St. Vincent's corporate compliance office, and Ms. Grissom asked that they grant a transfer agreement to ONI. During the call, Mr. McDaniel and Ms. McNamara asked Ms. Grissom questions about the transfer agreement, and Ms. Grissom provided the information they needed.  They stated that they would send Ms. Grissom a template for a transfer agreement with St. Vincent's.  Joint Ex. 26; Grissom Tr. 1147:7 – 1148:2.

118.    On May 13, 2011, Mr. McDaniel sent an email to Ms. Grissom attaching a draft transfer agreement.  Mr. McDaniel stated that if the terms of the agreement were acceptable, Ms. Grissom should notify Ms. McNamara and she would prepare a final draft for signatures.  Joint Ex. 26; Grissom Tr. 1147:11 – 1148:6.

119.    On May 25, 2011, Ms. Grissom emailed Ms. McNamara and stated that after speaking to Ms. McNamara that morning, she had one comment on the draft, but that "[o]therwise everything is good."  Ms. Grissom's comment related to the fact that the draft was for a long-term care facility, rather than an ASC.  Ms. Grissom also asked what the turnaround time for a transfer agreement is.  Joint Ex. 27; Grissom Tr. 1148:7-24.

120.    Throughout the summer of 2011, Ms. Grissom followed up by both email and telephone with St. Vincent's multiple times regarding the transfer agreement.  On June 2, 2011, Ms. Grissom emailed Ms. McNamara information she needed for the final draft of the transfer agreement, including the name of the signatory on the agreement and the address for the ONI Center.  On June 10, 2011, Ms. Grissom emailed Mr. McDaniel to let him know that Ms. McNamara was working on the final draft of the agreement.  On June 13, 2011, Ms. Grissom

28

emailed Ms. McNamara to ask whether she needed any additional information for the transfer agreement. On July 1, 2011, Ms. Grissom emailed Ms. McNamara to ask for a timeline on the final transfer agreement. At this point, Ms. Grissom had not received any information from Ms. McNamara. Joint Ex. 27; Grissom Tr. 1149:3-13.

121. On August 1, 2011, Dr. Schneider sent an email to the other physician investors to encourage them to purchase Schneider Limited Partnership's interests in ONI LLC, touting the high expected return on the investment and suggesting that the time to purchase additional interests was now because once the center opened, the value of the interests would increase substantially. Joint Ex. 179.

122. On August 2, 2011, an ONI Board of Directors meeting was held. Mr. Baker and Drs. Emery, Schmidt, and Schneider were present at that meeting and were informed by Ms. Grissom that a transfer agreement "is still pending with St. Vincent's's Hospital. It is being reviewed and we are hoping to have it completed soon via the Contract Compliance Office— Sarah McNamara." Ms. Grissom also informed the board that "partners will be updated as changes occur or progress is made, as well as if there is difficulty." As of that meeting, Ms. Grissom had no reason to believe that St. Vincent's wasn't going to finalize and execute the transfer agreement with ONI. She believed that because St. Vincent's is a big hospital system, asking them to do anything takes time. Ms. Grissom discussed this during the ONI board meeting. Joint Ex. 28; Grissom Tr. 1150:4-16.

123. Ms. Grissom testified in her experience, the process of obtaining a transfer agreement with St. Vincent's was taking longer than usual, but that she was communicating with St. Vincent's and they were communicating back, so she had no indication that they were not going to give ONI a transfer agreement. Grissom Tr. 1151:2-16.

124.    On August 11, 2011, Ms. McNamara informed Ms. Grissom that Dr. Schneider had shown up on the Excluded Provider List Service ("EPLS system"), which shows providers that may be excluded from federal programs. Ms. McNamara did not indicate that St. Vincent's would not be entering a transfer agreement with ONI. Joint Ex. 29; Grissom Tr. 1151:17 – 1152:15.

125.    Following her conversation with Ms. McNamara, Ms. Grissom conducted her own search for Dr. Schneider on the EPLS system, but he was not listed as an excluded provider at the time. On August 12, 2011, Ms. Grissom emailed Ms. McNamara to inform her that Dr. Schneider was not on the excluded provider list. Ms. Grissom also asked Ms. McNamara to keep her posted on the administrative review process of the transfer agreement. Joint Ex. 29; Grissom Tr. 1151:17 – 1152:15.

126.    Throughout August 2011, Ms. Grissom called St. Vincent's multiple times and left many voicemail messages for Jason Barker, CEO of St. Vincent's at that time. Grissom Tr. 1152:19 – 1153:15.

127.    On August 29, 2011, Dr. Biles filed a lawsuit against Ms. Fallon for her involvement in the scheme involving defamatory flyers, alleging that Ms. Fallon did not act alone, but instead, published the defamatory statements at the request of an unknown person and used someone else's money to pay for the printing and mailing of the flyers. Joint Ex. 30; Schneider Tr. 342:17 – 343:18.

128.    On September 2, 2011, Mr. Barker left Ms. Grissom a message informing her that St. Vincent's would never execute a transfer agreement with the ONI Center if Dr. Schneider was involved with the project. Grissom Tr. 1152:16 – 1153:15; Kowalski Tr. 1321:20 – 1322:4; Joint Ex. 32.

30

129.    In September 2011, after St. Vincent's indicated it would not enter into a transfer agreement, Ms. Grissom contacted Billings Clinic to see if it would reconsider entering into a transfer agreement. Billings Clinic agreed to review a draft transfer agreement. MSP-Montana sent Billings Clinic a draft transfer agreement, signed by Kari Fox on behalf of the ONI Center. Grissom Tr. 1154:2 – 1156:3; Joint Ex. 113.

130.    Soon after Dr. Biles filed his lawsuit against Ms. Fallon, Dr. Schneider began to sell Schneider Limited Partnership's interest in ONI. In September 2011, Schneider Limited Partnership sold additional 6% interests to Dr. Emery and Big Horn Basin Bone and Joint, LLC (Dr. Schmidt), bringing their total ONI membership interests from 4% to 10% each. On September 28, 2011, Schneider Limited Partnership also sold a 5% share to Daniel Mattson, who had not originally invested in ONI. Joint Ex. 12; Joint Ex. 13; Joint Ex. 14; Joint Ex. 409, Schmidt Dep. (September 24, 2015) 63:5-9; Joint Ex. 410, Emery Dep. (September 21, 2015) 80:6-11, 83:16-25.

131.    In October 2011, Dr. Winzenried, who had not originally invested in ONI, purchased a 10% interest in ONI directly from Schneider Limited Partnership. The check for Dr. Winzenried's shares was made payable to John Schneider, M.D, not Schneider Limited Partnership. Joint Ex. 414, Winzenried Dep. (September 23, 2015) 101:23-25; Schneider Tr. 404:17 – 405:24; Joint Ex. 36; Joint Ex. 15.

132.    Dr. Schmidt testified that Dr. Schneider did not disclose his conduct in the *Biles* litigation to him before Dr. Schmidt (through Big Horn Basin Bone & Joint, LLC) purchased the additional shares from Schneider Limited Partnership. Joint Ex. 409, Schmidt Dep. (September 24, 2015) 66:10-13.

31

133.   Following Schneider Limited Partnership's sales, the members and ownership percentages of ONI were: Schneider Limited Partnership (in which Dr. Schneider held a 49.5% interest through his revocable trust) 23%; Dr. Emery 10%; Big Horn Basin Bone and Joint, LLC (a controlled entity of Dr. Schmidt) 10%; Dr. Winzenried 10%; Andrew Baker 5%; Daniel Mattson 5%; and MSP-Montana 37%. Joint Ex. 15 (Exhibit A); Joint Ex. 16.

134.   On October 4, 2011, a meeting of the ONI Board of Directors was held. Mr. Baker and Drs. Schneider, Schmidt, and Emery were present at the meeting and were informed by Ms. Grissom that "The Billings Clinic has moved our transfer agreement through legal—it is on the desk of the VP of nursing; Lou Bird. [sic] She is out at a conference for the week, returning the week of the 10th." Joint Ex. 34; Joint Ex. 35; Grissom Tr. 1156:16 – 1157:12; Joint Ex. 34; Kowalski Tr. 1322:23 – 1323:10.

135.   On October 16, 2011, Ms. Grissom sent an email to Dr. Schneider, stating "Looks promising—Lou Bird [sic] the VP of nursing has been at conferences the last two weeks, to return tomorrow..." At this point, Ms. Grissom was optimistic because the transfer agreement had made it through legal review, which she believed was the biggest hurdle. Joint Ex. 197; Grissom Tr. 1158:10-17.

136.   Beginning on or around October 31, 2011, Dr. Schneider sent various emails to Ms. Fallon urging her to avoid being deposed in the *Biles* litigation, providing a medical excuse to be signed by her physician to help her avoid being deposed, instructing her on how to evade and answer deposition and interrogatory questions, offering to destroy her computer hard drives by giving them the "microwave treatment," bribing her and telling her she should have "a 250k plus payoff for your future." Joint Ex. 81.

32

137.   Dr. Schneider has refused to answer questions regarding the Fallon e-mails at both of his depositions in this case despite the Arbitrator's Order compelling his testimony at his second deposition, and also refused to answer at proceedings in both this case and his bankruptcy case.  In his depositions for this case, Dr. Schneider refused to answer questions approximately 186 times, asserting his Fifth Amendment Right "to avoid further civil liability".  Joint Ex. 393, Schneider 341 Tr. (March 23, 2015), 70:2-22; *see also* June 7, 2016, Respondents' Motion to Limit Testimony and for Adverse Inferences & Designations cataloging Dr. Schneider's various refusals.

138.   In September or October 2011, the ONI Center applied for a Montana state license.  As part of its response to that application, the State of Montana informed the ONI Center for the first time that the Center would have to obtain either a transfer agreement with a local hospital or provide documentation that its physicians had admitting privileges at a local hospital in order to obtain a state license.  Grissom Tr. 1163:2 – 1165:12; Joint Ex. 40; Kowalski Tr. 1325:19 – 1326:18, 1327:7 – 1328:13.

139.   In 2011, the application for a Montana state license for an ASC did not require the ASC to have a transfer agreement with a local hospital or for the ASC's physicians to be credentialed at a local hospital.  There is no evidence that in 2011 Montana statutes or administrative rules expressly required a transfer agreement.  Grissom Tr. 1167:17 – 1168:7; Bays Tr. 1692:14 – 1693:13; Joint Ex. 109 p. 4-5.

140.   Roy Kemp was MSP-Montana's primary point of contact with the State of Montana with respect to obtaining a state license for the ONI Center.  Mr. Kemp acknowledged to MSP-Montana that the State of Montana's requirements for state licensure of an ASC in 2011 were vague and did not include a requirement either for a transfer agreement with a local hospital

or for the ASC's physicians to be credentialed at a local hospital. Nevertheless, Mr. Kemp maintained that the State of Montana had discretion to impose licensure requirements for ASCs that were not included in the applicable written regulations. Grissom Tr. 1168:23 – 1172:1; Joint Ex. 34.

141.    MSP-Montana contacted Ellen Layton, Associate General Counsel for Billings Clinic, on numerous occasions in the fall of 2011 to request a transfer agreement for ONI. Layton Tr. 280:5 – 283:4.

142.    On November 3, 2011, Ms. Layton informed MSP-Montana that Billings Clinic was not in a position to make a decision about a transfer agreement with the ONI Center at that time. Grissom Tr. 1158:18 – 1159:9; Layton Tr. 277:3-24; Joint Ex. 37; Joint Ex. 38.

143.    In November 2011, MSP-Montana asked Angela Humphreys to assist in the process of obtaining a transfer agreement with a local hospital for the ONI Center. Grissom Tr. 1172:11 – 1173:14; Joint Ex. 415, Humphreys Dep. 18:6-23.

144.    Ms. Humphreys has served as primary outside counsel for Meridian since 2006. Throughout her career, Ms. Humphreys has been involved in over 100 ASC transactions for her clients, including all of Meridian's de novo ASC developments, and has never worked on an ASC where a transfer agreement was not obtained. Joint Ex. 415, Humphreys Dep. 7:6-10, 9:2-18.

145.    Ms. Humphreys called Mr. Kemp with the State of Montana regarding the transfer agreement issue, and Mr. Kemp informed her that if at least one of the ONI physicians became credentialed at a local Billings hospital, he would grant a state license to ONI without a transfer agreement with a local hospital. Joint Ex. 415, Humphreys Dep. 20:8-21:5; Grissom Tr. 1181:23

34

– 1182:8, 1187:6 – 1187:11, 1195:14 – 1196:5; Joint Ex. 248; Kowalski Tr. 1332:16 – 1333:6, 1339:16 – 1339:22.

146.    On November 8, 2011, a meeting of the ONI Board of Directors was held.  Mr. Baker and Drs. Schneider and Schmidt were present at the meeting and were informed by Ms. Grissom that "[w]e are asking for legal counsel to assist us in acquiring a transfer agreement with The Billings Clinic—we are unable to move forward with them at this point.  Angela Humphries will begin working on this; attempting to get a meeting with the CEO of the hospital and other avenues."  Joint Ex. 39.

147.    Mr. Hancock also became involved in the ONI project again in November 2011 after Billings Clinic informed ONI it would not provide a transfer agreement.  Hancock Tr. 798:15 – 801:18.

148.    Mr. Hancock sent a letter to the CEO of Billings Clinic, Dr. Nick Wolter, on November 16, 2011 to request a meeting to discuss the transfer agreement.  Hancock Tr. 801:19 – 803:8; Layton Tr. 300:11-14; Joint Ex. 42.

149.    Mr. Hancock also contacted Dr. Tom Price, a member of the U.S. House of Representatives, by letter and subsequent phone calls, to enlist his help with the local Billings hospitals because Mr. Hancock believed that the hospitals were playing games with respect to ONI's attempt to obtain a transfer agreement.  Hancock Tr. 808:3 – 810:14; Joint Ex. 43.

150.    At the same time, MSP-Montana also requested that the physician investors apply for credentials at Billings Clinic and St. Vincent's in order to obtain a state license.  Hancock Tr. 807:13 – 808:2.

151.    After sending the November 16, 2011 letter, Mr. Hancock had a phone call with Dr. Mark Rumans, the Physician in Chief for Billings Clinic in 2011.  This resulted in a second

35

phone call in late November 2011 in which Dr. Rumans, Ms. Layton, Mr. Hancock, Ms. Humphreys, and potentially others from Billings Clinic and MSP-Montana participated. During the second phone call, MSP-Montana asked Billings Clinic to reconsider its position that it would not grant a transfer agreement to ONI, and Billings Clinic advised they would take it under consideration. During the second phone call, there was no discussion about the ONI physicians being available 24/7. Hancock Tr. 803:6 – 804:8, 806:3 – 807:10, 938:25 – 941:7; Layton Tr. 299:11 – 300:3.

152.  During November 2011, Ms. Grissom kept the ONI investors apprised of MSP-Montana's continued efforts to obtain a transfer agreement. On November 11, 2011 and again on November 30, 2011, Ms. Grissom sent emails to Mr. Baker, Mr. Mattson, and Drs. Schneider, Schmidt, and Emery informing them of the various efforts that MSP-Montana and Ms. Humphries were taking to reach out to Billings Clinic and the State of Montana about the transfer agreement issue. Joint Ex. 41; Joint Ex. 44.

153.  On December 2, 2011, Ms. Layton emailed Ms. Humphreys and stated that "Given the new information Meridian provided to us last week regarding the physicians' availability in town and 24/7, Billings Clinic is willing to enter into a transfer agreement." Joint Ex. 45; Layton Tr. 286:24 – 287:3; Grissom Tr. 1173:6 – 1174:10; Kowalski Tr. 1328:18 – 1329:17.

154.  Ms. Layton testified that continuity of care was a consideration in granting a transfer agreement to ONI and that approximately a week before Ms. Layton sent the December 2, 2011 email to Ms. Humphreys that this issue was raised on a telephone call with MSP-Montana and Billing Clinic personnel. Layton Tr. 285:22 – 287:16.

36

155.   Ms. Layton was told in the pre-December 2, 2011 phone call that "the physicians who would be performing services in the surgery center would be available to take care of their patients". Ms. Layton does not specifically recall that Meridian representatives told Ms. Layton that the ONI physicians would be available in Billings 24/7. Layton Tr. 287:4 – 288:6.

156.   Jovanna Grissom testified that she discussed with Billings Clinic that one of the ONI physicians would be available if a patient was transferred from the ONI Center to Billings Clinic. Ms. Grissom also testified that she had discussed that coverage plan with the ONI physicians several times and that the physicians did not anticipate needing coverage very often because of the very low rate of patient transfers. Grissom Tr. 1173:24 – 1175:18, 1196:6 – 1197:7.

157.   Ms. Humphreys testified that she does not recall telling Ms. Layton that the physicians would be in Billings "24/7." Ms. Humphreys recalls instead that she told Ms. Layton that the physicians would maintain a presence in Billings and would have offices in Billings where they would be conducting their practice in conjunction with their work at the surgery center. Joint Ex. 415, Humphreys Dep. 51:12-52:16.

158.   Billings Clinic agreed to enter into the transfer agreement knowing that none of ONI physicians were credentialed at Billings Clinic and believing that the ONI physicians lived somewhere other than Billings, Montana. Layton Tr. 320:10 – 321:12.

159.   Because Ms. Layton did not have the authority to sign contracts on behalf of Billings Clinic in 2011 she would not have sent the December 2, 2011 email unless directed to send the email by someone with authority at Billings Clinic. Ms. Layton does not recall who directed her to send the December 2, 2011 email but it would have at least included Dr. Rumans. Layton Tr. 301:15-23, 302:10-16.

37

160.   Dr. Rumans, Dr. Wolter, Peggy Wharton, and Lu Byrd were the key decision makers on whether to grant a transfer agreement to ONI. In 2011, Peggy Wharton was the Vice President of Clinic Operations for Billings Clinic and she reported to Billings Clinic CEO, Dr. Wolter.   In 2011, Lu Byrd was the Chief Nursing Officer and Vice President of Hospital Operations for Billings Clinic. Layton Tr. 297:18 – 298:9, 298:21 – 299:10, 300:15-22.

161.   Ms. Humphreys emailed Ms. Layton four times between December 5, 2011 and December 13, 2011, and left her voice mails, checking on when the transfer agreement would be signed and provided to ONI. Joint Ex. 47; Joint Ex. 48; Joint Ex. 51; Joint Ex. 53.

162.   Ms. Humphreys did not provide any additional information regarding the project or the physicians in the December 2-13, 2011 emails. Layton Tr.   321:20 – 325;21; 326:19 – 327:1; Joint Ex. 47; Joint Ex. 48; Joint Ex. 51; Joint Ex. 52.

163.   Ms. Layton's responses to Ms. Humphrey's emails did not suggest there was a new continuity of care issue or that Billings Clinic was considering withdrawing its agreement to enter into a transfer agreement.  Joint Ex. 47; Joint Ex. 48; Joint Ex. 51.

164.   On December 7, 2011, Ms. Layton emailed Ms. Humphreys stating "I believe that due to scheduling conflicts Lu Byrd is not available to sign the transfer agreement until Friday. It is ready here and just awaiting her signature.  I will send it to you right away when I have it signed. Thanks." Layton Tr.  326:19 – 327:1; Joint Ex. 48.

165.   After Billings Clinic agreed to enter into a transfer agreement on December 2, 2011, Ms. Layton did not call Ms. Humphreys to express a new continuity of care issue. Layton Tr. 327:2-5.

166.     On the same day that Billings Clinic agreed to enter a transfer agreement, December 2, 2011, Dr. Schneider's patient, Russell Monaco died while under his care. Joint Ex. 396; Schneider Tr. 345:16 – 346:22.

167.     On December 7, 2011, five days after Billings Clinic agreed to enter a transfer agreement with the ONI Center, Dr. Jimmie Biles filed a lawsuit against Dr. Schneider asserting claims for defamation, joint enterprise, intentional infliction of emotional distress, intentional interference with economic relations, and conspiracy. The *Biles* complaint alleges that Dr. Schneider orchestrated a conspiracy with Lisa Fallon to distribute defamatory flyers about Dr. Biles to more than 14,000 Wyoming residents with the intent to injure Dr. Biles' reputation. Schneider Tr. 351:13-19; Joint Ex. 49.

168.     On December 13, 2011, the Powell Tribune ran an article on the *Biles* litigation. The headline read "Other surgeon was behind mass mailing, Biles says". Joint Ex. 54; Schneider Tr. 353:3-7.

169.     On December 13, 2011, Dr. Schneider sent an e-mail denying any misconduct and telling the investors of ONI, including MSP-Montana, that the *Biles* allegations were "wildly false." Dr. Schneider stated:

> "Teresa, I received your email and was made aware today that Dr. Biles has accused myself and my wife in a lawsuit. I am sure this will play out locally over the next few weeks as we file our countersuit against he and his associates. *Beyond that I can only say, as usual with lawsuits, allegations are wildly false* and we suspect his actions are a direct result of his exclusion from the OMNI project and advertising that will disfavor his practice regionally....Dr. Biles who has a long history of alcohol abuse, alcohol related MVA, slander and actual fraud in his practice of medicine and relies upon the Big Horn Basis as his referral network will be negatively impacted by the negative press that is about to unfold."

Joint Ex. 53 (emphasis added); Schneider Tr. 353:3 – 354:10.

170.    On December 14, 2011, the Cody Enterprise reported on the *Biles* litigation against Dr. Schneider with an article headlined "Cody doctor accused of conspiracy".   Joint Ex. 55; Schneider Tr. 352:17 – 353:2.

171.    Jovanna Grissom testified that Dr. Schneider assured her that the allegations made against him in Dr. Biles' lawsuit were not true and that she believed that representation.   Grissom Tr. 1177:12 – 1178:15; Joint Ex. 53.

172.    Mr. Hancock saw copies of the newspapers articles regarding the *Biles* lawsuit against Dr. Schneider on December 13 and 14, 2011, and he called Dr. Schneider on December 13 or 14 to ask about the articles.   Dr. Schneider emphatically denied the allegations in the lawsuit during the phone conversation.   Hancock Tr. 942:10-25, 944:1 – 946:6.

173.    On December 13 or 14, Mr. Hancock also received a copy of the email that Dr. Schneider sent to Ms. Grissom and the other ONI investors stating that the lawsuit's "allegations are wildly false".   Hancock Tr. 944:1 – 946:6; Joint Ex. 53.

174.    Because Mr. Hancock believed Dr. Schneider's denials about his involvement in the *Biles* matter, he advised Buddy Bacon by email that he believed that the issues with the local hospitals might be competition related.   Hancock Tr. 954:25 – 955:1.

175.    Andrew Baker and Dr. Schmidt both testified that after the news articles were published, a lot of people in the local medical community were talking about Dr. Biles' lawsuit against Dr. Schneider.   Baker Tr. 714:6 – 714:19; Joint Ex. 409, Schmidt Dep. 78:12-23.

176.    On December 14, 2011, twelve days after Billings Clinic promised to enter into a transfer agreement with ONI, Ms. Layton emailed Ms. Humphreys and attached a copy of a letter of the same date signed by Ms. Byrd and Dr. Rumans with a copy to Dr. Wolter stating that Billing Clinic had decided not to enter into a transfer agreement with ONI.   Neither Ms. Layton's

40

email nor the letter stated any reason why Billings Clinic was refusing to enter into a transfer agreement with ONI after previously agreeing to do so.  Joint Ex. 56.

177.   Mr. Hancock believed that Billings Clinic's withdrawal of their agreement to enter into a transfer agreement with ONI was suspect given that Billings Clinic notified ONI on December 14 (the day after the first article came out and the day of the second article) that it would not enter into a transfer agreement.  Hancock Tr. 941:8 – 944:5; Joint Ex. 54; Joint Ex. 55; Joint Ex. 57.

178.   Billings Clinic never provided any explanation to ONI on why it changed its position on December 14, 2011.  Hancock Tr. 946:18 – 947:6.

179.   Ms. Layton was deposed as the corporate representative for Billings Clinic in December 2015.  In response to a deposition and document subpoena, Billings Clinic refused to produce 67 documents that were listed on a seven-page privilege log on the grounds that the documents were protected by the attorney client privilege, work product doctrine and/or peer review privilege. Layton Tr.  295:1-22; Joint Ex. 107.

180.   Pages 4 and 5 of the privilege log identify documents created from November 2011 through December 2011. Joint Ex. 107; Layton Tr.  296:17 – 297:9.

181.   The November to December 2011 documents identified on pages 4 and 5 of the privilege log indicate that Ms. Wharton, Ms. Byrd, Dr. Rumans and Dr. Wolter were recipients of documents that were withheld in response to the subpoena. Joint Ex. 107.

182.   Between December 2, 2011 and December 14, 2011, there were 11 emails exchanged between various Billings Clinic personnel including the key decision makers regarding the transfer agreement with ONI.  Of those 11 emails, eight were dated either December 13 or December 14, 2011.  Joint Ex. 107; Layton Tr. 307:8-24.

41

183.    On December 12, 2011, Dr. Michael Willis of Billings Clinic sent an email to Ms. Wharton regarding concerns he had about the proposed transfer agreement.  Ms. Layton was not a recipient of that email and she has never discussed the email with Dr. Willis or Ms. Wharton. Layton Tr. 339:13-22.

184.    On December 13, 2011, Dr. Rumans authored an email to Ms. Layton and others regarding "OMNI physicians" but Billings Clinic did not produce the email claiming it was protected by the peer review privilege and attorney client privilege.  Joint Ex. 107, p. 4.

185.    On December 13, 2011 there was a meeting that included Ms. Wharton and Dr. Rumans to discuss the transfer agreement, but Ms. Layton claimed that the meeting was privileged and would not waive privilege at the arbitration.  Ms. Layton does not recall what Ms. Wharton said at that meeting. Layton Tr. 339:23 – 340:22.

186.    Although Ms. Wharton, Ms. Byrd, Dr. Rumans and Dr. Wolter were key decision makers in terms of granting a transfer agreement to ONI, Ms. Layton did not speak to them in preparation for the Billings Clinic corporate deposition or to prepare for her testimony at the arbitration. Layton Tr. 295:1-22, 297:11-17, 298:10-20, 300:4-10.

187.    Billings Clinic considers who the physicians are that are involved in the entity requesting a transfer agreement and believes that doing due diligence on those physicians is good business practice.   Layton Tr. 308:11 – 309:3.

188.    Dr. Schneider's involvement in the ONI project was a relevant point to Billings Clinic in deciding whether to grant a transfer agreement.  Layton Tr. 308:11 – 309:3.

189.    Dr. Schneider was discussed frequently during internal discussions about whether to grant a transfer agreement to ONI. Layton Tr.  310:12 – 311:1.

42

190.    Although Ms. Layton did not speak to Ms. Wharton, Ms. Bryd, Dr. Rumans or Dr. Wolter about when they knew about the *Biles* lawsuit or how much of a factor the *Biles* lawsuit was in their decision not to grant a transfer agreement, she testified at her deposition that some participants were aware of the allegations and those were "part of what some people were thinking when they made their decision." Layton Tr. 314:8 – 315:10.

191.    Ms. Layton was aware of the newspaper articles related to the *Biles* litigation but does not know when she became aware of the articles. Layton Tr. 313:4-13.

192.    Ms. Layton does not know if anyone listed on the privilege log which includes Ms. Wharton, Ms. Byrd, Dr. Rumans and Dr. Wolter, knew about the death of Dr. Schneider's patient, Russell Monaco, before December 14, 2011.  Layton Tr. 309:21-24.

193.    On January 5, 2012, Ms. Wharton assured Dr. Robert Schultz that Billings Clinic was aware of the newspaper articles about the *Biles* lawsuit against Dr. Schneider. Joint Ex. 64.

194.    Following Billings Clinic's denial of a transfer agreement, MSP-Montana continued to work on various avenues to get the ONI Center open.  In addition to attempting to get one ONI physician investor credentialed, which would allow a state license to be issued, Mr. Hancock continued to look for political avenues to address the situation.  Mr. Hancock contacted Ty Gose, the grandson of one of the St. Vincent's Board of Directors, by letter and email to enlist Mr. Gose's help.  Hancock Tr. 956:2 – 957:8; Joint Ex. 60.

195.    MSP-Montana also considered legal proceedings as an avenue to obtain a transfer agreement or credentials for one of the ONI physician investors in an effort to get a state license. On January 13, 2012, Ms. Humphreys sent a demand letter to St. Vincent's regarding the transfer agreement and credentialing issues and demanded that St. Vincent's provide an executed transfer

agreement by January 18, 2012 or a lawsuit would be filed against St. Vincent's. Hancock Tr. 961:22 – 962:3, 962:22 – 964:14; Joint Ex. 68.

196.    MSP-Montana did not file a lawsuit against St. Vincent's on January 18, 2012 because, at that time, the ONI investor physicians had applied for credentials at Billings Clinic, and ONI felt that it was in its best interests to sue St. Vincent's and Billings Clinic simultaneously.   Therefore, ONI wanted to wait and see the outcome of the credentialing applications at Billings Clinic before simultaneously filing lawsuits against both Billings hospitals. Hancock Tr. 962:25 – 964:14, 1078:5-15; Joint Ex. 68.

197.    Dr. Schneider did not advise MSP-Montana about the December 2, 2011 death of Russell Monaco until early January 2012 in response to an email from Mr. Hancock inquiring about a patient death.   In that same email, Dr. Schneider again denied any wrong doing in the *Biles* lawsuit and suggested the allegations were merely an attempt to prevent ONI from succeeding: "Weave [sic] found that the misinformation and lies have become very very very thick even that lawsuit you asked me about, all in a fairly coordinated effort to prevent our success". Hancock Tr. 957:9 – 961:15; Joint Ex. 425.

198.    On January 28, 2012, the Wyoming Board of Medicine summarily suspended Dr. Schneider's Wyoming medical license because of the death of Russell Monaco. The Wyoming Board of Medicine accused Dr. Schneider of falsifying statements made in Mr. Monaco's medical records.   Dr. Schneider testified that he successfully defended that allegation.   Dr. Schneider testified at the arbitration hearing that "They determined I did not alter medical records." Dr. Schneider's testimony was not accurate. The Wyoming Board of Medicine did not "find" that he did not alter Mr. Monaco's medical records.   The Wyoming Board of Medicine found that there was no "clear and convincing evidence." However, the Board also found that

44

Dr. Schneider had, at the least, manipulated Mr. Monaco's records and that Dr. Schneider's statements were "suspicious, inaccurate, and a manipulation":

> [T]he Board finds and concludes that while evidence was presented that strongly suggested that medical records were, at the least, manipulated in this case, Petitioners did not prove by clear and convincing evidence that Respondent [Dr. Schneider] violated WYO. STAT. ANN § 33-26-402(a)(xxvii)(F) by '[u]sing any false, fraudulent or deceptive statement in any document connected with the practice of medicine including the intentional falsification or fraudulent alteration of a patient or heal care facility record[.]
>
> The Board finds that Respondent's statements in his Consultation or Discharge Summary do not rise to the level of intentional falsification or fraudulent alteration. The Board does find that Respondent's statements in those documents to be suspicious, inaccurate, and a manipulation.

Second Req. Judicial Notice, Ex. L ¶¶ 112, 428-429; Schneider Tr. 350:7-14, 355:6-11, 419:10-16.

199.    Wyoming public records regarding Dr. Schneider's suspension stated that Dr. Schneider's possession of a Wyoming medical license "posed an imminent and immediate threat to the public health, safety, and welfare of the people of Wyoming that imperatively required a temporary suspension of Dr. Schneider's license." Joint Ex. 104, p. MSPM002784; Schneider Tr. 379:8 – 381:13.

200.    On January 31, 2012, the Billings Gazette published a newspaper article stating that Dr. Schneider's Wyoming license had been suspended because Dr. Schneider was believed to have violated the Wyoming Medical Practice Act by making "false, fraudulent or deceptive statements in medical records" regarding the emergent nature of Mr. Monaco and the immediate need for surgery and because of Dr. Schneider's prescription of painkillers for the patient. Joint Ex. 128.

45

201.   On January 31, 2012, The Republic published a similar article about Dr. Schneider under the headline "Wyoming Board of Medicine suspends Cody doctor, alleging patient didn't need emergency surgery". Joint Ex. 70.

202.   MSP-Montana became aware that Dr. Schneider's Wyoming medical license had been suspended when it received an email from Western Security Bank attaching the January 31, 2012 Billings Gazette article. Dr. Schneider did not call Meridian to advise that his license had been suspended. Hancock Tr. 964:15 – 966:6; Joint Ex. 71.

203.   Meridian was very concerned after it received the article regarding the suspension of Dr. Schneider's license because the ONI project was dependent on the strength of Dr. Schneider's practice. Mr. Hancock called Dr. Schneider after receiving the January 31, 2012 email to discuss the license suspension. During that conversation, Mr. Hancock raised the *Biles* lawsuit, and Dr. Schneider once again flatly denied any involvement in the Biles matter. Hancock Tr. 965:9 – 968:22.

204.   On February 2, 2012, Ms. Wharton at Billings Clinic reported that ONI had recently laid off employees, and Ms. Byrd replied "the news" yesterday didn't help matters. Dr. Rumans asked what news and Ms. Wharton replied "regarding John Schneider" and Dr. Rumans replied "thanks". Dr. Wolter and others were included on the email exchange. Joint Ex. 74.

205.   On February 2, 2012, Doug McMillan, the CEO of the West Park Hospital in Cody, Wyoming sent an e-mail regarding the suspension of Dr. Schneider's medical license and the pending *Biles* litigation. Mr. McMillan wrote:

> Please be advised that on January 28, 2012 at 5:00 pm, the Wyoming Board of Medicine issues an Order of Temporary Suspension of John H. Schneider, Jr. Wyoming Physician License. This order was released by the Wyoming Board of Medicine to the Associated Press and has run in the Cheyenne newspaper, Casper Star Tribune, Billings Gazette, and Cody Enterprise, in addition to the local radio stations today. Due to the fact of the temporary suspension of Dr. Schneider's

46

license to practice medicine in Wyoming, Dr. Schneider cannot perform medical procedures at West Park Hospital and the Medical Executive Committee had no choice but to suspend his privileges in accordance to the West Park Hospital Medical Staff By Law Requirements.

In addition, as most of you are aware there is pending litigation between Dr. Jimmie Biles and Dr. Schneider.

Joint Ex. 72; Schneider Tr. 358:18 – 359:17.

206.    In February 2012, Dr. Schneider traveled to Nashville, Tennessee to take a course at Vanderbilt as part of his efforts to have his license reinstated.  During dinner with Mr. Wilson, Mr. Hancock, and Ms. Kowalski, Dr. Schneider assured them that the allegations made against him in the *Biles* lawsuit were false and denied any culpability in the matter.  Kowalski Tr. 1330:7 – 1331:8; Hancock Tr. 971:24 – 973:12.

207.    Mr. Hancock believed Dr. Schneider's continued denials of involvement in the Biles matter because he didn't believe that Dr. Schneider would risk "his economic engine" by trying to defame a colleague.  Hancock Tr. 972:11 – 973:12.

208.    On March 20, 2012, Dr. Schneider's medical license in Wyoming was conditionally reinstated.  Dr. Schneider did not perform any surgeries between January 28, 2012 and March 20, 2012.  Schneider Tr. 363:21 – 364:5.

209.    On March 28, 2012, Mr. Hancock emailed the ONI investors requesting that they sign their respective guaranties for the surgery suite lease between ONI and ONI Realty in accordance with each investor's pro rata ownership percentage in ONI.  Mr. Hancock explained that Meridian had guaranteed the lease temporarily simply to allow ONI Realty to secure financing and begin construction in 2010.  Joint Ex. 79; Kowalski Tr. 1334:4 – 1335:24; Hancock Tr. 974:4 – 976:24.

47

210.    In April 2012, Dr. Schneider's misconduct in the *Biles* litigation was discovered when the receipt for mailing labels purchased by Dr. Schneider and the emails between Dr. Schneider and Ms. Fallon were provided in response to a subpoena issued to Ms. Fallon's employer. Joint Ex. 31; Joint Ex. 81.

211.    During an emergency withdrawal hearing on April 26, 2012, Dr. Schneider's attorneys in the *Biles* litigation, Laurence Stinson and Brad Bonner, stated that they were moving to withdraw from representing Dr. Schneider based on Rule 3.3(b) of the Wyoming Rules of Professional Conduct, which they read to the court: "A lawyer who represents a client in an adjudicated proceeding and who knows that a person has engaged in criminal or fraudulent conduct related to the proceeding shall take remedial measures, including, if necessary, disclosure to a tribunal." The Court transcript reflects that Dr. Schneider's attorneys made the following representations to the Court:

> On Monday of this week, April 23, plaintiff's counsel sent us an email, and the email included a number of attachments that included both emails and documents which we were previously unaware of. The documents were obtained by plaintiff's counsel as a result of their service of a subpoena upon the Indiana hospital where Ms. Fallon works. The emails contain communication between Mr. Schneider and Ms. Fallon during the period October and November 2011. During that time Ms. Fallon was a defendant in Biles v. Fallon, but Biles v. Schneider had not yet been filed and served.

> In general, the emails concern Ms. Fallon's answers to interrogatories and the testimony that she would be giving in an upcoming scheduled deposition. There is considerable communication from Dr. Schneider where – and it's to Ms. Fallon – where Dr. Schneider quite apparently is instructing Ms. Fallon on what to say, what not to say, and how to say it, both in her deposition and in her interrogatories. There is also a document that quite apparently appears to be – and it's provided from his to her – that appears to be his proposed text of her interrogatory answers.

> ... However, the emails also contain communication in which Dr. Schneider provides Ms. Fallon with a doctor's note for signature by her personal physician. And the purpose of the note, it is stated in their communication, is to prevent Ms. Fallon from having to give her deposition in the litigation.

48

> Then, Your Honor, when Ms. Fallon relates in an email to Dr. Schneider that she
> has secured her doctor's commitment to sign the doctor's note, thus hopefully in
> their mind precluding the deposition, Dr. Schneider writes in a responding email,
> 'That should be a 250K-plus payoff for your future. Thank You'.

First Req. Judicial Notice, Ex. H, p. 2-7; Schneider Tr. 359:18 – 360:21.

212.    Dr. Schneider refused to answer any questions about the April 26, 2012
withdrawal hearing transcript.  Schneider Tr. 360:13-17.

213.    On April 25, 2012, MSP-Montana sent a letter to Billings Clinic threatening
antitrust litigation for its failure to grant a transfer agreement to ONI.  The letter stated that if
Billings Clinic did not enter a transfer agreement with ONI by May 15, 2012, MSP-Montana
would file a lawsuit against it.  Joint Ex. 82.

214.    ONI did not file a lawsuit against Billings Clinic on May 15, 2012 because on
May 15, 2012, Meridian received an email attaching a copy of a newspaper article reporting on
the April 26, 2012 hearing where Mr. Stinson and Mr. Bonner, counsel for Dr. Schneider,
withdrew from the *Biles* matter because they believed that Dr. Schneider had been engaged in
criminal and fraudulent conduct. Hancock Tr. 978:11-980:9; Joint Ex. 86.

215.    On May 9, 2012, Dr. Schneider settled the *Biles* litigation. The settlement
involved a cash payment to Dr. Biles.  Schneider Limited Partnership loaned the settlement funds
to Dr. Schneider's business, Northern Rockies Neurospine.  Dr. Schneider then altered the
coverage that he had through his captive insurance company, Northern Rockies Insurance
Company.  After the insurance policy was modified, Northern Rockies Insurance Company paid
the claim asserted by Northern Rockies Neurospine in January 2013.  Dr. Schneider admits
personally withdrawing $2,850,000.00 from NRIC to pay claims and to reimburse Schneider
Limited Partnership.  Joint Ex. 393, Schneider 341 Tr. (March 23, 2015) 20:15-21, 70:19 –

71:12; Schneider 341 Tr. (Jan. 23, 2015) 119:14-41, 101:44 – 103:13; First Req. Judicial Notice, Ex. C. ¶ IV(e)(iii)(1).

216.   Dr. Schneider has refused to answer questions regarding the settlement in *Biles* and the amount of the settlement. Dr. Schneider claims that he paid the settlement himself:

| | |
|---|---|
| Womack: | Did you pay the money directly to him? |
| Schneider: | Did I pay the money? |
| Womack: | Yes. |
| Schneider: | It was paid for, by myself yes. |
| Womack: | It came from you. |
| Schneider: | It did. |

Joint Ex. 393, Schneider 341 Tr. (March 23, 2015), 19:18-21:3, 20:9-14, 43:15-21.

217.   On May 15, 2012, the Powell Tribune reported that Dr. Bile's lawsuit against Dr. Schneider had been settled. The article stated:

> Damning emails from Dr. Schneider uncovered

> An embattled local neurosurgeon has settled allegations that he was behind a mass mailing that falsely disparaged a fellow surgeon, but court records say other investigations into his actions remain pending.

> The flyer in question was sent to more than 14,200 Big Horn Basin homes in December 2010. It was made up on embellishments and flat-out fabrications of misconduct against Biles and told people to 'beware' if he was their doctor.

> The mailing claimed to be sent by a dissatisfied Biles patient named Rita, but was actually sent by Fallon, who has never met the doctor.

> Dr. Schneider has denied being involved in the mailing, filing a response to Biles' suit that accused Biles of being jealous of him. But court records made public on Friday indicate that Biles' attorneys have uncovered emails showing Schneider was involved in the mailing and engaged in potentially illegal efforts to hide his involvement.

> Schneider paid Fallon $5,000 a couple days before her deposition and $10,000 immediately afterwards, Fleck said. 'That is called a bribe,' he said.

Joint Ex. 86; Schneider Tr. 365:7-10.

50

218.    On May 15, 2012, John Wilson received an e-mail from Greg Glueckert of Western Security Bank regarding the Powell Tribune article and Dr. Schneider's settlement of the *Biles* litigation.   Mr. Glueckert stated:    "I received the attached article from the Powell newspaper today.   Regardless of the accuracy of these issues, Dr. Schneider has put himself and the Billings surgery center in a very tough spot."   Ms. Kowalski agreed with Mr. Glueckert that Dr. Schneider had put himself and the ONI Center in a very tough spot.   Joint Ex. 86; Schneider Tr. 364:6 – 365:10; Kowalski Tr. 1341:14 – 1341:22.

219.    The newspaper article was the first time Meridian became aware of the withdrawal hearing and the statements of his counsel because Dr. Schneider had not informed Meridian about the hearing or his counsel's withdrawal in the *Biles* case.   Hancock Tr. 980:10-1.

220.    Meridian obtained a copy of the withdrawal hearing transcript on or about May 18, 2012, sent it to the other ONI investors on May 21, 2012, and set up a call with the ONI investors, other than SLP, for May 25, 2012.   Mr. Mattson responded to the email indicating that it looked like the US Attorney's office could pursue criminal charges against Dr. Schneider for witness tampering. Hancock Tr. 983:1 – 984:2; Joint Ex. 87; Joint Ex. 88; Joint Ex. 89.

221.    Ms. Kowalski testified that she was shocked to learn about disclosures made in the April 2012 withdrawal hearing transcript in the *Biles* litigation because Dr. Schneider had represented to Meridian that the accusations in the lawsuit were false.   After learning about the disclosures made in the emergency withdrawal hearing, Ms. Kowalski was concerned that the ONI project may not be able to move forward successfully.   Kowalski Tr. 1340:6 – 1341:13, 1390:3 – 1391:7.

222. Billings Clinic's General Counsel became aware that Dr. Schneider's counsel had withdrawn from representing Dr. Schneider in the *Biles* lawsuit and informed Ms. Layton. Layton Tr. 317:6-21.

223. Prior to the call on May 25, 2012, Mr. Hancock had a conversation with Mr. Baker in which Mr. Baker told Mr. Hancock that if he had known about Dr. Schneider's involvement in the *Biles* lawsuit, he would not have invested in ONI. Hancock Tr. 986:12 – 987:10; Joint Ex. 426.

224. On May 25, 2012, all of the ONI investors, except for SLP, participated in a phone call to discuss the withdrawal hearing transcript. None of the ONI investors on the May 25, 2012 call were willing to move forward with Dr. Schneider because Dr. Schneider had lost all credibility with the other investors based on the conduct cited in the transcript. Dr. Schneider had not been honest with the ONI investors regarding his involvement in the *Biles* matter and was no longer trusted by them. The ONI investors also discussed that any litigation strategy was now compromised because the conduct of Dr. Schneider provided the local Billings hospitals with a plausible reason as to why they would not enter into a transfer agreement. Hancock Tr. 989:8 – 990:18; Wilson Tr. 1462:5 – 1463:1, 1462:5 – 1463:1, 1498:16 – 1500:7; Grissom Tr. 1194:1 – 1195:2; Kowalski Tr. 1343:2 – 1343:22.

225. On the May 25, 2012 call, the ONI investors also discussed the fact that they could buy out SLP with the vote of 70% of the ONI members. The investors discussed the fact that either they would have to find a replacement for Dr. Schneider, which would not be easy to do, or they would have to find another use for the facility. The investors discussed that buying SLP out at this juncture would relieve SLP of its guarantees, and there was no downside to

52

waiting to see what options were available to salvage their respective investments.  Hancock Tr. 993:5-18; 994:8 – 995:9.

226.   If additional physicians could have been recruited and the project had become viable, SLP would have been bought out of the ONI project.  Hancock Tr. 995:10 – 996:11.

227.   During the May 25, 2012 call, Dr. Winzenried stated that Dr. Schneider's conduct was unconscionable.  Dr. Winzenried testified that he was no longer willing to move forward with Dr. Schneider participating in the ONI project.  Dr. Winzenried testified as follows:

> Q.    After this information came out about Dr. Schneider's conduct in the *Biles* litigation, were you willing to move forward with Dr. Schneider as a partner in the Billings surgery center?
>
> A.    Not, I wasn't at that point.
>
> Q.    And why not?
>
> A     A matter of trust, if nothing else. He never said "boo" to any of us. He never apologized to any of us for his conduct.  I felt that he was fully aware of his conduct. This had already happened before I even bought my share from him, which is where my suit comes from. He knew full well that he had skeletons in the closet. And, in fact, in our very first meeting with Meridian back in April of 2010, when we were getting this whole project started, one of the stipulations, as I recall verbally, and I don't -- I've never seen it written anywhere was, "Hey, if any of you here have any skeletons in your closet or reasons that would deter this project, you should let us know." Well, that was before the whole thing with Biles. But nonetheless, I remember that statement being made. Well, I don't have any skeletons in my closet. But anyway, so I didn't trust him anymore, and I didn't feel like he was somebody I would want to do business with.

Joint Ex. 414, Winzenried Dep. (September 23, 2015) 67:18 – 68:24; Hancock Tr. at 990:19 – 991:9.

228.   Dr. Schmidt also testified that he was no longer willing to move forward with Dr. Schneider involved in the ONI project.  Dr. Schmidt testified as follows:

> Q.    Do you recall if the paper you read, the newspaper article, did it mention anything about the portion of the transcript here on Page 7 that talks about Dr. Schneider

53

writing in an email to Ms. Fallon that, quote, "That should be a $250,000-plus payoff for your future."

A.  You know, I'm not sure where I got the information, but that is -- yes, I did become aware of that in April, 2012.

Q.  When you became aware of it, did it concern you?

A.  Well, yes.

Q.  I mean, did it concern you that it would have a negative impact on the surgery center's ability to open and operate?

A.  To the best of my recollection, we had had a meeting among members of OMNI and decided that none of us could go forward with any dealings with Dr. Schneider.

Q.  Because of this?

A.  Because of -- yes, because this is --when I speak of crime or -- I know it is my understanding that he was never charged with a criminal offense, but I mean, in my opinion, this is criminal.

Q.  Okay. And I think that there was a call, and I'll show you a document has a counter invite, but there was a call on May 25th of 2012 that was just the physician investors and the two nurses and some Meridian personnel to discuss this. Do you think that sounds right?

A.  I think that's what I'm referring when we decided that we could not go forward with any business-like activity with Dr. Schneider. I think that was agreed upon by everyone.

Joint Ex. 409, Schmidt Dep. (September 24, 2015) 91:23 – 93:11.

229.  Andrew Baker testified that he places some blame on Dr. Schneider and his conduct for the ONI Center not opening. Baker Tr. 717:14 – 718:15.

230.  Mr. Baker testified that if Dr. Schneider had pulled out of the ONI project prior to his investment in the project, he would not have gone forward with his own investment. Baker Tr. 709:25 – 710:4.

231.  Immediately after the May 25, 2012 call, Mr. Hancock called Dr. Schneider and informed him that the other investors were moving forward without him based on the

54

information in the noisy withdrawal hearing transcript.  Dr. Schneider never called Mr. Hancock back.  Hancock Tr. 996:17-25.

232.  On May 25, 2012, Dr. Schneider sent an e-mail to his attorney, Mike Greear, his sister Kathleen Burrows, and ONI investors stating that he had contacted a Washington, D.C. attorney who was an expert in healthcare that would solicit participation in a lawsuit against Meridian.  In his May 25, 2012 e-mail, Dr. Schneider stated:

> I received a VM from Kenny Hancock that I will save as evidence.  Based upon the transcript represented in the Biles/Schneider matter, which is tantamount to an unsubstantiated and well-orchestrated crucifixion by all attorneys, despite the large sum I paid for representation, and amazingly without my opportunity to ever defend myself;  Meridian is trying to renege on their responsibility to get the OMNI ASC open.  They are refusing to take further action to open the ASC and looking to sell their part of the asset.  They are also demanding a capital call of '200 K for the next 6 months or else the bank will foreclose on 'your' loan."  I will provide no further funds.  We have contacted the D.C. attorney for health care whom is expert in these matters and he will receive documents by Tuesday.  That attorney will solicit participation by non-meridian ASC partners in action against Meridan [sic] and possibly Samples properties as it is clear from legal document review, they are in breech [sic] of contract and fraudulently induced the physician partnership into the OMNI ASC and the building LLC without due diligence prior to beginning construction on this project.

Joint Ex. 397; Schneider Tr. 361:23 – 363:20; Sec. Req. Judicial Notice, Ex. R.

233.  After May 25, 2012, neither Mr. Wilson or Mr. Hancock received a phone call or email from Dr. Schmidt, Dr. Emery, Dr. Winzenried, Mr. Baker or Mr. Mattson stating that they wanted to open the surgery center with Dr. Schneider.  Wilson Tr. 1463:6-11; Hancock Tr. 991:10-21.

E.    **Meridian and MSP-Montana's Mitigation Efforts**

234.  On June 1, 2012, an ONI board meeting was held.  At that meeting, it was discussed that the whole project had changed now, that it would be necessary to replace Dr. Schneider's volume or seek an alternative use for the facility to mitigate the investors' losses,

55

and that Mr. Hancock would go to Billings to explore all options for the project, including potentially selling the facility. A capital call of $200,000 to prevent default on the capital lease was also approved at the board meeting. Hancock Tr. 997:8 – 998:18; 999:16 – 1000:7.

235.   No one on the June 1, 2102 board call stated that they wanted to move forward with Dr. Schneider being involved. Hancock Tr. 1000:8-13.

236.   In early June 2012, Mr. Hancock met with St. Vincent's and Billings Clinic separately to see if there was any interest in the ONI facility or other alternatives. These initial meetings lead to a second round of meetings in late June with Billings Clinic where they toured the facility and discussed the possibility of a partnership with the existing ONI physicians or buying the facility outright. Billings Clinic had its architect look at the building. In August of 2012, Billings Clinic informed Mr. Hancock it had elected not to move forward. Hancock Tr. 1000:14 – 1001:12, 1002:18 – 1004:10.

237.   Mr. Hancock also met and toured the ONI surgery center with the administrator for the Northern Rockies Surgery Center in June 2012. In July 2012, the regional Vice President of Surgical Care Affiliates, the owner of the Northern Rockies Surgery Center, toured the facility. Discussions took place with the architect for the Northern Rockies Surgery Center regarding expansion of the facility to meet its needs. In August 2012, Mr. Hancock was advised by Northern Rockies Surgery Center that it was not interested in moving forward. Hancock Tr. 1004:11 – 1005:8.

238.   After the initial meeting with St. Vincent's in early June 2012, Mr. Hancock met with the CEO of Ortho Montana, a large orthopedic group in Billings, at the request of St. Vincent's which had indicated that its interest would be heightened if Ortho Montana was interested. St. Vincent's was considering the facility as a spine center that would be a partnership

56

with Ortho Montana.  Because St. Vincent's and Ortho Montana owned Yellow Stone Surgery Center on St. Vincent's campus and Ortho Montana had a non-compete, Ortho Montana could not move forward on its own and all three became tied together in the process.  Hancock Tr. 1005:9 – 1007:16.

239.   In the middle of September 2012, Mr. Hancock had further discussions with Ortho Montana, Yellowstone Surgery Center and St. Vincent's.  Yellowstone Surgery Center informed Mr. Hancock that certain of its partners were interested in selling part of their ownership interests.  Mr. Hancock explained that Meridian would consider an investment in Yellowstone Surgery Center provided that there was a solution for ONI.  In late 2012 or early 2013, St. Vincent's, Ortho Montana and Yellowstone Surgery Center informed Mr. Hancock that they were not interested in moving forward.  Hancock Tr. 1007:17 – 1001:1, 1014:4-11.

240.   Mr. Hancock also initiated conversations with the VA hospital that was considering opening a clinic and had acquired land behind the ONI center.  After some consideration, the VA elected to build its own facility.  Hancock Tr. 1013:14 – 1014:3.

241.   In May 2013, Mr. Hancock also talked to RegionalCare, a Nashville based company that had formed a new joint venture with Billings Clinic.  RegionalCare ultimately said they were not interested in the facility.  Hancock Tr. 1021:11-1022:7.

242.   Mr. Hancock kept the investors apprised of his efforts at the ONI board meetings, which were attended by SLP's counsel, and advised Drs. Schmidt, Emery and Winzenried of his efforts via email.  Joint Ex 93; Joint Ex. 94; Joint Ex. 96; Joint Ex. 98; Joint Ex. 99.

243.   In September 2012, Mr. Hancock asked Drs. Schmidt and Emery to continue to pursue privileges as he was also still trying to identify physicians that could replace Dr. Schneider.  Hancock Tr. 1011:2 – 1012:4; Joint Ex. 94.

57

244. Beginning in August 2012, Mr. Hancock had discussions with Dr. Joe Erpelding, an orthopedic surgeon in Billings. Dr. Erpelding also brought his partner, Dr. Dabov, into the discussions around a partnership involving Drs. Schmidt, Emery and Winzenried along with Drs. Erpelding and Dabov. Dr. Erpelding believed that Dr. Myers, a neurosurgeon, was necessary for the project to be viable. Dr. Schmidt had discussions with Dr. Erpelding regarding the potential partnership. Hancock Tr. 1012:6 – 1013:13, 1014:12 – 1016:8.

245. In the fall of 2012, Dr. Schmidt became credentialed at Billings Clinic. Grissom Tr. 1194:1 – 1194:7; Kowalski Tr. 1333:15 – 1333:19, 1339:23 – 1340:3. He was not required to take call, and Dr. Erpelding agreed to cover any call related to Dr. Schmidt's patients. Hancock Tr. 1015:4 – 1016:17.

246. When Dr. Schmidt became credentialed at Billings Clinic, the ONI Center could have obtained a license from the State of Montana to open and operate. Grissom Tr. 1194:1 – 1194:11; Bays Tr. 1694:5 – 1694:17; Kowalski Tr. 1333:15 – 1334:1, 1342:20 – 1343:1.

247. ONI did not apply for a state license once Dr. Schmidt was credentialed at Billings Clinic because the project was not financially viable with only Drs. Schmidt, Emery and Winzenried and would have lost significant money not just in year one, but over the course of multiple years. Hancock Tr. 1016:18 – 1017:1, 1023:12-21; Barbo Tr. 1741:2-15; 1727:7-11. *See also* Findings 396-432 below.

248. In April 2013, the proposed partnership died because Dr. Myers moved to Texas, Dr. Dabov moved to Memphis and Dr. Erpelding was not interested in moving forward without Drs. Myers' and Dabov's involvement. Hancock Tr. 1017:5-24.

249. In 2013, Meridian ran projections to determine the viability of ONI without Dr. ` Schneider and discounted the case volumes of Drs. Schmidt, Emery and Winzenried by 50%

58

because it was not clear if Dr. Winzenried would perform procedures at ONI and because Drs. Schmidt and Emery indicated that they would continue to perform certain procedures at the Northern Wyoming Surgery Center. Wilson Tr. 1464:7 – 1465:8; Hancock Tr. 1018:13 – 1021:9, Joint Ex. 100 at Emery0322.

250.    If ONI had attempted to operate with only Drs. Emery, Schmidt and Winzenried performing procedures, ONI would not have been financially viable as confirmed by Meridian's own projections, even if those projections were run discounting the case volumes of Drs. Emery, Schmidt and Winzenried by 20% as Mr. Bennett, the business manager for Big Horn Basin Bone & Joint, LLC, advocated. Wilson Tr. 1456:11 – 1457:8.

251.    As CFO of Meridian, Mr. Wilson is familiar with the facility fee reimbursement rates for various procedures charged by ASCs both through the contracts with existing Meridian ASCs and through due diligence of well over 300 potential Surgery Center deals considered by Meridian. Wilson Tr. 1401:18 – 1402:15, 1450:18 – 1451:12.

252.    Meridian projected $2,100 as the average facility fee reimbursement rate for orthopedic procedures performed at the ONI Center based on the facility fee reimbursement rates for existing Meridian ASCs as well as industry surveys that were in line with Meridian's historical experience. The facility fee reimbursement rate of $5,265 used by Mr. Bennett in his projections is inflated. Wilson Tr. 1452:14-17.

253.    Mr. Bennett purportedly used the average facility fee reimbursement rate for Northern Wyoming Surgery Center located in Cody, Wyoming. This was flawed because: (1) certain orthopedic surgeons at the Wyoming center were performing high reimbursement procedures that Mr. Bennett admitted were not performed by Drs. Emery, Schmidt or Winzenried; (2) the Wyoming center had a hospital partner that owned 40% of the facility

59

allowing it to leverage higher reimbursement rates versus an ASC like ONI that did not have a hospital owner; and (3) the ONI Center and the Wyoming center were located in different states and commercial reimbursement rates vary wildly between states and even in the same cities, and therefore, it cannot be assumed that the rates would be the same for the two centers simply because they were located 90 miles apart. Wilson Tr. 1452:18 – 1456:6.

254.   While continuing to search for a financially viable alternative for ONI, MSP-Montana sold or returned certain equipment and supplies in 2012 to preserve capital and mitigate ONI's debt. The supplies and equipment that were sold or returned could be re-purchased within a week if ONI was ultimately able to open. Wilson Tr. 1478:2 – 189:3, 1531:4-7, 1632:8-14, 1650:10-17.

255.   In April or May 2012, MSP-Montana was able to sell certain software and computer equipment to another Meridian ASC for the same price that ONI originally paid for the software. The sale of the software reduced ONI's debt by $32,000. Wilson Tr. 1479:10 – 148:3, 1628:9 – 1630:25; Joint Ex. 448.

256.   Any equipment sold to other Meridian ASCs was not sold at "sweetheart" prices. Wilson Tr. 1480:4-24.

257.   Prior to June 11, 2012, Mr. Baker requested to purchase drugs and equipment from ONI. On June 11, 2012, Mr. Baker emailed Mr. Hancock and stated: "I asked Jovanna, Kathy and you regarding me purchasing propofol, other drugs, and possibly equipment from the ASC. I have not had a reply regarding this for quite some time." Baker Tr. 716:14 – 717:8; Joint Ex. 408.

258.   In October 2012, MSP-Montana contacted healthcare facilities in and around Billings to see if they could find a purchaser for the equipment as well as third party vendors but

60

there was no interest. MSP-Montana apprised all of the ONI investors of its efforts and next steps for a potential sale of the equipment, including potential sales to other Meridian ASCs. Wilson Tr. 148:25 – 1482:16; Joint Ex. 443.

259.   MSP-Montana reported on its efforts to sell equipment at the October and December 2012 ONI board meetings as reflected in the minutes from those meetings. SLP, through its counsel and/or Dr. Schneider, attended those meetings. Wilson Tr. 1482:17 – 1484:22; Joint Ex. 96; Joint Ex. 98.

260.   MSP-Montana sold certain equipment in late 2012 to Treasure Coast Surgery Center which was owned by Meridian. The approximately $290,000 sales price was within $7,000 to $8,000 dollars of what ONI paid for the equipment and was determined by comparing third party quotes that Treasure Coast received for the same equipment. Wilson Tr. 1484:6 – 1486:3.

261.   In every instance, the sale proceeds from the equipment and supplies were applied to reduce ONI's debt with Western Security Bank, and none of the proceeds were kept by MSP-Montana or Meridian. The reduction of debt benefitted SLP by reducing its guaranty obligation. Wilson Tr. 1526:4:10, 1486:4-20.

262.   Having exhausted all avenues that Meridian could think of, it instituted this arbitration against Dr. Schneider and SLP. Hancock Tr. 1022:8-25.

263.   On July 2, 2013, Dr. Emery and Dr. Schmidt signed Consents to remove Dr. Schneider as a Manager of ONI. Joint Ex. 395; Schneider Tr. 255:2-13.

264.   On October 11, 2013, Dr. Schneider wrote to some of the other investors in ONI regarding Montana's requirements for Montana licensure. Dr. Schneider wrote:

> In light of Meridians withdrawal of efforts to open the ASC at OMNI, I have finally received a position statement from Montana regarding licensure of the

61

OMNI ASC for non-Medicare/non-federal patients.  Please reference this and share with your attorney.  To my interpretation, once one surgeon (in our case Dr. Schmidt) obtained credentials at one of the Billings hospitals (DBC) [Billings Clinic], the OMNI ASC met all criteria for the state of MT to open and begin providing surgical and interventional services.  The ability to open the ASC exists today.  I plan on resisting any efforts to sell of equipment at the ASC that would inhibit providing those services, as we have yet to consider alternative management to Meridian healthcare that would open the ASC and allow a resumption of the utilization of the OMNI building in Billings, MT.

Joint Ex. 131; Schneider Tr. 381:18 – 383:6.

265.    None of the other physicians responded to Dr. Schneider's email based on the testimony and no one, including, Dr. Schneider, has produced a responsive email to Dr. Schneider's email.   Joint Ex. 410, Emery Dep. (Sept. 21, 2015) 150:4-24; Joint Ex. 414, Winzenried Dep., (Sept. 23, 2015) 91:17-20.

266.    Neither Dr. Schmidt nor Dr. Emery has spoken to Dr. Schneider since April 2012. Joint Ex. 409, Schmidt Dep. (Sept. 24, 2015) 22:1-18; Joint Ex. 410, Emery Dep. (Sept. 21, 2015) 85:8-16.

267.    Dr. Winzenried has not spoken to Dr. Schneider since 2012.   Joint Ex. 414, Winzenried Dep. (Sept. 23, 2015) 18:13-18.

268.    On September 14, 2012, the Centers for Medicare & Medical Services (CMS) revoked Dr. Schneider's billing privileges for Medicare, effective October 14, 2012, because he had failed to report the suspension of his Wyoming medical license in January 2012.  Joint Ex. 132; Schneider Tr. 373:17 – 374:10.

269.    Dr. Schneider appealed that revocation, and, on January 7, 2014, the Department of Health and Human Services Departmental Appeals Board affirmed CMS's decision to revoke Dr. Schneider's enrollment and billing privileges.  Joint Ex. 132; Schneider Tr. 373:17 – 374:10.

270.    On March 12, 2014, the Wyoming Board of Medicine revoked Dr. Schneider's medical license, effective January 25, 2014. The Wyoming Board of Medicine decision states: "The Board finds and concludes that [Dr. Schneider's] continued practice presents a danger to the public." Joint Ex. 104; Second Req. Judicial Notice, Ex. L. ¶¶ 452-453.

271.    Dr. Schneider has not been credentialed or had privileges at any hospital or surgery center since January 2013. Schneider Tr. 372:14-17, 391:9-392:5.

272.    Dr. Schneider has not had malpractice insurance since January 2013. *Id.*

273.    On April 26, 2013, Dr. Schneider submitted an affidavit to the Montana Insurance Commissioner stating that he would stop practicing medicine as a self-employed physician. He did not stop practicing and his affidavit was false. First. Req. Judicial Notice, Ex. C; Schneider Tr. 376:19 – 378:14.

274.    Dr. Schneider has not performed any surgeries in Montana, Wyoming, or the United States since January of 2013. Schneider Tr. 372:14 – 373:13. Dr. Schneider testified that he has performed surgeries outside of the United States on cadavers. Schneider Tr. 373:3-9.

275.    In September 2012, two years after the ONI syndication process, Meridian was served with a *qui tam* lawsuit. Although the lawsuit had been filed in April 2011, Meridian was not aware of the lawsuit because it was filed under seal, and Meridian had not been contacted by the OIG or Department of Justice informing it of the *qui tam* lawsuit. September 2012 was the first time Meridian became aware of the lawsuit. Wilson Tr. 1465:9 – 1467:21.

276.    The lawsuit alleged that Meridian overpaid for its ownership interest in the Treasure Coast Surgery Center as an inducement for physicians to refer cases to the center and that subsequent minority sales to physicians were below fair market value. There were no

63

allegations that center had falsely or improperly billed the government.   Wilson Tr. 1467:22 –
1469:2.

277.   The whistleblower in the *qui tam* lawsuit was fired from the Treasure Cost center
for stealing.   Wilson Tr. 1471:10-16.

278.   The whistleblower alleged that every procedure performed at the center after the
acquisition was tainted because of the alleged overpayment for the center and subsequent sales to
physicians.   Wilson Tr. 1469:7-20.

279.   The whistleblower's expert made an error in his calculation of fair market value
and Plaintiff initiated settlement discussions.   Meridian settled the lawsuit for $0.03 on the dollar
because Meridian's counsel advised Meridian that, despite his confidence in their case, he could
only assign an 80% chance of success at trial simply because of the uncertainties accompanied
with a jury trial and the fact that the damages alleged were over $100,000,000.   Wilson Tr.
1471:17 – 1473:9.

280.   During depositions in the *qui tam* lawsuit, no Meridian witness pled the Fifth
Amendment.   At no point during the lawsuit did Meridian's counsel withdraw from representing
Meridian or advise the court that Meridian had done anything improper.   Wilson Tr. 1473:10-25.

281.   The settlement of the *qui tam* lawsuit was reached months before the trial date,
not on the eve of trial.   Wilson Tr.  1518:1 – 1519:6.

**F.      Dr. Schneider's Bankruptcy and the Settlement of Dr. Schneider's Individual Claim**

282.   In 2011, Dr. Schneider claimed a net worth of nearly $17 million.   Joint Ex. 413,
Womack Dep. 32:7-9.

64

283.    On December 4, 2014, Dr. Schneider filed bankruptcy under Chapter 7 of the U.S. Bankruptcy Code before the U.S. Bankruptcy Court for the District of Montana.   Schneider Tr. 392:6-8; First Req. Judicial Notice, Ex. E. ¶ 4.

284.    On April 10, 2015, Dr. Winzenried filed a proof of claim against Dr. Schneider for $100,000 and listed his basis for the claim as "Sales of Interest in LLC."   Dr. Winzenried purchased his ONI LLC interest from Schneider Limited Partnership for $100,000. Joint Ex. 15; Joint Ex. 105; Joint Ex. 414, Winzenried Dep. (September 23, 2015) 101:23-25.

285.    Joseph Womack was appointed as the Bankruptcy Trustee for Dr. Schneider's case.   Mr. Womack has served as a Chapter 7 bankruptcy trustee for approximately 20 years. Joint Ex. 455, Womack Hearing Tr. 10:17-23, 11:9-12.

286.    Both Dr. Schneider's initial bankruptcy Schedules and his Amended Bankruptcy Schedules listed, as his personal assets, both an interest in Schneider Limited Partnership and a contingent claim against Meridian valued at $15 million.   Dr. Schneider testified that this $15 million claim is related to Schneider Limited Partnership and that Schneider Limited Partnership's damages were included in the $15 million.   First Req. Judicial Notice, Exs. A & B, Schedule B, items 14 and 21; Joint Ex. 392, Schneider Dep. (Dec. 11, 2015) 223:16 – 224:11, 225:21 – 226:2.

287.    On May 18, 2016, Mr. Womack settled the $15 million claim against Meridian with the Bankruptcy Estate by agreeing to pay Meridian $6,500 and deeming the settlement an administrative expense of the Bankruptcy Estate.   Second Req. Judicial Notice, Exs. G, H & I. On May 24, 2016 the Settlement Agreement between Mr. Womack and Meridian was approved by the Bankruptcy Court.   *Id.*  Upon the execution of a mutual release, Dr. Schneider's claims

against Meridian and Meridian's claims against Dr. Schneider in his individual capacity have been dismissed with prejudice. *Id.*

288.    On July 14, 2015, Mr. Womack filed an adversary complaint against Dr. Schneider alleging that Schneider Limited Partnership was the alter ego of Dr. Schneider and that with the assistance of family members, Dr. Schneider "attempted to employ a web of entities, trusts and transfers to hide his personal assets from creditors." Schneider Tr. 392:9-12; First Req. Judicial Notice, Ex. F ¶ 1.

289.    In the adversary complaint, Mr. Womack alleged that:

> Dr. Schneider formed Schneider Limited Partnership, a Wyoming limited partnership, in which Dr. Schneider through his revocable trust owns a 49.5% limited partner interest; Dr. Schneider's wife, Michelle Schneider, though her revocable trust, also holds a 49.5% limited partner interest in Schneider Limited Partnership; The remaining 1% of Schneider Limited Partnership is held by Schneider Management, LLC as the general partner; and Schneider Management is a Wyoming limited liability company whose sole members are Dr. Schneider and Michelle Schneider, either directly or through their revocable trusts.

First Req. Judicial Notice, Ex. F ¶¶ 6-7, 19-22.

290.    Mr. Womack sought to consolidate Schneider Limited Partnership and Schneider Management, alleging that Schneider Management "was formed to create an illusion of separation" between the management of Schneider Limited Partnership and Dr. Schneider, individually. First Req. Judicial Notice, Ex. F ¶ 23; Joint Ex. 455, Womack Hearing Tr. 22:19 – 24:13. Mr. Womack asserted that at all times since formation, Dr. Schneider "has exercised actual control and authority" over both Schneider Management and Schneider Limited Partnership, and to the extent that Michelle Schneider has acted on behalf of Schneider Limited Partnership, either individually or through her revocable trust, she has done so at Dr. Schneider's direction. *Id.* Because Dr. Schneider operated these entities as a single economic unit, Mr.

Womack sought to pull all of the assets of those entities into the Bankruptcy Estate for the benefit of Dr. Schneider's creditors.  Joint Ex. 455, Womack Hearing Tr. 24:14 – 25:16.

291.    Mr. Womack further alleged that:

- All capital contributions to Schneider Limited Partnership came from monies earned by Dr. Schneider;
- Virtually all of the assets of Schneider Limited Partnership, Schneider Management, and the revocable trusts of Dr. Schneider and Michelle Schneider represent Dr. Schneider's individual earnings or were acquired through his individual earning power;
- Despite the allegedly separate nature of Schneider Limited Partnership and Schneider Management, Dr. Schneider exercised complete control over the entities and their assets, including having control over all bank accounts as the signatory on them;
- Dr. Schneider routinely commingled his personal funds and those of Schneider Limited Partnership and Schneider Management and routinely used those funds to pay for personal living expenses and to satisfy personal obligations;
- Dr. Schneider believed that he had the right to demand distributions from Schneider Limited Partnership and acted in accordance with that belief by causing Schneider Limited Partnership to distribute to him and/or pay his personal obligations, including attorneys' fees and settlement costs related to medical malpractice claims, in a total amount of at least $1,658,431.30 from February 2013 through 2014;
- Dr. Schneider disregarded and abused the formalities governing partnerships and limited liability companies;
- Schneider Limited Partnership and Schneider Management do not keep reasonable or adequate financial records or accountings; rather, Dr. Schneider controls the entities and manipulates the accountings for his own purposes; and
- Dr. Schneider regularly represented the funds and assets of Schneider Limited Partnership to be his own.

First Req. Judicial Notice, Ex. F ¶¶ 24, 79-108; Joint Ex. 413, Womack Dep. 24:11-13, 25:2-23, 80:5-20.

292.    Dr. Schneider has signature authority on the Schneider Limited Partnership bank accounts.  Joint Ex. 393, Schneider 341 Tr. (March 23, 2015) 26:14-15.  The bank statements are sent to Dr. Schneider.  Joint Ex. 393, Schneider 341 Tr. (March 23, 2015) 77:13.

293.    Schneider Limited Partnership made a capital distribution to Dr. Schneider for the *Biles* settlement. Joint Ex. 393, Schneider 341 Tr. (March 23, 2015) 20:5-21. According to Dr. Schneider, the money went from Schneider Limited Partnership to Northern Rockies Neurospine and then to Dr. Biles. *Id.* Dr. Schneider considered this a "capital distribution" to Dr. Schneider. *Id.*

294.    Dr. Schneider took money from Schneider Limited Partnership for his personal needs and his wife's personal needs. Dr. Schneider testified: "That is my understanding of what I'm able to take funds of, to the extent of my capital account of Schneider Limited Partnership to use if the management authority approves the distribution of those funds." Joint Ex. 393, Schneider 341 Tr. (March 23, 2015) 27:7-9.

295.    Dr. Schneider's request for distributions from Schneider Limited Partnership have never been turned down. Joint Ex. 393, Schneider 341 Tr. (March 23, 2015) 36:15-17.

296.    Dr. Schneider admits that he depleted the assets of Schneider Limited Partnership to pay his legal expenses: "Schneider Limited Partnership assets had been progressively depleted by me. My capital account was I paid over a million dollars to various legal issues from 2012 forward". Joint Ex. 393, Schneider 341 Tr.  (March 23, 2015) 40:17-18. Dr. Schneider admitted that he withdrew a little over $1.7 million from SLP before he filed bankruptcy and "Paid lawyers and all for litigation".  Joint Ex. 393, Schneider 341 Tr.  (March 23, 2015) 72:23 – 73:1. Dr. Schneider testified that he had only $500 of cash left when he filed bankruptcy. "There was only $20,000.00, I believe left of the Schneider Limited Partnership. $15,000.00 went to Mr. Clark to assume the litigation against Meridian. The last bit was going to pay the accountant for Schneider Limited Partnership for this past tax year, so I have no cash left". Joint Ex. 393, Schneider 341 Tr.  (March 23, 2015) 57:17-23 & 85:6-9. Dr. Schneider testified that he could

68

use as much as he wanted from his Schneider Limited Partnership account.   Joint Ex. 393, Schneider 341 Tr. (March 23, 2015) 26:5 – 27:13.

297.   Mr.   Womack   concluded   that   Dr.   Schneider   controlled   Schneider   Limited Partnership. Joint Ex. 413, Womack Dep. 24:11-13.

298.   Mr. Womack concluded that Schneider Limited Partnership is the alter ego of Dr. Schneider. Joint Ex. 413, Womack Dep. 24:22- 25:1.

299.   Mr.  Womack testified that Dr. Schneider potentially committed a crime and did not testify truthfully in his bankruptcy proceeding.   There was evidence that Dr. Schneider gave false testimony. Dr. Schneider's bankruptcy schedules, signed under oath and penalty of perjury, were not true, accurate and complete.  Dr. Schneider transferred, removed or concealed property from his bankruptcy estate.  Joint Ex. 413, Womack Dep. 34:11-16, 34:23 – 35:1, 46:3-14, 54:12 – 20, 83:24 – 84:2; First Reg. Judicial Notice, Ex. B.

300.   Mr. Womack concluded that Dr. Schneider and his sister, Ms. Burrows, conspired to sell the home that Schneider (and at times SLP) owned in Molt, Montana.  The proceeds were placed into a U. S. Bank account in Ms. Burrows' name and Dr. Schneider was given an ATM card for the account.  Dr. Schneider exercised dominion and control over the account before and after he filed bankruptcy.  Dr. Schneider did not disclose the account in his bankruptcy schedules. Joint Ex. 455, Womack Hearing Tr. 105:23 – 107:6, 111:12 – 112:7.

301.   According to Mr. Womack, as early as 2011, Dr. Schneider was extremely concerned about potential liabilities and protecting his assets from creditors and began working to hide his assets. First Req. Judicial Notice, Ex. F ¶ 30.

302.   On April 17, 2011, Debtor emailed his accountant and informed him:

Larry – can we get together sometime in May or June as I would like to gift my kids each 1.5 million in cash and hard assets but of course want to be able to

> control these such as selling a house, or living in the house for as long as we want, etc. Everything I have is in the Schneider Limited Partnership for asset protection, but for estate tax planning and liability protection that would be ideal long term.

First Req. Judicial Notice, Ex. F ¶ 32; Joint Ex. 413, Womack Dep. 78:19 – 79:4

303.   Dr. Schneider transferred, removed, or concealed property from the bankruptcy estate. Joint Ex. 413, Womack Dep. 54:17-20.  In a bankruptcy court hearing on April 26, 2016, Mr. Womack was asked to describe the adversary proceeding. Mr. Womack stated:

> After investigating this matter, I believed that Dr. Schneider, his wife, his attorneys, other individuals had been involved in a series of transactions that were designed to shield effectively 100 percent of his nonexempt assets from creditors over the course of a two-and-a-half – three year-year period prior to the filing of his bankruptcy.  He engaged in multiple transactions and directed multiple transactions in order to accomplish that goal.  The complaint was designed to try to set those transfers aside and obtain assets for the benefit of the creditors of the estate.

Joint Ex. 455, Womack Hearing Tr. 22:1-18; First Req. Judicial Notice, Ex. F.

304.   Dr. Schneider refused to produce multiple documents in his bankruptcy case.  Mr. Womack obtained an order compelling Dr. Schneider to provide the documents but Dr. Schneider did not comply with the order.  Joint Ex. 455, Womack Hearing Tr. 129:4-15, 132:8-11; Joint Ex. 413, Womack Dep. 16:23 – 19:19, 20:13 – 23:9, 32:1-4.

305.   Dr. Schneider settled the adversary case with Trustee Womack.  Second Req. Judicial Notice, Ex. P.  The Settlement was approved by the Bankruptcy Court by Order dated June 7, 2016. Second Req. Judicial Notice, Ex. Q. Pursuant to the terms of the Settlement, Dr. Schneider transferred substantial assets, with a value in excess of $2 million, to the Trustee. Second Req. Judicial Notice, Ex. P; Schneider Tr. 397:20 – 398:10.

306.   Dr. Schneider refused to answer questions regarding Trustee Womack's adversary proceeding.  Joint Ex. 392, Schneider Dep. (May 25, 2016) 101:8-22.

307.   Dr. Schneider is not a credible witness. Mr. Womack testified that Dr. Schneider did not testify truthfully in his bankruptcy proceeding.   Mr. Womack also testified that Dr. Schneider potentially committed a crime. Joint Ex. 413, Womack Dep. 46:3-14; 83:24 – 84:2.

308.   The Wyoming Board of Medicine also found that Dr. Schneider was neither credible nor believable as a witness. The Board found that Dr. Schneider's credibility had been impeached and contradicted by multiple prior inconsistent statements, by identification of his self-contradiction, and by presentation of testimony of other credible witnesses whose testimony directly refuted Dr. Schneider's.  Second Req. Judicial Notice, Ex. L ¶¶ 374 & 375; Schneider Tr. 387:23 – 389:16.

309.   Mr. Womack objected to Dr. Schneider receiving a discharge in his bankruptcy case due to his unprecedented misconduct.  First Req. Judicial Notice, Ex. E; Schneider Tr. 392:9-12.

310.   On May 13, 2016, Dr. Schneider voluntarily waived his Chapter 7 bankruptcy discharge. Second Req. Judicial Notice, Ex. C, D.

311.   On May 23, 2016, the U.S. Bankruptcy Court for the District of Montana entered an order approving Dr. Schneider's waiver of discharge.  Second Req. Judicial Notice, Ex. E; Schneider Tr. 394:1-24.

312.   In his May 25, 2016 deposition, Dr. Schneider refused to answer questions about why he waived his bankruptcy discharge.  Schneider Tr. 393:9-25; Joint Ex. 392 (May 25, 2016) 101:8-22.

## G.   State Licensure and Transfer Agreements

313.   A state license is the bare minimum requirement to open and operate an ASC in a state.  Joint Ex. 415, Humphreys Dep. 23:3-9.

71

314.   In most states there are two ways in which a state license can be obtained: (1) the ASC has a transfer agreement or (2) the ASC's physicians are credentialed at a local facility. Joint Ex. 415, Humphreys Dep. 22:11-15.

315.   State licensure for an ASC is separate and distinct from obtaining a transfer agreement for an ASC. Hancock Tr. 790:21 – 791:7.

316.   Since 2010, Montana law has never required that an ASC execute a transfer agreement with a local hospital in order to obtain a state license. Bays Tr. 1692:14 – 1693:13; Grissom Tr. 1139:14 – 1140:2; Joint Ex. 415, Humphreys Dep. 20:1-16; Hancock Tr. 790:21 – 791:7. Claimant's expert Chuck Owen testified that Montana law did not require a transfer agreement to obtain a state license for an ASC in 2010. Owen Tr. 581:8 – 581:15.583:14 – 583:19.

317.   A transfer agreement with a local hospital is not required for an ASC to obtain certification for the Medicare program. Bays Tr. 1695:25 – 1696:2.

318.   According to the projections provided during the investment phase of the ONI Center, 80% of the revenues for the Center were to be spine procedures, which are not typically Medicare reimbursed procedures. Joint Ex. 109, p. 3; Joint Ex. 17; Joint Ex. 122.

319.   Medicare certification was not essential for the ONI Center to open and operate. *Id.*; Bays Tr. 1696:15 – 1696:21; Grissom Tr. 1141:19 – 1141:22.

320.   ASCs rarely need to transfer a patient to a hospital pursuant to a transfer agreement with that hospital. Bays Tr. 1689:23 – 1690:5; Grissom Tr. 1142:23 – 1143:17.

321.   Transfer agreements between ASCs and hospitals are not intended to address emergency transfer situations. Bays Tr. 1689:23 – 1692:13.

72

322.   Neither Meridian employees, nor Meridian's outside legal counsel Angela Humphreys, nor Respondents' expert witness Richard Bays, nor Claimant's expert witness Chuck Owen has any personal experience with an ASC that was unable to obtain a transfer agreement except for ONI. Bays Tr. 1691:23 – 1691:25; Owen Tr. 578:20 – 578:24; Grissom Tr. 1142:10 – 1142:19; Joint Ex. 415, Humphreys Dep. 19:11-20.

323.   Mr. Bays testified that transfer agreements typically are sought and obtained toward the end of the development of the ASC, usually approximately 30 to 60 days before the ASC is scheduled to open. Bays Tr. 1687:5 – 1689:22, 1705:13 – 1706:1.

324.   Credentialing is a process of a healthcare facility granting privileges to a provider to render specified services in their facility. Credentialing for admitting privileges and being on call are not synonymous. Admitting privileges do not necessarily require taking call.  Joint Ex. 109, p. 8.

325.   Mr. Bays testified that it is not unusual that physicians intending to practice at an ASC do not hold privileges at a local hospital at the inception of an ASC project.  Bays Tr. 1698:6 – 1699:18; Joint Ex. 109.

326.   Mr. Bays testified that he has extensive experience with the process of physicians becoming credentialed at a hospital and that the credentialing process typically takes about four to six weeks. Bays Tr. 1706:2 – 1707:9.

327.   In 2011, Billings Clinic and St. Vincent's each had physicians who were credentialed at the hospital but did not participate in the hospital's call cycle.  Grissom Tr. 1161:5 – 1161:18; Joint Ex. 38.

328.   Billings Clinic represented that the ONI physicians could be credentialed at the hospital without having to take call at the hospital.  Joint Ex. 65; Grissom Tr. 1185:5 – 1186:10.

73

329.    Mr. Grissom was never told by anyone at St. Vincent's or Billings Clinic that either hospital respectively would deny a physician's application for admitting privileges if the physician did not live within twenty-five miles of Billings or was unwilling to take call at the hospital. Grissom Tr. 1183:19 – 1184:6.

330.    Mr. Bays testified that it is not unusual for physicians to perform procedures at an ASC that is located 90 miles or more away from where the physicians live.  Bays Tr. 1696:22 – 1698:5; Joint Ex. 109.

331.    Ms. Layton testified that Billings Clinic has transfer agreements with other hospitals and surgery centers where the physicians are not credentialed at Billings Clinic and do not live in Billings, Montana.  Layton Tr. 329:5 – 330:15.

332.    Jovanna Grissom testified that based on her experience she would expect a suspended license to adversely affect that physician's application for credentials at a hospital. Grissom Tr. 1188:15 – 1189:5, 1189:23 – 1190:20.

333.    The ONI Center could have obtained a state license to open in 2012 when Dr. Schmidt obtained credentials at a local Billings hospital. Bays Tr. 1694:5 – 1694:17.

334.    The ONI Center maintained its own credentialing process separate from the hospitals' credentialing processes.  Grissom Tr. 1190:21 – 1191:16.  A physician would have to have credentials specific to the ONI Center in order to perform procedures at the ONI Center. *Id.*

335.    The ONI Center's medical staff bylaws required that every physician credentialed at the ONI Center carry medical malpractice insurance.  Grissom Tr. 1191:12 – 1192:12.  If an ONI physician failed to maintain medical malpractice insurance, that physician would automatically be de-credentialed in accordance with the medical staff bylaws.  Grissom Tr. 1191:12 – 1192:12; Joint Ex. 3 § 8.3.

74

336.    Medicare was not a primary payor for the ONI project.  Hancock Tr. 797:8 – 798:14.

337.    In 2009, Dr. Emery was performing procedures at West Park Hospital or Northern Wyoming Surgical Center in Cody, Wyoming, at Hot Springs Memorial in Thermopolis, Wyoming, and at Powell Valley Hospital in Powell, Wyoming.  Joint Ex. 410, Emery Dep. (Sept. 21, 2015) 22:11-18, 25:9 – 26:2.  Dr. Emery also had privileges at Washakie Memorial Hospital in Worland, Wyoming and has had a clinic in Worland for 26 years.  Joint Ex. 410, Emery Dep. (Sept. 21, 2015) 22:11-18.

338.    Powell, Wyoming is located approximately 20 miles from Cody, Wyoming.  Joint Ex. 410, Emery Dep. (Sept. 21, 2015) 26:11-20.   Thermopolis, Wyoming is located approximately 80 miles from Cody, Wyoming.  *Id.*  Worland, Wyoming is located approximately 90 miles from Cody, Wyoming.  *Id.*

339.    Billings, Montana is also located approximately 90 miles from Cody, Wyoming.  Joint Ex. 410, Emery Dep. (Sept. 21, 2015) 26:11-20.

340.    Currently, Dr. Emery performs between thirty and forty percent of his procedures in Worland. Joint Ex. 410, Emery Dep. (April 25, 2016) 21:1-2, 22:4-9, 23:22 – 24:4.  Dr. Emery performs the rest of his procedures in Cody, Wyoming or Thermopolis, Wyoming.  Joint Ex. 410, Emery Dep. (April 25, 2016) 23:22 – 24:17.

341.    In 2010, Dr. Schmidt had credentials at West Park Hospital, Northern Wyoming Surgical Center, Hot Springs Memorial Hospital, Washakie Memorial Hospital, and Powell Valley Hospital.  Joint Ex. 409, Schmidt Dep. (Sept. 24, 2015) 12:5-9.

342.    Over the past several years, Dr. Schmidt has performed procedures at West Park Hospital and Northern Wyoming Surgical Center in Cody, Wyoming.  Joint Ex. 409, Schmidt

75

Dep. (April 26, 2016) 5:20 – 6:5.  Dr. Schmidt also performs approximately ten to fifteen percent of his procedures in Thermopolis and approximately fifteen to twenty percent of his procedures in Worland.  Joint Ex. 409, Schmidt Dep. (April 26, 2016) 5:4-16.  Thermopolis, Wyoming is approximately 83 miles from Dr. Schmidt's residence.  Joint Ex. 409, Schmidt Dep. (April 26, 2016) 26:18-12.  Worland, Wyoming is approximately 45 miles from Dr. Schmidt's residence. Joint Ex. 409, Schmidt Dep. (April 26, 2016) 25:23-24.

343.    When Dr. Schmidt performs procedures in Thermopolis, Wyoming and a patient needs to stay at the hospital overnight, Dr. Schmidt returns to his residence and does not stay in Thermopolis overnight.  Joint Ex. 409, Schmidt Dep. (April 26, 2016) 27:13-21.  When Dr. Schmidt performs procedures in Worland, Wyoming and a patient needs to stay at the hospital overnight, Dr. Schmidt returns to his residence and does not stay in Worland overnight.  Joint Ex. 409, Schmidt Dep. (April 26, 2016) 25:10-22.

344.    The patient populations in Worland, Wyoming and Thermopolis, Wyoming are significantly smaller than the patient population in Billings, Montana.  Joint Ex. 409, Schmidt Dep. (April 26, 2016) 11:18-24.

345.    The amount that Dr. Schmidt is paid per procedure in Worland, Wyoming is about half or a little less than half of what he gets paid in Cody, Wyoming.  Joint Ex. 409, Schmidt Dep. (April 26, 2016) 31:5-15.

346.    Worland, Wyoming is about the same size as Cody, Wyoming.  Joint Ex. 410, Emery Dep. (April 25, 2016) 35:13-17.

347.    Dr. Schneider did not apply for credentials at either St. Vincent's or Billings Clinic when the ONI Center was attempting to obtain a state license in 2011-2012.  Grissom Tr. 1187:12 – 1187:17.

76

## H.   Financing for ONI

348.   Mr. Wilson was in charge of the financing for ONI.  Wilson Tr. 1405:4-6; Joint Ex. 412, Bacon Dep. 46:25 – 47:6.

349.   The POM disclosed that the total indebtedness to be incurred by ONI was approximately $2.6 million and stated, "[f]or this purpose, indebtedness includes leases and loans, tenant improvement loans, working capital loans and real estate leases".  ONI did not incur debt in excess of that amount.  Wilson Tr. 1549:5-10; *see, e.g.,* Joint Ex. 1, p. 3 (under heading "Indebtedness of the Center").

350.   Four banks were considered to provide the financing for ONI.  Western Security Bank ("WSB") was ultimately selected because it provided the most favorable terms which were fair and reasonable based on Mr. Wilson's experience with financing ASCs.  Wilson Tr. 1406:7 – 1407:16.

351.   The financing for ONI closed on December 12, 2011, two days before Billings Clinic backed out of its agreement to execute the transfer agreement.  Wilson Tr. 1429:3-6; Joint Ex. 9, p. 1; Joint Ex. 10, p. 1; Joint Ex. 11.

352.   Prior to the recession, there were many equipment leasing companies, such as GE and Citibank, that provided surgery center financing through capital leases.  Meridian used capital leases for financing its first few centers.  These capital leases did not require Meridian or its holding companies to pay interest. After the recession, leasing companies were no longer an option for financing ASCs, requiring Meridian to obtain financing through local banks. Wilson Tr. 1408:21 – 1410:8.

353.   ONI was financed through a loan and a capital lease.  WSB made a traditional loan to OMNI Funding Corp. ("OMNI Funding"), a special purpose entity that was set up to hold

77

the loan with WSB, and in turn, OMNI Funding used the loan proceeds to purchase the equipment and tenant improvements for the surgery center. OMNI Funding entered into a capital lease with ONI and leased back the equipment and tenant improvements for the surgery center. ONI paid the capital lease payments to OMNI Funding which then paid the principal and interest payments to WSB. The capital lease payments and the principal and interest payments were the same amounts. Wilson Tr. 1411:7 – 1414:25; Joint Ex. 33.

354.    The terms of the capital lease and loan were identical, and once the capital lease payments were paid, ONI would own the equipment and tenant improvements it had been leasing. Wilson Tr. 1415:5 – 1417:1.

355.    All of the investors in the ONI project, including MSP-Montana, guaranteed either the loan or the capital lease based on their pro rata share of ownership in ONI. The physician investors guaranteed the loan, and MSP-Montana guaranteed the capital lease, rather than the loan, due to the prohibition of paying interest. WSB, however, had the right to look through OMNI Funding and call MSP-Montana's guarantee on the capital lease if there was a default, which is what ultimately happened when ONI was unable to make the capital lease payments. Wilson Tr. 1417:2 – 1419:19; Joint Ex. 1, p. 3 (under heading "Indebtedness of Center"), p.6 (under heading "Indebtedness and Personal Guarantees").

356.    WSB required each of the ONI investors to guarantee 125% of their respective ownership in ONI because at the time the financing transaction was closed, SLP had sold part of its ownership interest in ONI. Because WSB had undertaken the underwriting process assuming SLP's higher ownership percentage and the credit worthiness of Dr. Schneider, it required an increase in the guarantees. Wilson Tr. 1597:13 – 1596:21.

78

357.   Mr. Wilson talked to Dr. Schneider about the debt of ONI and the requirement to guarantee the debt from the very beginning of the transaction.  WSB advised Mr. Wilson that the ONI investors had counsel communicating with WSB about the guarantees, including sending red lines of the guarantees.  Wilson Tr. 1581:6 – 1582:19.

358.   Mr. Wilson sent the entire guaranty agreements to each ONI Investor, not just the signature pages.  Wilson Tr. 1609:12-18, 1612:5-24.

359.   OMNI Funding was owned by Global Securitization Services ("GSS").  Neither Arcapita, Meridian or MSP-Montana had an ownership interest in GSS or OMNI Funding. Wilson Tr. 1419:20 – 1420:10.

360.   The promissory note between WSB and OMNI Funding was not unique and was governed by the laws of Montana, not Sharia law.  Wilson Tr. 1421:13 – 1422:24, 1554:5 – 1556:4; Joint Ex. 9, p. 1 (under the heading "Governing Law").

361.   The capital lease between OMNI Funding and ONI was not unique and was governed by the laws of New York, not Sharia law.  Wilson Tr. 1423:4 – 1424:20, 1554:5 – 1556:4; Joint Ex. 11, p. 23 (under the heading "Section 33. Miscellaneous").

362.   Promissory notes and capital leases are traditional methods used to finance surgery center transactions.  Wilson Tr. 1424:21 – 1425:3.

363.   No fees were received by Arcapita, Meridian or MSP-Montana from WSB, GSS or OMNI Funding because of the financing structure or otherwise.  Wilson Tr. 1425:5 – 1426:5.

364.   There was no financial detriment to ONI or the physician investors because the financing structure used a traditional loan and capital lease.  Wilson Tr. 1426:6-15.

365.   Dr. Schneider does not know if Sharia Law had any economic impact on SLP. Schneider Tr. 403:8-23; Joint Ex. 392, Schneider Dep. (Dec. 11, 2015) 121:4-7.

366. Claimant's expert Chuck Owen does not know if compliant financing structure had any negative financial impact on SLP. Owen Tr. 584:20 – 584:24. Mr. Owen does not know whether the fact that the financing transaction was Sharia law compliant had any bearing on whether the ONI Center could obtain a transfer agreement or Medicare certification. Owen Tr. 584:25 – 585:9.

367. SLP was aware of OMNI Funding, and the documents signed by SLP explicitly referenced OMNI Funding and GSS. Wilson Tr. 1442:2 – 144:6.

368. SLP signed a commercial guaranty that stated that the borrower was "OMNI Funding Corp. c/o Global Securitization Services, LLC" and identified the lender as WSB. Joint Ex. 7, p. 1.

369. Dr. Schneider was the president of ONI and signed an action by unanimous written consent that identifies OMNI Funding and references various agreements on Exhibit A thereto between OMNI Funding, WSB, and ONI. Wilson Tr. 1444:15 – 1445:22; Joint Ex. 441 at MSPM003975 – 81.

370. WSB required SLP to execute a Manager's Certificate that references the loan between OMNI Funding and WSB, which was signed by Dr. Schneider and his wife. Wilson Tr. 1446:16 – 1448:22; Joint Ex. 442 at MSPM004005 – 07.

371. Mr. Wilson discussed the financing structure with Dr. Schneider, and SLP had its counsel review the documents before Dr. Schneider signed the documents. Wilson, Tr. 1446:24 – 1447:22.

372. The ONI investors, including SLP, did not pay any fees charged by GSS for setting up OMNI Funding. Meridian paid 100% of those fees. Wilson Tr. 1426:16 – 1427:6.

373.     Under a traditional loan, the borrower pays both its own legal fees as well as the bank's legal fees incurred to document and close the loan.  Wilson Tr. 1426:20 – 1427:7, 1432:23 – 1424:3.

374.     In this case, WSB incurred legal fees of $30,309 related to the loan and $20,500 related to the capital lease.  ONI paid WSB $50,809 in legal fees, which was disclosed to SLP. Wilson Tr. 1430:6 – 1431:23; Joint Ex. 97.

375.     ONI's legal counsel, King & Spalding, charged a total of $80,000 in legal fees for its loan and capital lease work, 100% of which was paid by MSP-Montana.  Wilson Tr. 1430:6 – 1431:12.

376.     MSP-Montana intended and ensured that ONI would not pay additional legal fees associated with the capital lease.  Under a traditional loan, ONI would have paid WSB $30,309 for fees associated with the loan.  King & Spalding did not itemize or separate the legal fees incurred for its work on the loan versus its work on the lease.  However, using the same ratio of fees incurred by the bank for its counsel's work on the loan, ONI would have paid King & Spalding approximately $48,000 ($80,000 x (30,000/50,000)) for its work on the loan.  This would have resulted in ONI paying a total of $78,309 in legal fees associated with the loan. Instead, ONI only paid a total of $50,809, in legal fees resulting in a net benefit to ONI of $28,309.  Wilson Tr. 1428:8 – 1430:24, 1430:6 – 1435:11, 1566:1 – 1568:1; Joint Ex. 63.

377.     The only additional fees associated with the capital lease financing structure that were necessary to comply with the requirement that MSP-Montana not pay interest were the fees charged by GSS and the attorneys' fees associated with the capital lease, both of which were paid 100% by MSP-Montana.  SLP did not pay any additional fees because of the financing structure. Wilson Tr. 1435:12-22.

**I.     Respondents' Damages**

378.    There was no benefit to Meridian or MSP-Montana if the ONI Center did not open. Wilson Tr. 1489:25 – 1490:6

379.    Because the ONI Center did not open, Meridian and MSP-Montana lost a total of $3,104,164. Wilson Tr. 1489:21-24; Joint Ex. 112.

380.    MSP-Montana initially invested $370,000 in the ONI project and was the only investor in ONI to invest its proportional share of a capital call in October 2012, which totaled $74,000. Wilson Tr. 1488:10-17, 1490:7-19; Joint Ex. 112.

381.    SLP refused to meet the June 2012 and October 2012 capital calls for ONI. Wilson Tr. 1487:5-20, 1488:10-17.

382.    ONI ran out of money, and MSP-Montana continued to pay 100% of the monthly lease-loan payments, totaling $313,026 during late 2012 and 2013, while Mr. Hancock worked to find an economically viable solution for the surgery center. Wilson Tr. 1490:7-25, 1493:8-16; Joint Ex. 112.

383.    MSP-Montana's payment of the lease-loan payments after ONI ran out of money benefited SLP because the payments reduced SLP's liability on its guaranty by $62,388, SLP's pro rata share of those payments. Wilson Tr. 1491:1-16; Joint Ex. 112 (under heading "SLP Pro-Rata Portion").

384.    Because the ONI Center did not open, the lease-loan eventually went into default, and MSP-Montana was required to pay its guarantee on the capital lease in the amount of $725,000. Wilson Tr. 1491:18 – 1492:1; Joint Ex. 112.

385.    From October 2012 to March 2016, MSP-Montana paid 100% of the surgery center suite lease payments to the landlord, ONI Realty. Neither Meridian nor MSP-Montana

82

had an ownership interest in or were otherwise affiliated with ONI Realty. MSP-Montana paid a total of $887,535 to keep the surgery suite lease from going into default. Wilson Tr. 1492:2 – 1493:17; Joint Ex. 112.

386.    MSP-Montana initially guaranteed 100% of the surgery suite lease between ONI and ONI Realty to allow ONI Realty to obtain financing and begin construction of the surgery center with the understanding that the other investors, including SLP, would guarantee the surgery suite lease in accordance of their pro rata share of ownership in ONI as required by both the POM and ONI Operating Agreement. Wilson Tr. 1492:24 – 1495:9, 1436:11 – 1404:4; Joint Ex. 1; Joint Ex. 3.

387.    The POM clearly advised SLP that "Each Member (and each equity owner of an entity that is a Physician Investor) also may be required to personally guarantee the Member's pro rate share of a minimum of 100% of certain indebtedness, lease and other obligations of the Company, if required by lenders, lessors and other third parties.   This may include equipment leases or loans, tenant improvement loans, working capital loans and real estate leases."   Joint Ex. 1, p. 1 (under heading "Securities Being Offered"), p. 3 (under heading "Indebtedness of the Center"), p. 6 (under heading "Indebtedness and Personal Guarantees"), p. 36 (under heading "Capital Contributions; Personal Guarantees").

388.    The ONI Operating Agreement required SLP to execute a guarantee for the surgery center lease: "each member and each equity owner of an entity that is a Physician Member may be required to personally guarantee, on a pro rate basis, based on each Member's Membership Percentage, the payment of the obligations of the LLC pursuant to an Principal Obligations or lease agreements approved by the Board for which any guarantee is required by the lender or lessor." Wilson Tr. 1440:5 – 1441:3; Joint Ex. 3 § 4.4(b).

83

389.    The Subscription Agreement that SLP executed references and incorporates the terms and conditions of the POM and the ONI Operating Agreement, including the members' pro-rata obligations for ONI's indebtedness and lease obligations. Joint Ex. 6, pp. 1, 3.

390.    ONI Realty required "Meridian Surgical Partners LLC and the other members of Tenant" to guarantee the lease for the surgery center suite. Joint Ex. 8, p. 1 (line of chart titled "Guarantor").

391.    SLP's pro rata share of the surgery suite lease was $176,892, plus interest of $21,195, for a total of $198,086 for the time period October 2012 through March 2016. Wilson Tr. 1495:10-15; Joint Ex. 112 (under heading "SLP Pro-Rata Portion").

392.    MSP-Montana's payment of 100% of the surgery suite lease benefitted SLP because SLP was an owner in ONI Realty and MSP-Montana's payments reduced the liability of SLP on the surgery suite lease that it was required to guarantee as a member of ONI, but refused. Wilson Tr. 1495:16 – 1496:5.

393.    MSP-Montana had to pay a lease termination fee of $150,000 on the surgery center suite lease.  SLP's pro rata share of that liability was $29,896, plus interest of $299, for a total of $30,195.  Wilson Tr. 1496:6 – 1497:17; Joint Ex. 112 (under heading "SLP Pro-Rata Portion").

394.    After ONI ran out of money, MSP-Montana paid additional expenses totaling $171,552, for costs such as utilities, insurance and taxes on behalf of ONI while MSP-Montana continued to explore an economically viable alternative for ONI.  With interest, MSP-Montana's total out-of-pocket for other expenses was $198,788. Wilson Tr. 1497:19 – 1498:2; Joint Ex. 112 (under heading "Other ONI Expenses").

84

395.    Respondents total losses were $3,104,164 with interest calculated at the statutory rate of 6%. Joint Ex. 112. However, taking into account only SLP's pro rata share of the losses reflected in three of the damage items above (*see* Findings 382-383, 391-393) results in total losses of $1,887,798 for which SLP is responsible. *See* Joint Ex. 112.

## J.    Financial Experts

396.    Mr. Barbo is a Managing Director at VMG Health. Prior to VMG, Mr. Barbo was a director with Deloitte in their healthcare valuation group. He is a certified public accountant and holds an MBA degree from Southern Methodist University. He is accredited in business valuation by the American Institute of Certified Public Accountants. Barbo Tr. 1719:23 – 1720:19; 1721:23 – 8; Joint Ex. 106, p.6-11.

397.    Mr. Barbo has valued approximately 75 to 100 ASCs. Barbo Tr. 1722:9 – 17.

398.    Mr. Barbo prepared an affirmative report that supports a finding that the ONI project was not financially viable with only Drs. Schmidt, Emery and Winzenried. *See* Finding 247 above. Mr. Barbo testified as to that and the numerous errors in Mr. Bennett's rebuttal report to his affirmative report. Joint Ex. 106; Joint Ex. 390; Barbo Tr. 1765:15 – 1775:18.

399.    Mr. Barbo's Scenario B in his affirmative report is a cash flow analysis as of March 2013 assuming ONI was opened with only Drs. Schmidt, Winzenreid and Emery. Barbo Tr. 1725:7 – 1727:6; Joint Ex. 106.

400.    The net revenue per case for orthopedic procedures of $2,136 used by Mr. Barbo in his Scenario B is consistent with industry data reported by surgery centers. Barbo Tr. 1733:18 – 19.

85

401.     Mr. Barbo's analysis shows that the cash flows would have been significantly negative – over $1,000,000 each year – for the first five years with only Drs. Schmidt, Winzenreid and Emery.  Barbo Tr. 1727:7 – 11; Joint Ex. 106, p.3-4.

402.     Mr. Barbo testified that opening ONI with only Drs. Schmidt, Winzenreid and Emery would have resulted in a negative return on investment as demonstrated by his Scenario B calculations.  Barbo Tr. 1741:2 – 15; Joint Ex. 106, p.4, Ex. E, Ex. F and Ex. G.

403.     Mr. Bennett did not perform a market analysis of Billings, Montana.  Bennett Tr. 648:10-12.

404.     Mr. Bennett did not talk to any surgery centers or hospital representatives in Billings, Montana regarding orthopedic surgery before preparing his report.  Bennett Tr. 648:13-19.

405.     Mr. Bennett has never worked for an ASC or the Northern Wyoming Surgery Center ("NWSC").  Bennett Tr. 648:20-25.

406.     Mr. Bennett's healthcare experience consists of working as the business manager for Dr. Schmidt's medical practice for the last two years and working on clinical trials as a researcher for pharmaceuticals.  Bennett Tr. 604:17 – 605:12, 649:1-12.

407.     Mr. Bennett has never negotiated a payor contract for an ASC, had not seen the payor contracts for the Northern Wyoming Surgery Center when he prepared his report, and did not perform any independent analysis or study to determine if the reimbursement rates for surgery centers in Cody, Wyoming were the same as Billings, Montana.  Bennett Tr. 665:13 – 666:9.

86

408.   Mr. Bennett's net revenue per case for orthopedics in his Scenarios A, B and C were based on the Northern Wyoming Surgery Center in Cody, Wyoming.  Bennett Tr. 613:25-614:3; Ex. 407.

409.   Mr. Barbo testified that the net revenue per case for orthopedics that was used by both Dr. Bowles (which was provided to Dr. Bowles by Mr. Bennett at Ex. 407) and by Mr. Bennett was extremely high – higher than the 90th percentile rate according to ASC industry survey data.  Barbo Tr. 1733:18 – 1734:19, 765:15 – 1766:12; Joint Ex. 377 at Table 2C; Joint Ex. 379 (last page); Joint Ex. 390, p. 7-11; Joint Ex. 407.

410.   Based on Mr. Barbo's extensive healthcare valuation experience, commercial payers' reimbursement rates can and do vary widely from market place to market place based on various market dynamics.  An ASC's ability to obtain high commercial reimbursement rates is dependent on many factors, including the size and services of the ASC, involvement of a hospital-partner in the ASC, the density of competitors, the size of the market place, the commercial payers' penetration, narrow or broad networks, and the ASC's overall purchasing power with the commercial payers.  The mere fact that two ASCs are approximately 90 miles apart, such as Northern Wyoming Surgery Center ("NWSC") in Cody, Wyoming, and ONI LLC in Billings, Montana, does not mean they will have similar reimbursement rates.  Cody has only two surgical facility providers, consisting of NWSC and WestPark Hospital, which is also an investor in NWSC.  NWSC had significant advantages over ONI LLC in terms of commercial payer rate negotiations because ONI LLC would have operated in a more competitive Billings market and without the negotiating leverage of a hospital investor.  The net revenue rates for orthopedic cases that Dr. Bowles used in his Table 2C Scenario are substantially above the rates

87

reported by other ASCs (23% higher than the 90% percentile for all orthopedic cases reported). Joint Ex. 390, p.7-8.

411.   Mr. Bennett's net revenue per case for orthopedics in his Scenario A and Scenario B not only were based on the NWSC, but also included spine (rather than just orthopedic) cases performed by Dr. Emery (which are reimbursed at a higher rate than orthopedic cases) and included Dr. Lee who was not a member of ONI and who performed high reimbursement cases such as arthroscopic hip procedures and multiligamental knee procedures that Drs. Emery, Schmidt and Winzenreid did not perform. Bennett Tr. 674:17 – 676:21; Joint Ex. 399; Joint Ex. 379.

412.   Scenario A and B of Mr. Bennett's rebuttal report to Mr. Barbo's report purports to use the same methodology as Mr. Barbo's Scenarios A and B but Mr. Bennett's Scenario A more than doubled the net revenue per case for orthopedics used by Mr. Barbo and changed the case volume discount applied by Mr. Barbo from 50% to 20%. Bennett Tr. 652:24 – 654:20; Joint Ex. 106 (Ex. C p.3 of 12); Joint Ex. 379.

413.   Mr. Bennett testified that he copied all the numbers from Mr. Barbo's report and plugged those same numbers into his Scenario A and B with the exception of the net revenue per case and the discount applied to case volumes. Bennett Tr. 654:14 – 655:16; Joint Ex. 106 (Ex. C); Joint Ex. 379 (Scenario A).

414.   Mr. Bennett did not replicate Mr. Barbo's methodology for calculating the ramp discount for case volumes. Mr. Barbo's ramp discount volumes in his Scenario A for Drs. Emery, Schmidt and Winzenreid were 18, 37 and 20 cases respectively which was 33% of the net base volume for those physicians. Because Mr. Bennett simply copied and used 18, 37 and 20 cases as the ramp volume for Drs. Emery, Schmidt and Winzenreid in his Scenario A, Mr.

88

Bennett was using a discount of only 20% of net base volumes rather than 33% which resulted in his year 1 case volume being overstated. Bennett Tr. 657:2 – 659:7; Joint Ex. 106 (Ex. C); Joint Ex. 379 (Scenario A "Projected Revenues"); Barbo Tr. 1734:20 – 1736:8, 1765:15 – 1766:1.

415.    Variable expenses should increase or decrease with a corresponding increase or decrease in case volumes and net revenues. Barbo Tr. 1738:17 – 20, 1740:14 – 23, 1767:2 – 15.

416.    Although Mr. Bennett's Scenario A increased the case volume by over 100 cases from Mr. Barbo's report and doubled the net revenue from Mr. Barbo's report, Mr. Bennett did not adjust the variable expenses upward in his Scenario A because he simply copied the dollar amounts for variable expenses from Mr. Barbo's report. Bennett Tr. 655:17 – 21, 661:24 – 13; Joint Ex. 106 (Ex. D); Joint Ex. 379 (Scenario A "Projected Expenses").

417.    For example, Mr. Bennett copied the same numbers from Mr. Barbo's report for medical supplies of $159,000. Bennett Tr. 661:1 – 23; Joint Ex. 106 (Ex. D); Joint Ex. 379 (Scenario A "Projected Expenses").

418.    Mr. Bennett's Scenario A contained this same error for all variable expenses which included medical supplies, ortho supplies, pain supplies, joint supplies, overnight, laundry and transportation and repairs and maintenance. Bennett Tr. 661:1 – 13, 662:14 – 18; Joint Ex. 106 (Ex. D); Joint Ex. 379 (Scenario A "Projected Expenses").

419.    In Mr. Bennett's Scenarios A and B he also copied the management fees from Mr. Barbo's report even though management fees by contract were 5% of net revenue generated by ONI. Because Mr. Bennett's Scenario A net revenues were more than double of those in Mr. Barbo's report, the management fees in Mr. Bennett's report should have been significantly higher but are instead understated. Bennett Tr. 662:19 – 22; Barbo Tr. 1767:16 – 1768:1.

420.   Because Mr. Bennett's variable expenses were erroneously understated in Scenario A, the net revenues are erroneously overstated.  Barbo Tr. 1767:16 – 1768:11.

421.   Mr. Bennett testified that his Scenario A net revenues were not correct and needed to be revised.  Bennett Tr. 663:22 – 25.

422.   Mr. Bennett's Scenario B simply copied the variable expenses and management fees from Mr. Barbo's Scenario B despite higher case volumes and revenues used by Mr. Bennett. Accordingly, Mr. Bennett's Scenario B variable expenses are also incorrect in Mr. Bennett's Scenario B.  Bennett Tr. 664:17 – 22; Joint Ex. 379; Barbo Tr. 1768:18 – 1770:23.

423.   Mr. Bennett's Scenario B also added an additional unknown Orthopedic Surgeon with 150 cases that was not in Mr. Barbo's Scenario B.  Bennett Tr. 664:23 – 12.

424.   Mr. Bennett's Scenario B overstates net cash flows.  Barbo Tr. 1770:12 – 23.

425.   Mr. Bennett's Scenario C is the same projection found at Joint Ex. 407, which was provided to and used by Dr. Bowles in his calculations.  Joint Ex. 379 (see last page); Joint Ex. 407.

426.   Mr. Bennett's rebuttal report incorrectly summarizes distributions for his Scenario C as $4,419 for year 5 but the last page of his report shows distributions for year 5 as $2,858. Bennett Tr. 649:21 – 651:5; Joint Ex. 379; p.2.

427.   Mr. Bennett's Scenario C understates the management fees which overstates EBITDA and Mr. Bennett did not know if the other variable costs in Scenario C were accurately stated.  Bennett Tr. 668:2 – 17; Joint Ex. 379 (see last page).

428.   The variable expenses used by Mr. Bennett in his Scenario C are all erroneously understated.  Barbo Tr. 1774:7 – 18.

429.    Mr. Bennett opined that working capital needs would increase if a surgery center's revenues increased, but on his Scenario C he simply copied the working capital numbers from a Meridian projection (Joint Ex. 400) despite the fact that his Scenario C net revenues are well over $1,000,000 higher than the net revenues in Meridian's projections at Joint Ex. 400. Bennett Tr. 668:18 – 671:16, 687:2 – 7; Joint Ex. 400; Joint Ex. 379 (See last page of Ex.).

430.    Because Mr. Bennett significantly increased the net revenues in his Scenario C, the working capital numbers should have increased and been higher not in just year one but each year thereafter. Barbo Tr. 1773:11 – 1774:6.

431.    In his Scenario C, Mr. Bennett estimated year 2 spine revenue per case by averaging year 1 and year 3 average spine revenue per case at the NWSC, even though Dr. Schneider did not perform any surgeries at that center in Year 2 (or thereafter) and there were virtually no spine procedures performed by anyone at NWSC in Year 2 (2013). Year 3 (2014) is based on a Dr. Poffenbarger's net revenue per case for spine even though he was never a member of ONI. Bennett Tr. 616:7 –618:9.

432.    Mr. Bennett has not provided corrected Scenarios A, B or C and they are admittedly incorrect and unreliable.

## CONCLUSIONS OF LAW

**A.    Delaware Law Applies To All Claims In This Arbitration**

1.    SLP's Subscription Agreement expressly incorporates all "terms and conditions" in the Operating Agreement, including the choice of law provision applying Delaware law. Joint Ex. 6, p. 3; Joint Ex. 5 § 13.3.

2.    The Management Services Agreement also includes a Delaware choice of law provision. Joint Ex. 5 § 13.3.

91

3.      The parties' claims and defenses must be analyzed under Delaware substantive law pursuant to the clear and unambiguous Delaware choice of law provisions in the relevant agreements in this case.  See *Masters Grp. Int'l, Inc. v. Comerica Bank*, 380 Mont. 1, 18-19 (2015) (reversing $52 million verdict against defendant where the district court applied Montana law but should have applied Michigan law pursuant to the clearly negotiated and unambiguous choice of law provision in the parties' agreements).

4.      Where an agreement includes a choice of law provision, that provision also applies to any non-contract claims asserted by the parties.  See, e.g., *Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1254 n.70 (Del. Ch. 2010) ("The choice of law clauses in the Subscription Agreements and Share Sale Agreements, which choose English law to govern the agreements, are also applicable to the non-contract claims[.]"); *Transdigm Inc. v. Alcoa Global Fasteners, Inc.*, 2013 WL 2326881, at *4–5 (Del. Ch. May 29, 2013) (applying Delaware law to fraud claims where stock purchase agreement contained Delaware choice of law provision); *Greetham v. Sogima L-A Manager, LLC*, 2008 WL 4767722, at *14 (Del. Ch. Nov. 3, 2008) (applying Delaware law to promissory estoppel claims where LLC operating agreement contained Delaware choice of law provision); *Pharmathene, Inc. v. Siga Techs., Inc.*, 2008 WL 151855, at *7–8 (Del. Ch. Jan. 16, 2008) (applying Delaware law to tort and promissory estoppel claims where merger agreement contained Delaware choice of law provision); *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (applying Delaware law to tort claims for fraudulent inducement and rescission where stock purchase agreement contained Delaware choice of law provision).  Accordingly, substantive Delaware law applies to all claims asserted in this matter.

5.      Because the ONI LLC investors—including Claimant and Respondents—contractually designated Delaware law as the substantive law to be applied in this arbitration, Delaware law applies to all claims.

6.      Under Delaware law, "plaintiffs bear the burden of proving their claims by a preponderance of the evidence.  In this regard, the Court must be mindful that if the evidence presented by the parties during trial is inconsistent, and the opposing weight of the evidence is evenly balanced, then 'the party seeking to present a preponderance of the evidence has failed to meet its burden.'" *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545 (Del. Super.), *aff'd*, 886 A.2d 1278 (Del. 2005).

7.      When balancing the evidence, courts apply the customary Delaware standard to trial testimony.  Under this standard, a court must "judge the believability of each witness and determine the weight given to all trial testimony" and consider:

> each witness's means of knowledge; strength of memory and opportunity for observation; the reasonableness or unreasonableness of the testimony; the motives actuating the witness; the fact, if it was a fact the testimony was contradicted; any bias, prejudice, or interest, manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affect the believability of the testimony.

*Dionisi v. DeCampli*, 1995 WL 398536, at *1 (Del. Ch. June 28, 1995).

**B.    Respondents are Entitled to Adverse Inferences Against Claimant Based on Dr. Schneider's Refusal to Testify and Independent Evidence**

8.      "The prevailing rule [is] that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Drawing an adverse inference is appropriate "when independent evidence exists of the fact to which the party refuses to answer." *Doe ex rel. Rudy-Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000). "The tension between one party's Fifth Amendment rights and the other party's right to a fair

93

proceeding is resolved by analyzing each instance where the adverse inference was drawn, or not drawn, on a case-by-case basis under the microscope of the circumstances of that particular civil litigation." *Id.*

9.    Under the circumstances of this litigation, adverse inferences against Claimant are appropriate.   Moreover, importantly, Respondents provided independent evidence beyond Dr. Schneider's mere silence to support each of the facts for which they previously moved for an adverse inference.  Claimant failed to provide any evidence to counter Respondents' independent evidence and the adverse inferences that Respondents seek. Dr. Schneider was ordered to appear for a second deposition to answer questions that he had previously refused to answer, but he still refused to answer those questions in his second deposition and invoked his Fifth Amendment privilege only to avoid civil liability.  Respondents did not have the opportunity to question any other witnesses who had personal knowledge about most or all of the facts about which Dr. Schneider refused to testify.   Therefore, based upon the foregoing, including independent evidence, adverse inferences are hereby drawn against Claimant with respect to any question that Dr. Schneider refused to answer or for which he invoked the Fifth Amendment privilege, including, but not limited to the following matters. Dr. Schneider orchestrated a scheme in 2010 to distribute more than 14,000 defamatory flyers to Wyoming residents with the intent of injuring Dr. Jimmie Biles. Dr. Schneider recruited Lisa Shaurette Fallon to send the flyers from her out-of-state address. Dr. Schneider purchased the mailing labels that were used by Lisa Fallon. Subsequently, Dr. Schneider sent multiple emails to Lisa Fallon that appear to have  involved a possible conspiracy, witness tampering, bribery, and obstruction of justice.  Dr. Schneider paid and/or promised money to Lisa Fallon in exchange for her testimony.  Dr. Schneider asked Lisa Fallon to send him her cell phone and computer hard drive so that he could give them "the

microwave" treatment.    Dr. Biles sued Lisa Fallon and Dr. Schneider for defamation. Subsequently, Dr. Schneider settled the Biles litigation.

10.    Dr. Schneider appears to have engaged in conduct that could constitute bribery, witness tampering, and obstruction of justice with respect to Lisa Fallon.

11.    Dr. Schneider was acting on behalf of himself and Schneider Limited Partnership with respect to the scheme to defame Dr. Biles.

12.    Dr. Schneider paid Lisa Fallon money in order to influence her to do something illegal and dishonest.

13.    The evidentiary record in this case supports the conclusion that Dr. Schneider and Schneider Limited Partnership are one and the same, and Schneider Limited Partnership is the alter ego of Dr. Schneider. *See* Findings 282-312 above and Conclusions 18-24 below.

14.    Dr. Schneider lied to and misled the other ONI investors in December 2011 when he told the investors that the accusations in the Biles lawsuit were "wildly false."

15.    Dr. Schneider's defamatory scheme and his conduct with respect to Lisa Fallon negatively impacted and prevented the ability of ONI LLC to obtain a state license if Dr. Schneider continued to be involved in ONI LLC after May 2012.

16.    Dr. Schneider's credibility as a witness is called into serious question by the evidentiary record in this case.

17.    Mr. Wilson, Mr. Hancock, Ms. Grissom, Mr. Suscha and Ms. Kowalski testified truthfully, consistently and credibly on behalf of Respondents.

**C.    Claimant is the Alter-Ego of Dr. Schneider**

18.    Schneider Limited Partnership is a Wyoming entity.   According to the Supreme Court of Wyoming, courts consider the following factors in determining whether an entity is the alter ego of another, such that piercing the corporate veil is appropriate.

95

19.    "[C]ommingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; the treatment by an individual of the assets of the corporation as his own; the failure to obtain authority to issue or subscribe to stock; the holding out by an individual that he is personally liable for the debts of the corporation; the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; the failure to adequately capitalize a corporation; the absence of corporate assets, and undercapitalization; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest or concealment of personal business activities; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; the use of the corporate entity to procure labor, services or merchandise for another person or entity; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another, the contracting with another with intent to avoid performance by use of a corporation as a subterfuge of illegal transactions; and the formation and use of a corporation to transfer to it the existing liability of another person or entity." *Ridgerunner, LLC v. Meisinger*, 297 P.3d 110, 115 (Wyo. 2013) (quoting *Amfac Mech. Supply Co. v. Federer*, 645 P.2d 73, 77–78 (Wyo. 1982)).

96

20.     Delaware courts have considered many of the same factors in considering whether to apply the alter ego theory. *See, e.g., O'Leary v. Telecom Res. Serv., LLC*, WL 379300, at \*7 (Del. Super. Jan. 14, 2011) (discussing degree of control, lack of formalities, and commingling of assets as relevant to the alter ego analysis); *Harco Nat. Ins. Co. v. Green Farms. Inc.*, No. CIV. A. 1131, 1989 WL 110537, at \*6 (Del. Ch. Sept. 19, 1989) (discussing undercapitalization in the context of alter ego analysis, as well as lack of formalities and commingling of assets); *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 793 (Del. Ch. 1992) (finding it relevant to the alter ego analysis that owner held out a company's debts as his own).

21.     Trustee Womack asserted that Claimant was the alter ego of Dr. Schneider and alleged that Dr. Schneider had engaged in a complex scheme of divestitures to hide his assets. The Trustee alleged Claimant is a mere instrumentality of Dr. Schneider for the transaction of Dr. Schneider's own affairs and is operated as an extension of Dr. Schneider.   All capital contributions to Claimant came from monies earned by Dr. Schneider.  In fact, virtually all of Claimant's assets represent Dr. Schneider's individual earnings or were acquired through Dr. Schneider's individual earning power.  Dr. Schneider routinely commingled his personal funds and those of Claimant and routinely used such funds to pay for personal living expenses and to satisfy personal obligations.  Claimant does not keep reasonable or adequate financial records or accountings. Instead, Dr. Schneider controls the entity and manipulates the accountings for his own purposes.

22.     Dr. Schneider has claimed or otherwise treated Claimant's assets as his own and has utilized, transferred, or directed the transfer of such assets in the exercise of his sole discretion for his personal benefit.   Indeed, Dr. Schneider believed that he had the right to demand distributions from Claimant at any time, and acted in accordance with that belief.  For

instance, from February of 2013 through 2014, Dr. Schneider caused Claimant to distribute to him and/or pay his personal obligations, including attorneys' fees and settlement costs related to medical malpractice claims, in a total amount of at least $1,658,431.30. Moreover, Dr. Schneider is the signatory on bank accounts for Claimant, routinely transferred funds and assets between himself and Claimant and utilized Claimant's funds and assets for his personal benefit. Further, Dr. Schneider regularly represented Claimant's funds and assets to be his own.   Dr. Schneider admits that he depleted assets to pay his legal expenses.

23.   Furthermore, when Dr. Schneider filed for Chapter 7 bankruptcy, he listed, as his personal assets, both an interest in Claimant and a contingent claim against Meridian valued at $15 million. Dr. Schneider testified that this $15 million claim is related to Claimant and that Claimant's damages were included in the $15 million, demonstrating that Dr. Schneider holds himself out as personally entitled for any debts that Claimant is allegedly owed.

24.   The law and the evidence support the conclusion that Claimant Schneider Limited Partnership is the alter ego of Dr. Schneider and that Respondents' claims are not barred by the Bankruptcy Court Settlement. *See* Findings 282-312 above.

**D.   Claimant Failed to Satisfy its Contractual Obligations and Respondents Suffered Damages as a Result**

25.   To maintain a breach of contract action under Delaware law, a plaintiff must prove (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiff. *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

26.   Respondents proved by a preponderance of the evidence each of the required elements of its breach of contract claims.   Respondents' evidence established that Claimant undertook contractual obligations to Respondents through its investment in ONI, that Claimant

failed to satisfy those contractual obligations, and that Respondents took proper steps to mitigate their damages but still suffered damages as a direct result.

27.     Claimant was required to execute a guarantee for the surgery center suite lease, through which ONI leased the surgery center suite in the ASC building from ONI Realty. Claimant refused to sign a guarantee for its pro rata share of the surgery center suite lease. As a result, MSP-Montana was forced to make the monthly surgery center suite lease payments to prevent a default while alternatives for the ONI Center were explored.   MSP-Montana paid 100% of the surgery center suite lease payments until ONI Realty sold and/or re-leased the building in March 2016.  Those payments totaled $887,535.  Claimant's pro rata share of the surgery center suite lease totaled $176,892 for the time period of October 2012 through March 2016. MSP-Montana's payment of 100% of the surgery center suite lease benefitted Claimant by reducing Claimant's liability on the surgery suite lease that it was required—but refused—to guarantee as a member of ONI.  Meridian was also forced to pay a termination fee of $150,000 with respect to the surgery center suite lease.  Claimant's pro rata share of that liability totaled $29,896.  Respondents are entitled to recover Claimant's pro rata share of the surgery center suite lease payments and the termination fee under the required guarantee that Claimant refuses to honor, plus interest.

28.     Claimant also executed a commercial guarantee for the lease-loan payments. Meridian made 100% of the lease-loan payments for a period of time while viable options to open the ONI Center were explored.  Those payments totaled $313,026.  MSP-Montana was forced to pay not only its own pro rata share of the capital lease, but also Claimant's pro rata share of the debt guaranteed to prevent foreclosure.  Claimant's pro rata share of this debt totaled $62,388.  MSP-Montana's payment of 100% of the lease-loan benefitted Claimant by reducing

99

Claimant's liability on the commercial guarantee that Claimant executed. Claimant is required to satisfy its pro rata obligation with respect to these payments, plus interest. MSP-Montana was also required to pay its guarantee on the lease-loan in the amount of $725,000 when the ONI Center did not open.

29.     MSP-Montana made an initial investment of $370,000 in the ONI project. MSP-Montana was also the only investor in ONI to invest its proportional share of the October 2012 capital call, totaling $74,000. Claimant refused to meet the June 2012 and October 2012 capital calls for ONI. MSP-Montana paid additional expenses totaling $171,552 for other costs such as utilities, insurance and taxes on behalf of ONI while MSP-Montana continued to explore an economically viable alternative for ONI.

30.     Because the ONI Center did not open, Meridian and MSP-Montana lost a total of $3,104,164, including interest. SLP is responsible for $1,887,798 of this amount. *See* Finding 395 and Conclusions 27-28 above.

31.     Under Delaware law, prejudgment interest must be calculated as simple interest rather than compound interest. *See* 6 Del. Code Ann. § 2301(a)("Where there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due"). "Although compound interest may be the type of interest generally obtained by investors, it is not generally favored in the law." *Weinberger v. UOP, Inc.*, 517 A.2d 653, 657 (Del. Ch. 1986) (citation omitted). "In addition, interest was set at the statutory rate of 5% above the Federal Reserve discount rate, 6 Del.C. § 2301(a), and the statute has been construed as providing only simple interest." *Id.* (citing *Papendick v. Robert Bosch GmbH*, 1981 WL 291739, at *4 (Del. Super. Aug. 4, 1981), *aff'd.*, 450 A.2d 894 (Del. 1982) (holding that prejudgment interest should be calculated as

100

simple interest under the general rule that interest should be computed so as to avoid the payment of compound interest and to secure a calculation of interest on the actual amount due.").

32.     Meridian and MSP-Montana are entitled to a judgment of $1,887,798 against Claimant.

**E.     Claimant Failed to Prove that Respondents Breached Any Contractual Obligations**

i.     Management Services Agreement

33.     Under Delaware law, "only a party to a contract has enforceable rights under, and may sue for breach of, that contract." *Maglione v. BCBSD, Inc.*, 2003 WL 22853421, at *3 (Del. Super. July 29, 2003); *see also Insituform of N. Am., Inc. v. Chandler*, Del. Ch., 534 A.2d 257, 270 (1987) (holding that non-signatories to a contract have no rights under the contract, and thus no standing to assert claims under the contract).

34.     ONI LLC and MSP-Montana are the only two parties to the Management Services Agreement ("MSA"). Joint Ex. 5. Therefore, ONI LLC and MSP-Montana are the only parties that have rights to sue under that agreement.

35.     Although Claimant owns an interest in ONI LLC, ONI LLC is a legal entity separate and distinct from the members who compose it. *See Mission Residential, LLC v. Triple Net Properties, LLC*, 654 S.E.2d 888, 891 (Va. 2008).

36.     Claimant does not have standing to sue for breach of the MSA because it is not a signatory to the MSA.

37.     Claimant also is not an intended third-party beneficiary to the MSA.

38.     "Third parties who may well benefit from a contract, but are not part of any beneficial intent by the contracting parties, are merely incidental beneficiaries" with no enforceable rights under the contract. *McClements v. Savage*, 2007 WL 4248481 at *1 (Del. Super. Ct. Nov. 29, 2007). Thus, only *intended* third-party beneficiaries may recover for breach

101

of the contract. *See Pettit v. Country Life Homes, Inc.*, 2009 WL 846922, at \*3 (Del. Super. Mar. 31, 2009), *aff'd*, 984 A.2d 124 (Del. 2009) ("Plaintiff has asserted rights as a third-party beneficiary to the contract by claiming that it was made for his benefit. There is a difference, though, between intended beneficiaries and incidental beneficiaries. It is a crucial distinction[.]").

39.   Claimant failed to identify a single provision in the MSA or offer any other evidence that establishes ONI LLC's and MSP-Montana's intent to benefit Claimant specifically through the execution of that agreement.

40.   Under Delaware law, status as a member of an LLC that stands to benefit from a contract simply by virtue of membership in the LLC is not sufficient to establish intended third-party beneficiary status. *Pettit*, 2009 WL 846922, at \*3.

41.   Claimant's evidence establishes that it is, at most, an incidental beneficiary to the MSA. Claimant did not meet its burden to demonstrate that it was a specifically intended third-party beneficiary of the MSA. Claimant offered no evidence of any intent by the two signatories of the MSA—ONI LLC and MSP-Montana—to benefit Schneider Limited Partnership specifically when they negotiated and executed the MSA.

42.   Because Claimant is not an intended third-party beneficiary of the MSA, Claimant lacks standing to sue for breach of that agreement as a non-signatory. Even if Claimant were an intended beneficiary of the MSA, it has failed to prove that Respondents breached any obligations under the MSA. *See* Conclusions 45-53 below.

43.   Claimant cannot establish standing to sue for breach of the MSA on the grounds that it was directly harmed or suffered any damages as a result of any alleged breach of the MSA by MSP-Montana.

44.     The *Tooley v. Donaldson, Lufkin & Jennette, Inc.* case cited in Claimant's Pre-Hearing Brief is inapposite to Claimant's standing argument. That case involved a purported class action alleging that a board of directors breached their fiduciary duty by agreeing to a delay in a proposed merger. It did not relate to breach of contract claims asserted by a non-signatory to the contract. The "direct" harm discussed in that case does not provide standing to a non-signatory to a contract to maintain an action for breach of that contract.

45.     Even if Claimant could establish standing to sue for breach of the MSA through direct harm, Claimant failed to prove that MSP-Montana breached any provision of the MSA or that Claimant was damaged directly—rather than derivatively—by any alleged breach. SLP existed for no other meaningful purpose than as an investment entity for Dr. Schneider. SLP held little significance beyond its status as a member of ONI LLC. As such, Claimant failed to prove that SLP suffered any direct harm that was independent from and unrelated to any harm suffered more generally by ONI LLC.

46.     Even if Claimant had standing to sue for breach of the MSA, Claimant failed to prove a breach of Section 4.3 of the MSA. Claimant previously alleged that MSP-Montana breached the MSA because it charged ONI for legal services in excess of $15,000. (*See* Claimant's Pre-Hearing Brief, p. 24). Legal expenses incurred by ONI LLC are not MSP-Montana out-of-pocket expenses governed by Section 4.3 of the MSA. The MSA grants MSP-Montana broad authority as the Manager of the ONI Center to oversee the business of the Company and to enter contracts and employ agents for the Company. Because Claimant failed to point to any provision in the MSA that prohibits ONI from paying for legal services provided to the Company, Claimant failed to prove a breach of Section 4.3 of the MSA.

103

47.    Even if Claimant had standing to sue for breach of the MSA, Claimant failed to prove that MSP-Montana breached Section 2 of the MSA by failing to disclose to the physician board members of ONI that the financing structure was also Sharia law compliant or by entering a letter of intent to buy into the Yellowstone Surgery Center in 2012.  (*See* Claimant's Pre-Hearing Brief, p. 24).  Claimant offered no evidence to establish how or why the financing structure or MSP-Montana's negotiations with Yellowstone Surgery Center constituted a conflict of interest.  Accordingly, Claimant failed to meet its burden to prove a breach of Section 2 of the MSA.

48.    Even if Claimant had standing to sue for breach of the MSA, Claimant failed to prove that MSP-Montana breached Section 3.1 of the MSA.   Under Delaware law, the commercial frustration doctrine excuses future performance under a contract:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611 (Del. Ch. 2005), *aff'd in relevant part*, 901 A.2d 106, 113 (Del. 2006) (quoting Restatement (Second) of Contracts § 265 (1981)).  The commercial frustration doctrine excuses MSP-Montana's performance of Section 3.1 of the MSA.  The MSA was entered into under the basic assumption that the ONI Center would open and operate as originally contemplated by the ONI members.  When the ONI investors could no longer move forward with Dr. Schneider as of May 25, 2012 due to Dr. Schneider's misconduct and SLP's breach of its contractual obligations and duties, the primary purpose for which MSP-Montana and ONI entered into the MSA was substantially frustrated because the Center was no longer able to open and operate.  Accordingly, Claimant cannot prove that MSP-Montana breached Section 3.1 of the MSA because MSP-Montana was excused from its performance of

104

the MSA. In addition, even if Claimant could prove a breach of Section 3.1, Claimant failed to prove that it suffered any damages as a result of Respondents' failure to direct and conduct operations that never existed.

49.     Even if Claimant had standing to sue for breach of the MSA, Claimant failed to prove that MSP-Montana breached Section 3.3 of the MSA. Claimant failed to offer any evidence that MSP-Montana did not take all reasonable and necessary actions to maintain all licenses, permits, and certificates required for operation of the Center. Similarly, Claimant failed to offer evidence that MSP-Montana did not take all reasonable and necessary steps to ensure that appropriate certification and accreditation available to the ONI Center were obtained.

50.     Claimant failed to prove a breach of Section 3.3 based on the ONI Center's inability to obtain a transfer agreement. Obtaining a transfer agreement was neither an express nor implied obligation of the MSA. Since 2010, Montana law has never required that an ASC execute a transfer agreement with a local hospital in order to obtain a state license. A transfer agreement with a local hospital is not required for an ASC to obtain certification for the Medicare program. Medicare certification was not essential for the ONI Center to open and operate. Nonetheless, Respondents offered considerable documentary evidence and testimony about MSP-Montana's extensive efforts to obtain a transfer agreement with a local Billings hospital. Respondents also established that the ONI Center could have obtained a state license to open in 2012 when Dr. Schmidt obtained credentials at a Billings hospital, but the ONI Center was no longer economically viable because of Dr. Schneider's egregious conduct.

51.     Certification and accreditation were not required for the ONI Center to open and operate profitably. Section 3.3 of the MSA states that MSP-Montana will "coordinate all reasonable and necessary actions . . . to ensure that all appropriate certification and accreditation

available to the Center's operations are obtained." First, certification and accreditation never became available to the ONI Center's operations because the ONI Center never opened and became operational. Second, MSP-Montana coordinated what reasonable and necessary actions it could have coordinated prior to the ONI Center opening to obtain certification and accreditation. Claimant failed to offer evidence that MSP-Montana failed to coordinate reasonable actions to obtain certification or accreditation available to the ONI Center's operations. Claimant failed to prove a claim for breach of Section 3.3 of the MSA.

52.     Even if Claimant did have standing to sue for breach of the MSA, Claimant failed to prove that MSP-Montana breached Section 3.14 of the MSA by failing to perform adequate diligence with local Billings hospitals regarding their requirements for entering a transfer agreement with ONI at a meaningful time prior to building and equipping the ONI Center. (*See* Claimant's Pre-Hearing Brief, p. 26). A transfer agreement with a local hospital was not required to obtain a state license for an ASC in Montana. Nonetheless, MSP-Montana made extensive efforts to obtain a transfer agreement in good faith and with reasonable diligence starting on January 2011, a full year before the targeted opening date for the ONI Center. MSP-Montana worked in good faith and with reasonable diligence towards opening the Center as required by Section 3.14 of the MSA.

53.     Even if Claimant did have standing to sue for breach of the MSA, Claimant failed to prove that MSP-Montana breached Section 6.1 of the MSA based on a default of the MSA and failure to cure such default. As explained previously with respect to Section 3.3 of the MSA, obtaining a transfer agreement was not an express or implied obligation of MSP-Montana under the terms of the MSA. The MSA merely provided that MSP-Montana would take all reasonable and necessary actions to maintain all *licenses* required for operation of the Center, and Claimant

106

failed to prove that MSP-Montana did not do that. Because MSP-Montana was not in default of the MSA, the notice of default and need to cure were unnecessary. Accordingly, MSP-Montana could not have breached Section 6.1.

ii.   ONI Operating Agreement

54.    Claimant failed to prove that MSP-Montana breached Section 7.12(a) of the ONI Operating Agreement. Claimant alleges that the May 25, 2012 decision to move forward without Dr. Schneider's involvement was a violation of that section because the majority of Physician Directors did not formally vote to approve that decision.

55.    Claimant failed to prove that the decision to move forward without Dr. Schneider's involvement was a Board action not approved by the necessary majority of Physician Directors. The May 25, 2012 call was not a Board meeting. Therefore, Section 7.12 of the Operating Agreement is inapplicable to that call and decisions made on that call. In addition, Mr. Hancock, Mr. Wilson, and Ms. Kowalski each testified that during the May 25, 2012 conference call, all of the ONI investors, except SLP, unanimously decided that ONI LLC could not move forward if Dr. Schneider were to be involved. This call included both Dr. Schmidt and Mr. Baker, two of the three Physician Directors, who also agreed that the project could not move forward with Dr. Schneider, constituting approval of a majority of the Physician Directors. Claimant failed to offer any counter evidence that Mr. Baker did not agree to move forward without Dr. Schneider. Furthermore, after May 25, 2012, Mr. Wilson and Mr. Hancock never received a phone call or email from Dr. Schmidt, Mr. Baker, or any of the other ONI investors stating that they wanted to open the surgery center with Dr. Schneider's involvement. Accordingly, the decision to move forward without Dr. Schneider's involvement was approved by the majority of the Physician Directors, and Claimant cannot show a breach of § 7.12(a).

56.     Claimant failed to prove that the decision to move forward without Dr. Schneider made it "impossible" to carry on the business of ONI, as the language of § 7.12(a) requires. Although Dr. Schneider's case volume was projected to constitute approximately 80% of the revenues for the ONI Center, MSP-Montana and the other ONI investors still fully intended to open and operate the ONI Center if they were able to find a replacement for those revenues. After May 25, 2012, MSP-Montana continued to seek state licensure.  In the fall of 2012, Dr. Schmidt was granted credentials at Billings Clinic and the ONI Center could have opened at that point if it were a financially viable project.  MSP-Montana also made substantial efforts to replace the revenues associated with Dr. Schneider after May 25, 2012, including attempting to form a partnership with Drs. Erpelding, Dabov, and Myers.  If the ONI investors had been able to form that partnership, the ONI Center would have opened.  Accordingly, Claimant cannot prove that the decision to move forward without Dr. Schneider made it "impossible" to carry on the business of ONI, and thus, Claimant cannot show a breach of § 7.12(a).

57.     Even if the unanimous decision not to move forward with Dr. Schneider constituted an act that would make it impossible to carry on the business of ONI, MSP-Montana cannot be held liable for any breach because the removal of Dr. Schneider was permissible under the terms of the ONI Operating Agreement.

58.     Section 8.15 of the ONI Operating Agreement lists a number of "Triggering Events" whereby a Physician Member may be terminated.  Section 8.15(xiii) provides that a Requisite Majority of the Members could determine "that a Physician Member's Membership Interest shall be repurchased by the LLC."  The Operating Agreement defines a Requisite Majority as Members holding 70% of the Membership Interests, including MSP-Montana's interest.

108

59.     All ONI investors, besides Claimant, were present via telephone for the May 25, 2012 conference call. Those ONI investors constituted 77% of the total membership interests of ONI. The ONI investors present for the May 25, 2012 conference call unanimously decided not to move forward with Dr. Schneider as part of ONI LLC. Because the ONI investors present for the conference call constituted 77% of the total membership interests, the Requisite Majority of 70% was satisfied. On the May 25, 2012 call, the ONI investors also discussed the fact that they could buy out SLP with the vote of 70% of the ONI members even though they ultimately decided not to buy out SLP. Claimant failed to offer any evidence that Mr. Baker did not agree to move forward without Dr. Schneider. However, even if Mr. Baker did not agree to move forward without Dr. Schneider, Mr. Baker's vote was not necessary for the Requisite Majority to be met because his membership interest in ONI was only 5%. Accordingly, even without Mr. Baker, the Requisite Majority was satisfied because the other investors present on the May 25, 2012 call constituted 72% of the ONI membership interests.

60.     ONI LLC did not repurchase SLP's membership interest. However, § 8.15(b) of the ONI Operating Agreement states that in the event of a Triggering Event, ONI "shall have the right, *but not the obligation*" to purchase the membership interests of the physician.

61.     If the ONI members had moved forward with repurchasing SLP's membership interest in 2012 or 2013, the purchase price for SLP's interest would have been $0.00. Section 8.15(b) provides the procedure for calculating the purchase price when a Triggering Event occurs. That purchase price is defined as three (3) times the LLC EBITDA minus the LLC's outstanding principal obligations, with that amount multiplied by the selling member's pro rata ownership interest in the LLC. Joint Ex. 3 § 8.15(b)(i). The LLC EBITDA "shall be determined based on the twelve (12) months immediately following the Triggering Event Date." *Id.* For

certain Triggering Events, such as exclusion from Medicare, the purchase price is equal to 50% of the price defined in section 8.15(b)(i). *Id.* § 8.15(b)(ii). Under either definition, the purchase price of SLP's membership interest would be $0.00. Where the purchase price is based on the ONI Center's twelve months' EBITDA following the Triggering Event, and the ONI Center has never had any earnings, both the ONI Center's EBITDA and any purchase price calculated based on that EBITDA would be $0.00.

62.    Even without a decision to move forward without Dr. Schneider by the other ONI investors, a number of other Triggering Events in the Operating Agreement occurred with respect to Dr. Schneider between 2012 and 2014.

63.    Section 8.15(a)(viii) provides that a Triggering Event occurs when a physician is excluded from participating in Medicare or Medicaid by the Centers for Medicare & Medical Services for any reason. On September 14, 2012, Dr. Schneider was excluded from participating in Medicare, effective October 14, 2012, because he had failed to report the suspension of his Wyoming medical license in January 2012. That decision was affirmed by the Department of Health and Human Services Departmental Appeals Board.

64.    Section 8.15(a)(x) provides that a Triggering Event occurs if a physician fails to maintain medical staff privileges at the ONI Center. The ONI Center's medical staff bylaws required that every physician credentialed at the ONI Center carry medical malpractice insurance. Dr. Schneider has not had malpractice insurance since January 2013.

65.    Section 8.15(a)(iii) provides that a Triggering Event occurs when a physician ceases the practice of medicine on a full-time basis. Dr. Schneider has not performed any surgeries on living persons in the United States since January of 2013. Dr. Schneider has not been credentialed or had privileges at any hospital or surgery center since January 2013.

110

66. Section 8.15(a)(vi) provides that a Triggering Event occurs when a physician "commences any voluntary proceeding under any bankruptcy...laws of any jurisdiction[.]" On December 4, 2014, Dr. Schneider filed bankruptcy under Chapter 7 of the U.S. Bankruptcy Code before the U.S. Bankruptcy Court for the District of Montana.

67. Even if the ONI Center had opened, Dr. Schneider, as an affiliated Physician of SLP, would have caused multiple Triggering Events to occur as early as October 14, 2012, but no later than December 4, 2014. With respect to each of those Triggering Events, ONI would have had the right, but not the obligation, to purchase Claimant's membership interest.

68. MSP-Montana did not breach § 7.12(a) of the ONI Operating Agreement.

69. Claimant failed to offer evidence that MSP-Montana breached § 7.12(b) of the ONI Operating Agreement. Section 7.12(b) provides that the Board of Directors may not "sell substantially all of the assets or goodwill of the LLC" without the approval by a majority of the Physician Directors.

70. Claimant failed to offer any proof that substantially all of the assets of ONI were sold (versus Western Security Bank's sale of assets) or that any sale was not approved by the necessary majority of Physician Directors. Prior to June 11, 2012, Mr. Baker requested to purchase drugs and equipment from ONI. On June 11, 2012, Mr. Baker emailed Mr. Hancock and stated: "I asked Jovanna, Kathy and you regarding me purchasing propofol, other drugs, and possibly equipment from the ASC. I have not had a reply regarding this for quite some time." In October 2012, MSP-Montana contacted healthcare facilities in and around Billings to see if they could find a purchaser for the equipment as well as third party vendors without success. MSP-Montana apprised all of the ONI investors of their efforts and next steps for a potential sale, including potential sales to other Meridian ASCs. Furthermore, MSP-Montana reported on

111

its efforts to sell equipment at the October and December 2012 ONI board meetings as reflected in the minutes from those meetings.  SLP, through its counsel and/or Dr. Schneider, and Dr. Schmidt attended those meetings.  Thus, both Dr. Schmidt and Dr. Schneider were aware that MSP-Montana was making efforts to sell substantial assets of ONI.  The sales of assets reduced ONI's debt and therefore benefitted all of the ONI investors.  Accordingly, Claimant failed to prove that substantially all of ONI's assets were sold or that the majority of the Physician Directors did not approve the sale of the assets of ONI.  Therefore, Claimant cannot prove that MSP-Montana breached § 7.12(b) of the ONI Operating Agreement.

**F.  Claimant Failed to Prove a Breach of the Implied Covenant of Good Faith and Fair Dealing**

71.     The implied covenant of good faith and fair dealing "is best understood as a way of implying terms in [an] agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap v. State Farm Fire and Casualty Co.*, 878 A.2d 434, 441 (Del. 2005) (quotations and citations omitted).  However, existing contract terms control "such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal document." *Id.*

72.     A claim for breach of the implied covenant of good faith and fair dealing generally cannot be based upon "conduct authorized by the agreement." *Nemec v. Shrader*, 991 A.2d 1120, 1125-26 (Del. 2010).  "At the same time, the covenant exists to fulfill the reasonable expectations of the parties, and thus the implied obligation must be consistent with the terms of the agreement as a whole." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).

73.     "The doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak

112

directly enough to provide an explicit answer." *Id.* "Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract. Rather the covenant is *a limited and extraordinary legal remedy*." *Nemec*, 991 A.2d at 1128 (emphasis added).

74.     Delaware courts will imply contract terms only "when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably." *eCommerce Industries, Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *33 (Del. Ch. Sept. 30, 2013) (citing *Nemec*, 991 A.2d at 1126) (internal quotations omitted).   Moreover, when a contract grants a party the right to exercise its discretion, "the implied covenant requires that the discretion be used reasonably and in good faith." *Airborne*, 984 A.2d at 146-47; *Amirsaleh v. Bd. of Trade*, 2008 WL 4182998, at *8 (Del. Ch. Sept.11, 2008) ("Simply put, the implied covenant requires that the 'discretion-exercising party' make that decision in good faith.").

75.     Claimant failed to prove that MSP-Montana breached its duties of good faith and fair dealing as imposed by Section 7.1(b) of the ONI Operating Agreement. (*See* Claimant's Pre-Hearing Brief, p. 33).   Section 7.1(b) of the Operating Agreement states that, "[e]ach of the Directors and officers of the LLC shall have the duties of good faith, loyalty and fair dealings in their actions for and [sic] dealings with the LLC and its Members."   Claimant failed to prove that MSP-Montana breached this section "by attempting to remove Dr. Schneider from participating in the OMNI ASC after May 25, 2012 and when it sold substantially all of the assets of OMNI instead of fulfilling its obligations to obtain a license, certification and accreditation." (*See* Claimant's Pre-Hearing Brief, p. 33).   Claimant also failed to prove that this section was violated

113

by the failure to disclose use of the Sharia law capital lease financing structure and "when it denied responsibility to obtain a transfer agreement[.]" *Id.*

76.   Claimant offered no evidence that any of MSP-Montana's actions were in bad faith or were arbitrary or unreasonable.

77.   Claimant failed to demonstrate how the implied covenant of good faith and fair dealing was violated by the non-Schneider investors' decision not to move forward with Dr. Schneider on May 25, 2012.  As explained above with respect to § 7.12(a) of the Operating Agreement, the ONI investors were entitled to remove a Physician Member under the explicit terms of that agreement.  A claim for breach of the implied covenant of good faith and fair dealing generally cannot be based upon "conduct authorized by the agreement." *Nemec*, 991 A.2d at 1125-26.  Moreover, Claimant failed to offer any evidence as to how the decision to move forward without Dr. Schneider was made in bad faith or was arbitrary or unreasonable. MSP-Montana and the other ONI investors reasonably believed Dr. Schneider's conduct to be detrimental to the ONI Center.  Accordingly, MSP-Montana's decision, along with the other investors in ONI, to move forward without Dr. Schneider was not made in bad faith nor was it arbitrary or unreasonable given the circumstances.

78.   Claimant failed to demonstrate how the implied covenant of good faith and fair dealing was violated through the sale of assets of ONI.  As explained above with respect to Section 7.12(b) of the Operating Agreement, Claimant failed to demonstrate how the implied covenant of good faith and fair dealing was violated through MSP-Montana's sale of the assets of ONI.  Claimant failed to prove that the decision to sell substantially all of the assets of ONI was not approved by the necessary majority of Physician Directors.  Prior to June 11, 2012, Mr. Baker requested to purchase drugs and equipment from ONI.  In October 2012, MSP-Montana

114

contacted healthcare facilities in and around Billings to see if they could find a purchaser for the equipment as well as third party vendors without success. MSP-Montana apprised all of the ONI investors of their efforts and next steps for a potential sale, including potential sales to other Meridian ASCs. MSP-Montana reported on its efforts to sell equipment at the October and December 2012 ONI Board meetings as reflected in the minutes from those meetings. SLP, through its counsel and/or Dr. Schneider, and Dr. Schmidt attended those meetings. Thus, both Dr. Schmidt and Dr. Schneider were aware that MSP-Montana was making efforts to sell assets of ONI. No witness testified that Dr. Schmidt, Dr. Schneider or Mr. Baker objected to the sales of equipment by ONI. Accordingly, Claimant failed to prove that the majority of the Physician Directors did not approve the sale of the assets of ONI.

79.     Claimant provided no evidence that MSP-Montana acted arbitrarily or unreasonably in selling the assets of ONI or that ONI's sale of assets was otherwise in bad faith. The sales of assets reduced ONI's debt and therefore benefitted all ONI investors, including SLP, and Claimant cannot show that the sale of ONI's assets caused any damages to Claimant. Because Claimant cannot prove that the sales of ONI's assets were done arbitrarily, unreasonably, or in bad faith, and because Claimant failed to establish any damages resulting from the sales of ONI's assets, Claimant's implied covenant claim fails.

80.     Claimant failed to prove that MSP-Montana violated the implied covenant of good faith and fair dealing through the alleged failure to disclose use of the Sharia law-compliant capital lease financing structure. The implied covenant of good faith and fair dealing is a limited remedy that is intended to fill gaps in contractual provisions. It does not apply it in this context where the Operating Agreement imposes duties of good faith and fair dealings. Additionally, Claimant failed to prove that it was not aware of the Sharia law capital lease financing structure.

115

Mr. Wilson testified that he discussed the financing structure and Sharia law with Dr. Schneider and that Claimant had its counsel review the documents before Dr. Schneider signed them. The POM also stated that financing would involve a capital lease, a common financing structure, as well as a loan.

81.     Even if the Sharia law-compliant aspect of the financing structure was not disclosed, as Claimant asserts, no fact or expert witness testified that Claimant suffered any damages as a result of the financing structure. Dr. Schneider admitted that he does not know if Sharia law had any economic impact on Claimant. MSP-Montana paid all additional costs of the financing structure out of its own pocket. The capital lease financing structure did not affect how much money any of the ONI investors borrowed or how much debt any of the ONI members guaranteed for the ONI project. The ONI investors' financial obligations were exactly the same under the capital lease and loan transaction as they would have been under a traditional bank loan directly to the ONI Center. Claimant failed to demonstrate any evidence that MSP-Montana acted in bad faith by using the Sharia law financing structure or that MSP-Montana acted arbitrarily or unreasonably with respect to executing the lease and loan documents necessary for the financing structure, as required to prove Claimant's implied covenant of good faith and fair dealing claim.

82.     Claimant failed to demonstrate that the implied covenant of good faith and fair dealing was violated with respect to obtaining a transfer agreement. Claimant argued that MSP-Montana "denied responsibility" for obtaining a transfer agreement, but has failed to provide any evidence supporting that allegation or establishing how that allegation amounts to a violation of the implied covenant of good faith and fair dealing. Catherine Kowalski and Jovanna Grissom were both responsible for satisfying the licensing requirements for the ONI Center, and neither

116

Ms. Kowalski nor Ms. Grissom denied that responsibility.  Throughout 2011 and 2012, both Ms. Kowalski and Ms. Grissom worked to secure licensing for the ONI Center.  A transfer agreement was one avenue that Ms. Kowalski and Ms. Grissom pursued, but it was not the only avenue for obtaining state licensure because a transfer agreement has never been a requirement to obtain a state license in Montana.  Claimant failed to provide evidence that MSP-Montana denied any responsibility to secure licensing for the ONI Center.  Accordingly, Claimant failed to demonstrate how MSP-Montana violated the implied covenant of good faith and fair dealing with respect to that claim, even if that implied covenant were found to apply.

83.    Claimant failed to prove a claim for breach of the implied covenant of good faith and fair dealing.

## G.    Claimant Failed to Prove its Promissory Estoppel Claim

84.    Under Delaware law, "[i]n order to establish a claim for promissory estoppel, a plaintiff must show *by clear and convincing evidence* that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000) (emphasis added).

85.    Claimant alleges: (1) that Meridian promised that it had the experience and ability to develop and open the ONI Center; (2) that Meridian reasonably expected Claimant to invest in the real estate entity, Claimant's clinical practice, and the ONI Center in preparation for its practice of medicine at the ONI Center; and (3) in reliance on Meridian's promise, Claimant invested in those entities to its detriment.  (*See* Claimant's Pre-Hearing Brief, p. 34).

86.    "[T]he doctrine of promissory estoppel is properly understood as a consideration *substitute* in cases where a contract has not been formed."  *See Chrysler Corp. (Delaware) v.*

117

*Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1031 (Del. 2003) (emphasis added) (citing *Lord*, 748 A.2d at 400 and *Corbin on Contracts* § 8.12, p. 101).

87.     Claimant executed both a Subscription Agreement and an Operating Agreement in connection with its purchase of a membership interest in ONI LLC.  Both of those agreements are valid contracts through which Claimant provided consideration for its membership interest in exchange for the expectation that the ONI Center would be developed and operated by MSP-Montana.  Furthermore, Claimant failed to demonstrate by clear and convincing evidence that there would be any injustice perpetuated by not enforcing the alleged promises, particularly because Claimant may properly sue under a breach of contract theory—which Claimant has, in fact, done.  Accordingly, Claimant failed to prove a promissory estoppel claim.

**H.     Claimant's Securities Claims Fail as a Matter of Law**

88.     Claimant's securities claims are time barred.

89.     Claims for violation of the Delaware Securities Act must be brought within three years of the sale of the security.  6 Del. Code Ann. § 73-605(e) ("No person may sue under this section more than 3 years after the contract of sale.").  This three-year limitation period operates as a statute of repose.

90.     Claimant invested in ONI in the summer of 2010.  Claimant did not assert a violation of the Delaware Securities Act until November 11, 2015—more than five years after the sale of an interest in ONI.

91.     Because more than three years elapsed between the date on which the security was sold and Claimant's assertion of its securities claims under Delaware law, Claimant's claims for violation of the Delaware Securities Act are time barred.

92.     Even if Delaware securities law is not deemed to apply exclusively here, Claimant's federal, Montana and Tennessee securities laws claims also are time barred because

118

each of those laws contains the statutory equivalent of a five-year statute of repose.  *See* 28 U.S.C. § 1658(b) (must be brought "not later than…5 years after such violation"); Mont. Code Ann. § 30-10-307(5) (must be "brought within 5 years after the transaction on which the action is based"); Tenn. Code Ann. § 48-1-122(h) (action must be "commenced before the expiration of five (5) years after the act or transaction constituting the violation").  Those statutes of repose are not subject to relation back principles.

93.     Courts have consistently held that the relation back doctrine does not apply to a statute of repose and cannot save claims that are otherwise barred by a statute of repose.  *See, e.g., IndyMac*, 721 F.3d at 106; *McCann v. Hy–Vee, Inc.*, 663 F.3d 926, 930 (7th Cir. 2011) (noting that a statute of repose "serves as an unyielding and absolute barrier to a cause of action"); *In re Lehman Bros. Sec. & Erisa Litig.*, 800 F. Supp. 2d 477, 483 (S.D.N.Y. 2011) ("relation back doctrine does not apply to statutes of repose"); *Baldain v. Am. Home Mortgage Servicing, Inc.*, 2010 WL 2606666, at *6 n.6 (E.D. Cal. June 28, 2010) (statutes of repose "cannot be extended through tolling, estoppel, relation back, or related doctrines); *Harris v. OSI Fin. Servs., Inc.*, 595 F. Supp. 2d 885, 898 (N.D. Ill. 2009) ("since the statutory period…is a statute of repose, Plaintiffs may not rely on the relation back doctrine or on any other equitable extensions").

94.     Claimant's federal, Montana, and Tennessee securities laws claims are based on Claimant's purchase of an interest in ONI in July 2010.  Those claims are time barred because Claimant did not assert its securities claims until November 11, 2015—more than five years after the investment was made.

95.     Thus, the Delaware three-year statute of repose and the federal, Montana, and Tennessee five-year statutes of repose bar Claimant's securities law claims regardless of whether

those claims arose out of any conduct, transaction, or occurrence set forth in previous pleadings in this matter and were triggered by the sale of interest in ONI to Claimant in the summer of 2010.

96.    Even if Claimant's Montana and Tennessee securities claims are not time barred, Claimant cannot assert Montana and Tennessee securities claims based on the facts of this case.

97.    Because the parties agreed to Delaware choice of law provisions, Claimant cannot assert claims for violations of Montana and Tennessee securities laws. *See Organ v. Byron*, 435 F. Supp. 2d 388, 391-93 (D. Del. 2006) (finding that a choice of law provision in a merger agreement required application of Delaware law and thus dismissing claims under the Illinois Securities Law); *Pyott-Boone Elecs. Inc. v. IRR Trust for Donald L. Fetterolf Dated Dec. 9, 1997*, 918 F. Supp. 2d 532, 548 (W.D. Va. 2013) (finding that a choice of law provision in a stock purchase agreement required the application of Delaware law and thus dismissing claims under the Virginia Securities Act).

98.    Even if the Delaware choice of law provisions do not prohibit other state securities law claims, Montana and Tennessee securities laws also do not apply to the facts of this case.

99.    The Securities Act of Montana applies to unlawful actions "in connection with the offer, sale, or purchase of any security, directly or indirectly, *in, into, or from this state*." Mont. Code Ann. § 30-10-301 (emphasis added).   Similarly, Tenn. Code Ann. § 48-1-121 prohibits misconduct "in connection with the offer, sale or purchase of any security *in this state*." Tenn. Code Ann. § 48-1-121(a) (emphasis added).

120

100. Claimant is a resident of Wyoming and expressly represented and warranted in its Subscription Agreement that all contacts and contracts regarding the offer and sale of ONI interests were made within Wyoming. Joint Ex. 6, p. 3.

101. Accordingly, the sale of interest in ONI to Claimant was not "in, into, or from" Montana or "in" Tennessee, and Claimant cannot assert claims under Montana and Tennessee securities laws.

102. Claimant purchased all of its interest in ONI in the summer of 2010 as part of the initial investments. Thus, Claimant cannot assert securities claims relating to the fall 2011 sales of interests in ONI LLC because Claimant did not purchase any interest in ONI in any of those transactions.

## I.   Claimant Failed to Prove that Respondents Engaged in Fraud or Misrepresentation

103. Under Delaware law, claims for negligent misrepresentation, intentional misrepresentation, constructive fraud, fraudulent inducement, and fraudulent concealment each require proof of a material misrepresentation or omission. *See e.g., Mark Fox Group, Inc. v. E.I. duPont de Nemours & Co.*, 2003 WL 21524886, *6 (Del. Ch.) (holding that plaintiffs had not proven defendant "made any misrepresentation of material fact," which is an "essential element" of a claim for negligent misrepresentation); *Williams v. White Oak Builders, Inc.*, 2006 WL 1668348, at *5-6 (Del. Ch. June 6, 2006), *aff'd sub nom. Williams v. White Oak Builders*, 913 A.2d 571 (Del. 2006) ("A claim of intentional misrepresentation, or common law fraud, requires proof...[of] the existence of a false representation, usually one of fact, made by the defendant...the claimed misrepresentation must be one of material fact."); *Duffield Associates, Inc. v. Meridian Architects & Engineers, LLC*, 2010 WL 2802409, at *4 (Del. Super. July 12, 2010) ("In order to state a claim for fraud or fraudulent inducement, a plaintiff must plead with particularity the following elements: (1) a false representation of material fact..."); *Szczerba v.*

121

*Am. Cigarette Outlet, Inc.*, 2016 WL 1424561, at *3 (Del. Super. Apr. 1, 2016) ("A prima facie case of fraudulent concealment requires a showing of: (1) deliberates concealment of a material fact or silence in the face of a duty to speak...").

104.    Claimant failed to establish any misrepresentation or omission—material or otherwise—made by Respondents with respect to their ability to obtain a transfer agreement. By 2009, Meridian and its officers and employees had significant experience developing de novo surgery centers and obtaining transfer agreements. At OrthoLink, Mr. Hancock had experience with eight de novo ASCs that obtained transfer agreements and became operational and worked on three ASCs that were in the development phase. Mr. Hancock and Ms. Kowalski also co-founded Surgical Alliance, which developed two de novo ASCs in Columbus, OH and Nashville, TN. As of 2009, Meridian held ownership in two de novo ASCs that were complete or substantially complete and two other de novo ASCs that were in the early stages of development. Prior to joining Meridian in 2010, Ms. Grissom had previously developed four de novo ASCs and secured four transfer agreements.

105.    Ms. Trier testified that when concerns regarding a transfer agreement for the ONI Center were raised, Meridian stated that it had never been unable to obtain a transfer agreement from a hospital, even when it encountered resistance from hospitals about granting transfer agreements. Those representations were true. Prior to the ONI project, Meridian had never experienced the denial of a transfer agreement for a surgery center in which it held an ownership interest. Furthermore, no fact or expert witness testified that he or she has any personal experience with an ASC that sought a transfer agreement with a hospital but was unable to obtain one other than the ONI project.

122

106.   A transfer agreement was not a stated requirement to obtain a Montana state license, and the Private Offering Memorandum clearly identified the risk that a license might not be obtained.  Respondents' expert Richard Bays testified that the risk disclosures in the Private Offering Memorandum were more extensive than in other private offering memorandums that he has reviewed for other ASC projects.  Mr. Bays also testified that private offering memorandums related to investment in ASCs typically do not disclose risks associated with obtaining a transfer agreement, and he would not expect to see such language because a transfer agreement is only one possible component of the licensure process.  Accordingly, Claimant failed to prove that Meridian made any misrepresentation or omission regarding its ability to obtain a transfer agreement.

107.   Claimant failed to demonstrate that Respondents made any material misrepresentation or omission regarding any alleged risk that Claimant's distance from Billings, Montana might pose on the ONI Center's ability to open.  Dr. Schneider represented to Meridian on the initial conference call that he had previously practiced in Billings, had a home in Billings, and was seeing patients in Billings.  Dr. Schneider explained to Meridian that people in that region of the country commonly drove up to five hours to come to the Billings market for goods and services, including healthcare.  Dr. Schneider represented to Meridian that he knew surgeons in Billings and in Cody, Wyoming with whom he had practiced who would be interested in practicing at an ASC in Billings.

108.   Respondents' expert Mr. Bays testified that it is not unusual for physicians to perform procedures at an ASC that is located 90 miles or more away from where the physicians live.  No one at either St. Vincent's or Billings Clinic ever told Jovanna Grissom that either hospital would deny a physician's application for admitting privileges if the physician did not

123

live within twenty-five miles of Billings or was unwilling to take call at the hospital. In the fall of 2012, Dr. Schmidt was able to obtain credentials at one of the Billings hospitals, even though he did not live in Billings. Accordingly, there was no risk related to Claimant's distance to Billings that Respondents failed to disclose.

109. Claimant's distance did not pose any risk to the ONI Center's ability to open and operate. Claimant's distance from Billings—if any—was not the reason that the ONI Center did not open. The ONI Center could have obtained a Montana state license and opened after Dr. Schmidt was credentialed at Billings Clinic in the fall of 2012. However, the ONI Center was not economically viable without Dr. Schneider's case revenues. Thus, Claimant failed to establish any material misrepresentation or omission related to Claimant's distance from Billings.

110. Claimant failed to demonstrate that Respondents made any material misrepresentation or omission with respect to the Sharia law compliant financing structure of the ONI Center. Mr. Wilson testified that he discussed the financing structure and Sharia law with Dr. Schneider, and Claimant had its counsel review the documents before Dr. Schneider signed the documents. The Private Offering Memorandum stated that financing would involve a capital lease, a common financing structure, as well as a loan.

111. Even if the fact that the financing structure was also Sharia law compliant had not been disclosed as Claimant asserts, no fact or expert witness testified that Claimant suffered any damages as a result of the financing structure. Dr. Schneider testified that he does not know if Sharia law had any economic impact on Claimant. MSP-Montana paid all additional costs that were incurred because the financing structure involved a capital lease and loan. The financing structure did not affect how much money any of the ONI investors borrowed or how much debt any of the ONI members guaranteed for the ONI project. The ONI investors' financial

124

obligations were the same under the capital lease and loan transaction as they would have been under a traditional bank loan directly to the ONI Center. Thus, the fact that the capital lease and loan finance transaction also satisfied Sharia law's prohibition on the receipt or payment of interest had no economic impact on the physician investors, and, therefore, was not a material fact related to the transaction.

112.   Claimant failed to demonstrate that Respondents made any material misrepresentation or omission to the other ONI investors by placing blame on Dr. Schneider for the ONI Center's failure to open. The financial projections for the ONI Center indicated that Dr. Schneider's case volume would account for 80% of the revenue of the ONI Center. On May 25, 2012, all of the ONI investors, except Claimant, participated in a phone call in which the investors unanimously agreed that they could no longer move forward with Dr. Schneider involved in the project after learning of Dr. Schneider's egregious misconduct. The ONI Center could not open unless it replaced the revenues associated with Dr. Schneider's case volume because the revenues associated with only Drs. Emery, Schmidt, and Winzenried were too low for the surgery center to operate profitably. MSP-Montana worked to find physicians to replace Dr. Schneider but was ultimately unsuccessful in doing so. Drs. Schmidt and Winzenried testified that the non-Schneider ONI investors unanimously no longer wanted to move forward with Dr. Schneider after learning about his conduct in the *Biles* litigation. Mr. Baker testified that he places blame on Dr. Schneider and his conduct for the ONI Center not opening. Claimant failed to prove that placing blame on Dr. Schneider for the ONI Center's failure to open was false or untruthful.

113.   Claimant failed to prove that Respondents made any material misrepresentation or omission to the other ONI investors that the ONI Center would be opened if one of the

125

physicians obtained admitting privileges.  Following the decision not to move forward with Dr. Schneider in May 2012, MSP-Montana still intended and attempted to open the ONI Center and continued to work towards obtaining physician credentialing.  Accordingly, its representation that the ONI Center could open if one physician obtained privileges was not false.  To achieve that outcome, MSP-Montana was simultaneously working toward finding new physicians who could replace the revenues that the ONI Center would no longer receive without Dr. Schneider. Accordingly, when Dr. Schmidt obtained privileges at Billings Clinic in the fall of 2012, opening the ONI Center was still not economically feasible because MSP-Montana had not secured physicians to replace Dr. Schneider.  Opening and operating the ONI Center at that point, with only approximately 20% of the projected revenues accounted for, would have been financially ruinous to all of the ONI investors because the ONI Center would have been operating at a significant loss.  Accordingly, Claimant failed to establish that MSP-Montana made any material misrepresentation or omission with respect to opening the ONI Center after a physician obtained privileges.

114.   Claimant   failed   to   demonstrate   that   Respondents   made   any   material misrepresentation or omission with respect to the *qui tam* lawsuit filed against Meridian. Although the lawsuit was filed in April 2011, it remained under seal until September 2012, and Meridian was not aware of the lawsuit until September 2012.  Thus, Meridian did not become aware of the lawsuit until long after Claimant had already made its investment in ONI in the summer of 2010.  Furthermore, there was no reason for Meridian to disclose the *qui tam* lawsuit to the ONI investors because it was not materially related to the ONI project.

115.   Because   Claimant   failed   to   establish   that   Respondents   made   any   material misrepresentations or omissions, Claimant failed to meet its burden of proving that Respondents

engaged in negligent misrepresentation, intentional misrepresentation, constructive fraud, fraudulent inducement, or fraudulent concealment.

**J.   Claimant Cannot Prove its Claims for Breaches of the Fiduciary Duties of Loyalty and Care[1]**

**i.   Duty of Care**

116.    Claimant failed to prove that MSP-Montana breached a duty of care by failing to "engage the Billings hospitals in any meaningful way to ascertain the continuity of care requirements necessary for receiving a transfer agreement." (Claimant's Pre-Hearing Brief, p. 52.) First, a transfer agreement was not a requirement for the ONI Center to open and operate. In addition, the evidentiary record establishes that MSP-Montana made extraordinary efforts to obtain a transfer agreement from a Billings hospital. Both Billings hospitals agreed at some point to execute a transfer agreement with the ONI Center, which illustrates MSP-Montana's

---

[1] Claimant's claims for breach of the fiduciary duties of loyalty and care must be analyzed as breach of contract claims. Under Delaware law, it is a well-settled principle that claims for breaches of fiduciary duties that arise from a transaction governed by a contract are analyzed as contract claims. As a long line of cases in Delaware make clear, "where a dispute arises from obligations that are **expressly addressed by contract,** that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be **foreclosed as superfluous.**" *Nemec,* 991 A.2d at 1129 (emphasis added); *see also Blue Chip Capital Fund II Ltd. P'ship v. Tubergen,* 906 A.2d 827, 833 (Del. Ch. 2006) (same); *Veloric v. J.G. Wentworth, Inc.,* 2014 WL 4639217, at *18 (Del. Ch. Sept. 18, 2014) ("to permit a fiduciary claim based entirely on a breach of contract to proceed alongside the primary contract claim 'would undermine the primacy of contract law over fiduciary law in matters involving . . . contractual rights.'" (quoting *Gale v. Bershad,* 1998 WL 118022, at *5 (Del. Ch. Mar. 4, 1998)). Here, Section 7.1(b) of the Operating Agreement states that, "[e]ach of the Directors and officers of the LLC shall have the duties of good faith, loyalty and fair dealings in their actions for and [sic] dealings with the LLC and its Members." Claimant alleges that MSP-Montana breached this section "by attempting to remove Dr. Schneider from participating in the OMNI ASC after May 25, 2012 and when it sold substantially all of the assets of OMNI instead of fulfilling its obligations to obtain a license, certification and accreditation." These allegations are based upon the same underlying conduct that Claimant's breach of contract claims related to the ONI Operating Agreement are based upon. Accordingly, Claimant's claims for breaches of the fiduciary duties of loyalty and care must be analyzed as breach of contract claims, and Claimant cannot separately recover under those theories.

127

reasonable and extensive efforts to obtain a transfer agreement. Claimant failed to prove a claim for breach of a duty of care.[2]

ii.   Duty of Loyalty

117.   Claimant failed to prove that MSP-Montana breached a duty of loyalty in any way. Claimant offered no evidence to establish that the Sharia law-compliant capital lease financing structure that ONI LLC entered into created a conflict of interest for MSP-Montana. Not only did Claimant offer no evidence that the capital lease structure damaged Claimant in any way, but Respondents established that ONI LLC paid less in legal costs than it would have if it had employed a traditional bank loan.

118.   Claimant did not prove that MSP-Montana breached a duty of loyalty by "persuad[ing] the Physician Members to proceed without Dr. Schneider's involvement" and "convinc[ing] the Physician Members that they could not proceed to work with Dr. Schneider given Dr. Schneider's 'conduct.'" (Claimant's Pre-Hearing Brief, p. 62-63.) The overwhelming evidence establishes that the non-Schneider ONI investors unanimously agreed not to move forward with Dr. Schneider or SLP without any persuading or convincing by MSP-Montana. That decision was well within the rights of the ONI members in response to Dr. Schneider's conduct and SLP's breaches of its own obligations and duties, was in the best interest of ONI LLC, and does not constitute a breach of a duty of loyalty as a matter of law. Claimant also acknowledges in its Pre-Hearing Brief that this claim is duplicative of its breach of contract claims; therefore, it is superfluous.

---

[2] As discussed in n.1 above, as a matter of law Claimant's claims for breaches of duty of care and duty of loyalty are superfluous in light of Claimant's breach of contract claims. Claimant's duty of care argument relating to Respondents' obligation to obtain a transfer agreement is clearly a re-casting of its claim for breach of the Management Services Agreement.

119.    Claimant did not prove that MSP-Montana breached a duty of loyalty by selling ONI assets without Physician Director approval.  Claimant offered no evidence that any sale of assets caused the ONI Center not to open or otherwise harmed Claimant in any way.  To the contrary, Respondents offered evidence that MSP-Montana's sale of ONI assets alleviated the debt obligations of all of the ONI investors, including Claimant.  Claimant also acknowledges in its Pre-Hearing Brief that this claim is duplicative of its breach of contract claims; therefore, it is superfluous.

120.    Claimant did not prove that MSP-Montana breached a duty of loyalty by attempting to salvage the ONI member's investments after May 2012.  During a June 1, 2012 ONI Board meeting, which Dr. Schmidt, Dr. Emery, and their legal counsel attended, the ONI Board approved a plan to seek an alternative use for the facility.  Dr. Schneider has no personal knowledge of MSP-Montana's attempts to salvage the ONI project after May 2012.  Claimant has offered no evidence that MSP-Montana's attempts to salvage the ONI project were improper or that they harmed it in any way. MSP-Montana's attempts to salvage the ONI members' investments after Claimant's breach of its obligations and duties to the other ONI members does not constitute a breach of a duty of loyalty as a matter of law.

**K.     Piercing the Corporate Veil of MSP-Montana to Reach Meridian**

121.    Claimant has submitted argument and citations to the hearing testimony of Meridian's CEO, John Wilson, to support its proposed conclusion that MSP-Montana is the alter ego of Meridian and that the corporate veil should be pierced to reach Meridian.[3]  Meridian has submitted argument and citations to Mr. Wilson's hearing testimony (*see* Findings 24-30 above) to support its proposed conclusion that there is no basis for piercing the corporate veil of MSP-

---

[3] *See* Claimant's Veil Piercing and Alter Ego Brief, dated September 12, 2016.

129

Montana and that Claimant's claims against Meridian fail as a matter of law.  Since no liability has been found against Respondents on any of Claimant's claims, it is not necessary to make a determination on this issue.  The same is true as to Claimant's damage claims and Respondents' response to those claims.

## INTERIM AWARD

For the reasons set forth in the above Findings of Fact and Conclusions of Law, the following Interim Award is entered:

1.  The claims of Claimant against Respondents are denied.

2.  Respondents are entitled to recover compensatory damages from Claimant in the amount of $1,609,728, plus interest in the amount of $278,070, for a total of $1,887,798.  No other pre-award interest and no post-award interest are awarded.

3.  The applicable arbitration agreement provides that the prevailing party in the arbitration shall be entitled to recover all costs, expenses and a reasonable sum for attorneys' fees incurred in bringing the arbitration.  Respondents shall have 20 days from the date of this Interim Award to submit their detailed claim for such items, Claimant shall have 20 days thereafter to submit its response, and Respondents shall have 10 days thereafter to reply.

4.  Upon receipt of the foregoing and determination of the proper amount to be awarded for such items, the Arbitrator will issue a Final Award.

Dated: October 28, 2016

David A. Ranheim, Arbitrator

130